# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____
)
ENGELHARD CORPORATION,                  )
                                        )
            Plaintiff,                  )
                                        )
        v.                              )        **Civil Action No. 05-11241-JLT**
                                        )
UNITED STATES OF AMERICA, <u>et al.</u>,       )        (*Electronic filing*)
                                        )
            Defendants.                 )
                                        )
_____)

## MEMORANDUM IN SUPPORT
## <u>OF UNITED STATES' MOTION FOR PARTIAL DISMISSAL</u>

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney
District of Massachusetts

ANTON P. GIEDT
Assistant U.S. Attorney
1 Courthouse Way
Boston, MA  02210
Tel:  (617) 748-3309
Fax: (617) 748-3967
anton.giedt@usdoj.gov

KELLY A. JOHNSON
Acting Assistant Attorney General
Environment & Natural Resources Division

STEPHEN E. CROWLEY
U.S. Department of Justice
Environmental Defense Section
P.O. Box 23986
Washington, D.C.  20026-3986
Tel: (202) 514-0165
Fax: (202) 514-8865
Stephen.Crowley@usodj.gov

October 18, 2005

<u>INTRODUCTION</u>

In this case concerning hazardous waste contamination at a former industrial manufacturing facility in Plainville, Massachusetts, Plaintiff Engelhard Corporation ("Engelhard") attempts to recover environmental response costs from the United States by asserting claims under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-75, and the citizen suit provision of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a). Engelhard also seeks to recover its cleanup costs pursuant to "federal common law" and the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

Engelhard, however, is a potentially responsible party ("PRP") under CERCLA at the Plainville facility, and Engelhard has not satisfied the clear statutory prerequisites that private PRPs must meet in order to recover their cleanup costs under Sections 107(a) or 113(f)(1) of CERCLA, 42 U.S.C. §§ 9607(a), 9613(f)(1). Engelhard's reliance on the citizen suit provision of RCRA is also misplaced, since RCRA does not waive the United States' sovereign immunity with respect to claims for response costs and does not authorize recovery of past cleanup costs by private parties. There is also no "federal common law" that authorizes Engelhard's claims, and the Declaratory Judgment Act creates no cause of action. Accordingly, with respect to the first, second, third, fifth, and sixth causes of action of Engelhard's Complaint, Engelhard has failed to state a claim on which relief can be granted, this Court lacks subject matter jurisdiction, and immediate dismissal is warranted.

<u>BACKGROUND</u>

I.    <u>LEGAL BACKGROUND</u>

A.    <u>CERCLA Cleanups and Recovery of Costs</u>

Congress enacted CERCLA in 1980 in response to the environmental and health dangers posed by property contaminated by hazardous substances.  <u>United States v. Bestfoods</u>, 524 U.S. 51, 55 (1998); <u>see</u> <u>United States v. Kayser-Roth Corp.</u>, 910 F.2d 24, 25 (1st Cir. 1990) ("[CERCLA] is a remedial statute designed to protect and preserve public health and the environment.").  CERCLA, as amended in 1986 by the Superfund Amendments and Reauthorization Act ("SARA"), Pub. L. No. 99-99, 100 Stat. 1613 (1986), "grants the President broad power to command government agencies and private parties to clean up hazardous waste sites." <u>Key Tronic Corp. v. United States</u>, 511 U.S. 809, 814 (1994).  It "both provides a mechanism for cleaning up hazardous waste sites, . . . and imposes the costs of the cleanup on those responsible for the contamination."  <u>Pennsylvania v. Union Gas Co.</u>, 491 U.S. 1, 7 (1989).

1.    <u>Government cleanups</u>

CERCLA provides the President (acting primarily through the United States Environmental Protection Agency ("EPA")) with alternative means for cleaning up contaminated property.  EPA (or, in some circumstances, other federal agencies) can undertake response actions to address hazardous substances, <u>see</u> 42 U.S.C. § 9604, or EPA can compel responsible parties (through an administrative order or a request for judicial relief) to undertake response actions, which EPA then monitors, <u>see</u> 42 U.S.C. § 9606.  Under either approach, the United States may recover the costs associated with the response action ("response costs") through an action under Section 107(a), 42 U.S.C. § 9607(a).

CERCLA Section 107(a)(4)(A) authorizes the United States, as well as other entities and persons, to seek recovery of appropriate response costs from four categories of "covered persons," referred to as "potentially responsible parties" or "PRPs." These four categories of PRPs are:

   (1)    owners and operators of facilities at which hazardous substances are located;

   (2)    past owners and operators of such facilities at the time hazardous substances were disposed of;

   (3)    persons who arranged for disposal or treatment of hazardous substances; and

   (4)    certain transporters of hazardous substances to the site.

42 U.S.C. § 9607(a)(1)-(4). A PRP can escape liability for response costs only if it can establish that it qualifies for one of the enumerated defenses in Section 107(b), 42 U.S.C. § 9607(b),[1] or one of the statutorily-defined exclusions from liability.[2]

Assuming that a PRP cannot avail itself of one of the enumerated statutory defenses to liability, Section 107(a) specifically provides that the United States, individual States, and Indian tribes are entitled to recover from PRPs "all costs of removal or remedial action incurred" that

---

[1] Section 107(b) specifies the defenses to liability and provides that a PRP will not be liable if it can establish that the release of hazardous substances "[was] caused solely by – (1) an act of God; (2) an act of war; (3) an act or omission of a third party, other . . . than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant . . . if the defendant establishes . . . that (a) he exercised due care with respect to the hazardous substance concerned . . . and (b) he took precautions against foreseeable acts or omissions of any such third party . . . ." 42 U.S.C. § 9607(b).

[2] See, e.g., 42 U.S.C. §§ 9607(n) (liabilities of fiduciaries and certain exclusions), 9607(q) (contiguous properties), 9607(r) (bona fide prospective purchasers).

are "not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A).[3]  In

addition, Section 107 provides that PRPs "shall be liable for [] any other necessary costs of

response incurred by any other person consistent with the national contingency plan." 42 U.S.C.

§ 9607(a)(4)(B).

2.   <u>Private Party cleanups</u>

Private parties also conduct cleanups of hazardous substances.  Several courts of appeals

have concluded that parties who are <u>not</u> PRPs (<u>i.e.</u>, not liable parties) may clean up contaminated

property and then invoke Section 107(a)(4)(B) of CERCLA to seek reimbursement from parties

that are PRPs.  <u>See</u> <u>United Techs. Corp. v. Browning-Ferris Indus.</u>, 33 F.3d 96, 100 (1st Cir.

1994).[4]  Critically, however, nine courts of appeals, including the First Circuit, have concluded

that a private party who is itself a PRP <u>cannot</u> rely solely on Section 107(a)(4)(B) to recover

response costs directly from another liable party; rather, the private PRP is limited to seeking

<u>contribution</u> from other liable parties pursuant to CERCLA Section 113(f), 42 U.S.C. § 9613(f).

<u>See</u> <u>United Techs. Corp.</u>, 33 F.3d at 103.[5]

---

[3]  "The national contingency plan specifies procedures for preparing and responding to
contaminations and was promulgated by the [EPA] pursuant to CERCLA § 105, 42 U.S.C.
§ 9605 (2000 ed. and Supp. I). The plan is codified at 40 C.F.R. pt. 300 (2004)." <u>Cooper Indus.,
Inc. v. Aviall Servs., Inc.</u>, 125 S. Ct. 577, 581, n.2 (2004).

[4]  <u>See also</u> <u>In re Reading Co.</u>, 115 F.3d 1111, 1120 (3d Cir. 1997); <u>Rumpke of Ind., Inc. v.
Cummins Engine Co.</u>, 107 F.3d 1235, 1242-43 (7th Cir. 1997); <u>Redwing Carriers, Inc. v.
Saraland Apartments</u>, 94 F.3d 1489, 1496 (11th Cir. 1996); <u>Akzo Coatings, Inc. v. Aigner Corp.</u>,
30 F.3d 761, 764 (7th Cir. 1994).

[5]  <u>See also</u> <u>Dico, Inc. v. Amoco Oil Co.</u>, 340 F.3d 525, 530-31 (8th Cir. 2003); <u>Bedford
Affiliates v. Sills</u>, 156 F.3d 416, 423-25 (2d Cir. 1998); <u>Centerior Serv. Co. v. Acme Scrap Iron
& Metal Corp.</u>, 153 F.3d 344, 356 (6th Cir. 1998); <u>Pneumo Abex Corp. v. High Point,
Thomasville & Denton R.R.</u>, 142 F.3d 769, 776 (4th Cir. 1998); <u>New Castle County v.
Halliburton NUS Corp.</u>, 111 F.3d 1116, 1120-24 (3d Cir. 1997); <u>Pinal Creek Group v. Newmont</u>

-4-

Section 113(f) of CERCLA, which was added to CERCLA in 1986, contains two provisions that provide an express cause of action for contribution. One provision, Section 113(f)(1), provides:

> Any person may seek contribution from any other person who is liable or potentially liable under [Section 107(a)], during or following any civil action under [Section 106] or under [Section 107(a)]. . . . Such claims . . . shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.

42 U.S.C. § 9613(f)(1). In <u>Cooper Industries, Inc. v. Aviall Services., Inc.</u>, 125 S. Ct. 577 (2004) ("<u>Aviall</u>"), the Supreme Court construed this provision to hold that a private PRP who has not been subject to a civil action under Sections 106 or 107(a) of CERCLA may not seek contribution under Section 113(f)(1) from other jointly liable parties. <u>See</u> 125 S. Ct. at 583-84.

The second express right of contribution is contained in Section 113(f)(3)(B), and is available to

> [a] person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement.

42 U.S.C. § 9613(f)(3)(B).[6]

---

Mining Corp., 118 F.3d 1298, 1301 (9th Cir. 1997); <u>Redwing Carriers</u>, 94 F.3d at 1496; <u>Control Data Corp. v. S.C.S.C. Corp.</u>, 53 F.3d 930, 935 (8th Cir. 1995); <u>United States v. Colorado & E. R.R.</u>, 50 F.3d 1530, 1534-36 (10th Cir. 1995); <u>Akzo Coatings</u>, 30 F.3d at 764. In addition, the Fifth Circuit, although it does not appear to have directly addressed this issue, has recognized that "[w]hen one liable party sues another to recover its equitable share of the response costs, the action is one for contribution, which is specifically recognized under CERCLA." <u>Amoco Oil Co. v. Borden, Inc.</u>, 889 F.2d 664, 672 (5th Cir. 1989).

[6] Section 113(f)(2) of CERCLA states that a party that resolves its liability to the United States or a State through an administrative or judicially approved settlement shall not be subject to contribution "regarding matters addressed in the settlement." 42 U.S.C. § 9613(f)(2).

In summary, therefore, "CERCLA provide[s] for a right to cost recovery in certain circumstances, § 107(a), and separate rights to contribution in other circumstances, §§ 113(f)(1), 113(f)(3)(B)." Aviall, 125 S. Ct. at 582; see also id. at 582 n.3 (noting that "the two remedies," i.e., a claim for response costs under Section 107 and contribution remedies under Section 113(f)(1) or (f)(3)(B), "are clearly distinct"); United Techs. Corp., 33 F.3d at 98-100 ("The statutory language . . . suggests that cost recovery and contribution actions are distinct and do not overlap.").[7]

B.      RCRA Regulation and Citizen Suits

Prior to enacting CERCLA, Congress enacted the Resource Conservation and Recovery Act of 1976 ("RCRA"), Pub. L. No. 94-580, 90 Stat. 2795 (1976), 42 U.S.C. §§ 6901-92k, to address the serious environmental and health dangers arising from the generation, management, and disposal of waste at active sites. RCRA's primary purpose is to reduce the generation of hazardous waste and to ensure proper storage, transportation, and disposal of hazardous wastes 42 U.S.C. § 6902(b); see Meghrig v. KFC Western, Inc., 516 U.S. 479, 483 (1996); City of Chicago v. Envtl. Def. Fund, 511 U.S. 328, 331 (1994) (describing the Congressional mandate of "cradle-to-grave" regulation of hazardous wastes under Subtitle C of RCRA, 42 U.S.C. §§ 6921-39e); American Chemistry Council v. EPA, 337 F.3d 1060, 1062 (D.C. Cir. 2003).[8] Facilities

---

[7] The similarity between these two types of actions lies in the fact that the liability elements for both actions are determined according to Section 107(a)'s terms, 42 U.S.C. § 9607(a). See 42 U.S.C. § 9613(f)(1) ("Any person may seek contribution from any other person who is liable or potentially liable under section [107(a)] of this title."); Acushnet Co. v. Mohasco Corp., 191 F.3d 69, 75 (1st Cir. 1999).

[8] Congress broadly defined "hazardous waste" as "a solid waste" which "may . . . pose a substantial present or potential hazard to human health or the environment when improperly . . . managed." 42 U.S.C. § 6903(5). "Solid waste" includes all "discarded material, including solid,

that treat, store, or dispose of hazardous wastes are required to have a RCRA permit issued by an

authorized state or EPA. 42 U.S.C. §§ 6924-25. "Recognizing that EPA could not issue permits

to all affected facilities before . . . RCRA's effective date, Congress provided that existing

facilities meeting certain requirements could operate on an 'interim status' basis until final

agency action could be taken on a facility's permit application. 42 U.S.C. § 6925(e)." Fla.

Power & Light Co. v. EPA, 145 F.3d 1414, 1416 (D.C. Cir. 1998).

      In part to address the concern that releases from RCRA facilities posed a threat to human

health and the environment, Congress in 1984 amended the statute by expanding EPA's

authority to require facilities to undertake "corrective action" for releases of hazardous waste

from any "solid waste management unit" at a facility regardless of when the waste was

deposited. 42 U.S.C. §§ 6924(u), 6928. With respect to permitted facilities, Section 3004(u) of

RCRA provides that any permit issued to a facility after November 8, 1984

> shall require . . . corrective action for all releases of hazardous waste or
> constituents from any solid waste management unit at a treatment, storage, or
> disposal facility seeking a permit under this subchapter, regardless of the time at
> which waste was placed in such unit.

42 U.S.C. § 6924(u). In Section 3008(h), 42 U.S.C. § 6928(h), Congress provided EPA with

corresponding authority to require corrective action at interim status facilities.[9]

_____

liquid, semisolid, or contained gaseous material resulting from industrial [or] commercial . . .
operations." 42 U.S.C. § 6903(27); see also 40 C.F.R. § 261.2 (regulatory definition of "solid
waste").

[9] See H.R. Conf. Rep. No. 98-1133, at 110-11 (1984), reprinted in 1984 U.S.C.C.A.N. 5682
("EPA should have the power to deal directly with an ongoing environmental problem without
awaiting issuance of a final permit. Accordingly, [Section 3008(h)] has been added . . . to allow
EPA to seek corrective action for release of hazardous waste into the environment through an
administrative order or through a civil action in Federal district court.").

Where a facility may present an "imminent and substantial endangerment" to human health and the environment, Section 7003 of RCRA authorizes EPA to issue an administrative order or bring a lawsuit to secure appropriate injunctive relief.  42 U.S.C. § 6973.  Section 7002 of RCRA also authorizes private citizens — after they provide 90 days prior notice — to bring similar types of suits to address potential imminent and substantial endangerments.  42 U.S.C. §§ 6972(a)(1)(B), 6972(b)(2)(A).  However, such citizen suits are expressly precluded in some specified circumstances where either the State or EPA has or is already taking action under certain provisions of RCRA or CERCLA to abate the acts or conditions that contributed (or are contributing) to the cited threat.  42 U.S.C. § 6972(b)(2)(B) and (b)(2)(C).  In addition, in Meghrig v. KFC Western, Inc., 516 U.S. 479 (1996), the Supreme Court held that the RCRA citizen suit provision does not authorize claims for the reimbursement of "past costs," i.e., abatement costs incurred before the citizen claim is brought.  See id. at 484, 488.

II.    FACTUAL BACKGROUND

Between 1957 and 1993, the Plaintiff, Engelhard Corporation, including its corporate predecessors-in-interest, built, owned, and operated a manufacturing facility (hereinafter "Facility") on an 18.3 acre site located on State Route 152 in Plainville, Massachusetts.  Compl. ¶¶ 14-54.[10]  During this time period, hazardous wastes were released into the environment as a result of spills and disposals by Engelhard.  Compl. ¶¶ 51, 54.

On September 9, 1993, Engelhard and the United States Environmental Protection Agency ("EPA") entered into an Administrative Order on Consent ("AOC") regarding the

---

[10] For the purposes of this motion only, the United States presumes that the factual allegations in the Complaint are true.

Facility.  Compl. ¶ 56.  (Relevant portions of the AOC are attached hereto as Ex. 1.)  The AOC

was issued pursuant to EPA's authority under Section 3008(h) of RCRA, 42 U.S.C. § 6928(h),

which empowers EPA to issue corrective action orders to "interim status" facilities, such as

Engelhard's Plainville Facility.  See Ex. 1.[1/]  Pursuant to the AOC, Engelhard hired

environmental cleanup contractors to conduct site investigations and mitigate and prevent

hazardous constituents from migrating off-site.  Compl. ¶ 57.  As of December 31, 2004,

Engelhard allegedly had incurred environmental contractor costs at the Facility that exceed

$15,000,000.  Id.

    This lawsuit, which was filed on June 13, 2005, attempts to recover from the United

States all or, alternatively, some of the environmental contractor costs incurred by Engelhard at

the Facility.  Id. ¶¶ 62-71 (seeking "Cost Recovery of All Environmental Response Costs"); id.

¶¶ 72-74 (seeking "Contribution Under CERCLA §107(a)(4)(B)"); id. ¶ 87 ("Defendants are

liable . . . for any and all past and future environmental response costs . . . .").  Pursuant to the

Declaratory Judgment Act and Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2),

Engelhard also seeks a declaration that the United States is liable for "any and all" of the

response costs to be incurred in the future at the Facility.  Id. ¶¶ 88-91.

    According to Engelhard, the United States is liable under CERCLA because Engelhard

produced and processed radioactive materials (i.e., nuclear fuels) for the United States at the

Facility.  Compl. ¶ 31.  Engelhard alleges the United States exercised a degree of control over

the nuclear manufacturing operations that was sufficient to make the United States liable as a

---

[1/] The AOC explains that the Engelhard Facility was "authorized, at all times relevant to this
Consent Order, to operate" as a hazardous waste interim status facility under Section 3005(e) of
RCRA, 42 U.S.C. § 6925(e).  See Ex. 1, at 16.

past "operator" of the Facility under Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).  Id. ¶¶ 18-29, 65.  Engelhard also alleges that the United States owned certain radioactive materials at the Facility and arranged for their disposal or treatment at the Facility, which makes the United States an "arranger" under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).  Id. ¶¶ 30-37, 66.  Furthermore, Engelhard alleges that the United States Mint is a liable person under CERCLA because Engelhard produced silver-copper alloy clad, or "sandwich" coin blanks and coin stock for the United States Mint, which resulted in numerous spills and releases at or from the Facility.  Id. ¶¶ 44-51.

Engelhard argues that as a matter of law, it is "an innocent party under CERCLA within the meaning of Section 107(b)(3), 42 U.S.C. § 9607(b)(3)."  Compl. ¶ 70.  However, Engelhard's Complaint is entirely devoid of any factual allegations that would support the "third party" defense under Section 107(b)(3).  Finally, Engelhard does not allege that it has been sued pursuant to Sections 106 or 107(a) of CERCLA with regard to the hazardous wastes that have been released into the environment at the Facility.

## STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims for relief.  Andrews-Clarke v. Lucent Techs., Inc., 153 F. Supp. 2d 93, 98 (D. Mass. 2001).  A court must dismiss for failure to state a claim when, accepting all well-pled factual allegations in the complaint as true and drawing all reasonable inferences from them in favor of the plaintiff, see id., "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  "This formulation does not mean, however, that a court must (or should) accept every allegation made

-10-

by the complainant, no matter how conclusory or generalized." United States v. AVX Corp., 962 F.2d 108, 115 (1st Cir. 1992). As the First Circuit has repeatedly stated: "'Modern notions of 'notice pleading' notwithstanding, a plaintiff . . . is nonetheless required to set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'" Boston & Maine Corp. v. Town of Hampton, 987 F.2d 855, 867 (1st Cir. 1993) (quoting Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988)) (emphasis added).

In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(1) where, as here, the defendant attacks solely the sufficiency of the allegations in the claim for relief, the well-pled factual allegations in the claim must be taken as true and viewed in light most favorable to the plaintiff. See Estate of Davis ex rel. Davis v. United States, 340 F. Supp. 2d 79, 82-83 (D. Mass. 2004); Valentin v. Hospital Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001). In other words, a facial motion to dismiss under Rule 12(b)(1) presents a purely legal question. As such, the Court should not accept as true any legal allegations of subject matter jurisdiction. See Papasan v. Allain, 478 U.S. 265, 286 (1986). As Plaintiff, Engelhard bears the burden of demonstrating the Court's subject matter jurisdiction. See Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994).

<u>ARGUMENT</u>

I.    ENGELHARD, AS A POTENTIALLY RESPONSIBLE PARTY WITHOUT A DEFENSE TO LIABILITY, HAS NO CLAIM TO RECOVER RESPONSE COSTS UNDER SECTION 107(a) OF CERCLA.

The first two claims in Engelhard's Complaint seek to recover costs pursuant to Section 107(a) and Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a) and 9607(a)(4)(B). See

Compl. ¶¶ 62-71 ("First Cause of Action," invoking Section 107(a)); id. ¶¶ 72-74 ("Second

Cause of Action," invoking Section 107(a)(4)(B)).  One distinction between the two claims is

that the first claim seeks recovery on a "joint and several" liability basis, id. ¶ 71, while the

second claim seeks "contribution," or recovery on a several liability basis, id. ¶ 74.  Whether

classified as a joint and several claim or contribution claim, however, makes no difference here,

because a private PRP may bring a claim arising solely under Section 107(a) of CERCLA to

recover response costs only if the PRP is "innocent," i.e., only if it can demonstrate that it

qualifies for one of the enumerated defenses in Section 107(b), or a statutorily defined exclusion

from liability.  See United Techs. Corp., 33 F.3d at 100.  In the instant case, because Engelhard

is a PRP without an affirmative defense to or exclusion from liability, it cannot bring a claim

solely under Section 107(a) to recover its response costs.  Rather, as a PRP without a defense to

liability, Engelhard is limited to seeking contribution in accordance with the provisions of

Section 113(f) of CERCLA.

        This conclusion, which has been reached by ten courts of appeals, including the First

Circuit, is not affected at all by the Supreme Court's recent decision in Aviall.  The Aviall Court

expressly "decline[d] to address the issue" as a matter of judicial "pruden[ce]." 125 S. Ct. at 584-

85.  Thus, nothing in the Aviall opinion casts doubt on the holdings or rationales of the

"numerous" decisions of the courts of appeals on this issue.  Id. at 585.

        The reasoning employed by a panel of the Second Circuit that recently construed the

scope of Section 107(a) claims after Aviall, Consolidated Edison Co. of New York, Inc. v. UGI

Utilities, Inc., 423 F.3d 90 (2d Cir. 2005), is unpersuasive and in conflict with CERCLA's

statutory scheme.  Moreover, the actual holding of that decision, if applied here, would by its

own terms have no bearing on the viability of Engelhard's Section 107 claims.

A.     Engelhard Is A Potentially Responsible Party Without A Defense Or Exclusion To Liability.

The allegations in the Complaint establish that Engelhard is a PRP under CERCLA with respect to the contamination at the Facility.  For example, Engelhard alleges that from 1957 through 1993, numerous hazardous substances were disposed of at the Facility, Compl. ¶¶ 49, 51, 54, and that during this same time period, Engelhard owned and operated the Facility, including the waste handling and disposal operations at the Facility.  See id. ¶¶ 14, 17, 26-27, 35, 44, 48, 50, 52-54.  Thus, the Complaint contains factual allegations that conclusively establish that Engelhard is liable as a past "owner" and "operator" under CERCLA.  See 42 U.S.C. § 9607(a)(2).[17]

The only way that Engelhard can escape liability under CERCLA is to establish that it falls under one of the defenses enumerated in Section 107(b), see note 1 at p. 3, supra, or certain other statutorily defined exclusions to liability, see note 2 at p. 3, supra.  Engelhard makes a

---

[17] Moreover, the 1993 AOC concerning the Facility — the terms and existence of which Engelhard relies upon extensively to support its causes of action, see Compl. ¶¶ 56-57, 80-82 — contains numerous detailed factual findings that clearly establish that Engelhard is a PRP without a defense to liability.  See, e.g., Ex. 1, at pp. 8-16 ("Engelhard owns and operates the Facility;" "Engelhard's Facility commenced operations in 1957;" "Wastes generated at various times as a result of [the Facility's] processes included: waste water containing cyanide, chromium, and/or acid/alkaline waste streams; solvents; pollution control dust; and metal hydroxide sludge.").  Although a copy of the AOC was not attached to Engelhard's Complaint, this Court may properly consider contents of the AOC without coverting this Rule 12(b) motion into one for summary judgment.  See Watterson v. Page, 987 F.2d 1, 3-4 (1st Cir. 1993); e.g., Cadlerock Properties Joint Venture, L.P. v. Schilberg, No. 3:01CV896 (MRK), 2005 WL 1683494, at *2 (D. Conn. July 19, 2005) (deciding not to convert a Rule 12(b) motion to dismiss) ("Not only was [Plaintiff] fully aware of the DEP Order, it is, according to [Plaintiff], one of the underlying reasons that the company brought this action for contribution, because the DEP Order imposes cleanup costs on [Plaintiff] that it hopes will be shared by Defendants.").

purely legal assertion that it is an "innocent party under CERCLA within the meaning of Section 107(b)(3), 42 U.S.C. § 9607(b)(3)." Compl. ¶ 70. However, the Complaint fails to contain a single allegation of fact that would support a "third party" affirmative defense under Section 107(b)(3) of CERCLA, or exclusion from liability under any other provision (which are inapplicable to this case). Indeed, Engelhard's conclusory allegation flies in the face of the fact that Engelhard operated a RCRA-regulated treatment, storage, and disposal facility for a number of years.

Therefore, on the face of the Complaint,[13] Engelhard is a PRP without a defense to liability under CERCLA.

> **B.** **Section 107(a) of CERCLA Does Not Provide A Potentially Responsible Party That Lacks A Defense To Liability, Such As Engelhard, With An Express or Implied Cause of Action To Recover Response Costs.**

> **1.** **Engelhard cannot recover costs on joint and several liability basis.**

Engelhard's first cause of action — seeking recovery on a joint and several liability basis solely under Section 107(a) of CERCLA — must be dismissed because the claim is properly characterized as a contribution claim, and thus falls within the ambit of Section 113(f). Engelhard is a PRP under CERCLA without a defense to liability. The First Circuit and other courts of appeal have concluded that a CERCLA claim by a PRP against another PRP is necessarily a claim for contribution. See United Techs. Corp., 33 F.3d at 101; New Castle

---

[13] Compare Gooley v. Mobil Oil Corp., 851 F.2d 513, 514 (1st Cir. 1988) (under Rule 12(b)(6), "court must accept well-pled factual averments . . . exempting, of course, those 'facts' which have since been conclusively contradicted by [plaintiff's] concessions or otherwise").

County, 111 F.3d at 1120; Pinal Creek Group, 118 F.3d at 1303 (and cases cited therein).[14]  As

such, Engelhard is not entitled to bring a joint and several liability claim under Section 107(a) of

CERCLA.

> 2.     Section 107(a)(4)(B) by itself does not contain an express right to
>        contribution.

There is also no express statutory basis for Engelhard's second cause of action, a

purported contribution claim arising solely under Section 107(a)(4)(B) of CERCLA.  Section

107(a)(4)(B)'s terms do not authorize a right to contribution in favor of a private PRP.  While

Engelhard may contend that Section 107(a)(4)(B)'s reference to "any other person" is broad

enough to render a PRP liable for another PRP's response costs, that provision only describes

liable parties and lists the elements of a claim for response costs.  There is no express mention of

a private PRP's right to recover costs from another PRP.  See In re Reading Co., 115 F.3d at

1117 ("Section 107 establishes CERCLA's basic framework under which persons are liable for

past environmental harms."); id. at 1118 (recognizing that Section 107(a)(4)(B) "lack[s] any

express mechanism" by which one PRP could recoup response costs from another).  In sum,

Section 107(a)(4)(B) does not by itself expressly confer a right on PRPs to bring a claim for the

recovery of response costs.[15]

---

[14] These courts have noted that "the term 'contribution' is a standard legal term that refers to a
claim 'by and between jointly and severally liable parties for an appropriate division of the
payment one of them has been compelled to make.'"  New Castle County, 111 F.3d at 1121
(quoting United Techs. Corp., 33 F.3d at 99, in turn quoting Akzo Coatings, 30 F.3d at 764).

[15] The conclusion that Section 107 does not provide an express right to contribution is confirmed
by the 1980 legislative history:  Congress considered contribution provisions but rejected them
prior to passage of Section 107.  See 126 Cong. Rec. 30,909 (Nov. 24, 1980); 126 Cong. Rec.
26,780, 26,784 (Sept. 23, 1980).

When Sections 107(a)(4)(B) and Section 113 of CERCLA are properly read in conjunction, however, see United Techs. Corp., 33 F.3d at 101, and cases cited at note 5, supra; see also King v. St. Vincent's Hosp., 502 U.S. 215, 221(1991) (congressional enactments should be construed in light of the "the cardinal rule that a statute is to be read as a whole"), it becomes clear that PRPs have a right of contribution under Section 113, which provides the details as to when and under what circumstances a PRP may initiate and maintain an action in contribution against another PRP. Thus, as the First Circuit and nine other courts of appeals have held, after the addition of Section 113 by SARA, a CERCLA contribution action is governed by Section 113. See United Techs. Corp., 33 F.3d at 103.[16]

---

[16] Other relevant courts of appeals cases include: Dico, 340 F.3d at 530-31 ("[T]here is overwhelming authority among the circuits to support the . . . argument that PRPs are limited to actions for contribution. Accordingly, we hold Dico may not bring an action against . . . for direct recovery unless it can establish it falls within one of the enumerated defenses set out in § 107(b)"); Bedford Affiliates, 156 F.3d at 424 ("The language of CERCLA suggests Congress planned that an innocent party be able to sue for full recovery of its costs, i.e., indemnity under § 107(a), while a party that is itself liable may recover only those costs exceeding its pro rata share of the entire cleanup expenditure, i.e., contribution under § 113(f)(1)"); New Castle County, 111 F.3d at 1120 ("An action brought by a potentially responsible person is by necessity a section 113 action for contribution"); Centerior Serv., 153 F.3d at 350 ("Claims by PRPs . . . seeking costs from other PRPs are necessarily actions for contribution, and are therefore governed by the mechanisms set forth in § 113(f)"); Pneumo Abex, 142 F.3d at 776 ("[S]ection [113] must be used by parties who are themselves potentially responsible parties"); Pinal Creek, 118 F.3d at 1302 ("Under CERCLA's scheme, section 107 governs liability, while section 113(f) creates a mechanism for apportioning that liability among responsible parties"); Redwing Carriers, 94 F.3d at 1513 ("[W]hen one liable party sues another liable party under CERCLA, the action is not a cost recovery action under § 107(a). Rather, it is a claim for contribution under § 113(f)"); Colorado & E. R.R., 50 F.3d at 1536 ("Whatever label Farmland may wish to use, its claim remains one by and between jointly and severally liable parties for an appropriate division of the payment one of them has been compelled to make . . . controlled by § 113(f)"); Akzo Coatings, 30 F.3d at 764 ("Whatever label Akzo may wish to use, its claim remains one by and between jointly and severally liable parties for an appropriate division of the payment one of them has been compelled to make. Akzo's suit accordingly is governed by section 113(f)").

3.    There is no implied right of contribution arising from Section 107(a)(4)(B).

      a.    The background of Section 113's enactment shows that Congress intended for Section 113 to govern all contribution actions brought under CERCLA.

In the years following CERCLA's enactment in 1980, courts generally held that the United States or a State, when bringing actions under Section 107(a) to recover its own response costs, could recover on a joint and several liability basis from any defendant who caused a harm indivisible from that caused by other PRPs. E.g., United States v. Chem-Dyne Corp., 572 F. Supp. 802, 808-10 (S.D. Ohio 1983); see United Techs. Corp., 33 F.3d at 100 (detailing history of case law).[17] The original CERCLA statute, however, did not contain any specific mechanism that would allow one PRP to seek contribution from other PRPs, and thus avoid a potentially disproportionate result. United Techs. Corp., 33 F.3d at 100; Centerior Serv., 153 F.3d at 348. Courts were thus uncertain whether Section 107(a) also gave private PRPs who had incurred more than their fair share of cleanup costs a right to seek contribution, i.e., to sue other PRPs to recover that portion of their incurred costs which exceeded their actual share of responsibility for the overall harm. See United Techs., 33 F.3d at 100.[18]

---

[17] This was an open question only because Section 107(a) does not expressly provide for joint and several liability in cases involving multiple defendants. See Chem-Dyne, 572 F. Supp. at 808. Rather, Congress left the question regarding the nature of liability to be determined by the courts using principles developed under the common law. See id.; United States v. Alcan Aluminum Corp., 964 F.2d 252, 268-69 (3d Cir. 1992). Relying on the Restatement (Second) of Torts, therefore, courts have generally held defendants jointly and severally liable in cost recovery actions brought under Section 107(a) on behalf of the Superfund (the "injured party"). See, e.g., O'Neil v. Picillo, 883 F.2d 176, 178 (1st Cir. 1989). This rule enables the United States to obtain full recovery of Superfund expenditures from those responsible parties.

[18] Pre-SARA, district courts were divided on the questions of whether there was an implied right to contribution under CERCLA, the source of such authority, and the timing for such actions. See, e.g., United States v. New Castle County, 642 F. Supp. 1258, 1261-69 (D. Del. 1986) (no

In 1986, Congress passed SARA, which included a new Section 113. "A principal goal of the new section [113] was to 'clarif[y] and confirm[] the right of a person held jointly and severally liable under CERCLA to seek contribution from other potentially liable parties, when the person believes that it has assumed a share of the cleanup or cost that may be greater than its equitable share under the circumstances.'" Id. (quoting H.R. Rep. No. 99-253(I), at 79 (1985), reprinted in 1986 U.S.C.C.A.N. 2835, 2861). The legislative history confirms that Congress meant to permit contribution only when the underlying liability had been or was in the process of being resolved. For example, the House Report states:

> The section should encourage private party settlements and cleanups. Parties who settle for all or part of a cleanup or its costs, or who pay judgments as a result of litigation, can attempt to recover some portion of their expenses and obligations in contribution litigation from parties who were not sued in the enforcement action or who were not parties to the settlement.

H.R. Rep. No. 99-253(I), at 80 reprinted in 1986 U.S.C.C.A.N. at 2862.

"Thus, the language of § 113(f), permitting contribution, replaced the judicially created right to contribution under § 107(a)(4)(B)," and became "the sole means for seeking contribution." In re Reading, 115 F.3d at 1119-20 (emphasis added).[19] As such, after SARA, if a

---

express or implied right to contribution under Section 107, but authority for right under federal common law); Bulk Distrib. Ctrs., Inc. v. Monsanto Co., 589 F. Supp. 1437, 1444 (S.D. Fla. 1984) ("While private cost recovery actions are permissible under CERCLA, courts disagree on when a claimant may commence its lawsuit."); United States v. Westinghouse Elec. Corp., 1983 WL 160587 (S.D. Ind. 1983) (no right to contribution); City of Philadelphia v. Stepan Chem. Co., 544 F. Supp. 1135 (E.D. Pa. 1982) (permitting City, the land owner, to pursue claim for response costs against responsible parties under Section 107).

[19] See also New Castle County, 111 F.3d at 1122 ("The history and language of section 113 lend support to our conclusion that it, and not section 107, is the appropriate mechanism for obtaining a fair allocation of responsibility between two or more potentially responsible persons."); Pinal Creek Group, 118 F.3d at 1302 (finding the legislative history supports the conclusion that Section 113 qualifies a right to contribution that pre-SARA courts had implied from Section 107, so that the contours and mechanics of any contribution action under CERCLA are governed and

PRP cannot bring a CERCLA contribution claim in conformity with limitations on such actions imposed by Section 113(f), it cannot bring it under CERCLA at all.

> b.    The text of the statute does not support an implied right of contribution in instances where the express preconditions set forth in Section 113(f)(1) or 113(f)(3) are not met.

Engelhard may argue that the language of Section 107(a)(4)(B) supports the implication of a private right to contribution. However, the existence of Section 113(f) — a provision expressly dictating the contours of a contribution remedy — combined with the absence of any express contribution right in Section 107, weighs heavily against the recognition of an implied right of contribution under Section 107(a)(4)(B) that is not subject to the express limitations on contribution provided by Section 113(f).

The Supreme Court has warned against the judicial implication of private rights of action not specifically authorized by Congress. See, e.g., Alexander v. Sandoval, 532 U.S. 275, 287-88 (2001); Correctional Servs. Corp. v. Malesko, 534 U.S. 61, 67 & n.3 (2001); Gonzaga Univ. v. Doe, 536 U.S. 273, 283-84 (2002). The Court has instructed that "[i]n the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate." Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 15 (1981). Similarly, the Court has stated that "where Congress has provided 'elaborate enforcement provisions' for remedying the violation of a federal statute, as Congress has done with RCRA and CERCLA, 'it cannot be assumed that Congress intended to authorize by implication additional judicial remedies for private citizens suing under' the statute." Meghrig v. KFC Western, Inc., 516 U.S. 479, 487-88 (1996) (quoting

---

regulated by Section 113).

-19-

Middlesex County Sewerage Auth., 453 U.S. at 14-15); Northwest Airlines v. Transp. Workers Union, 451 U.S. 77, 93-94 (1981) (express statutory provisions allowing private enforcement "in certain carefully defined circumstances" and enforcement by the federal government in other circumstances, "strongly evidence[] an intent not to authorize additional remedies"). Finally, it is an "elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 19 (1979); see also Meghrig, 516 U.S. at 488; Northwest Airlines, 451 U.S. at 95 n. 34. In Northwest Airlines, the Court stated that the "'frequently stated principle of statutory construction . . . that when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies'" applied with full force to a putative implied right to contribution. 451 U.S. at 94 n.30 (quoting Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers, 414 U.S. 453, 458 (1974)). In light of these governing principles, it is incorrect to focus on the language of Section 107(a)(4)(B) alone to determine if it creates an implied contribution right. See also Koons Buick v. Nigh, 125 S. Ct. 460, 466 (2004) (quoting United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988)).

Even if the language of Section 107(a)(4)(B) were sufficiently broad and ambiguous to imply a contribution right, the fact that Section 113(f) expressly addresses and defines the procedural preconditions and parameters for a contribution remedy strongly evidences that Section 107(a)(4)(B) does not provide a stand-alone contribution remedy free of the preconditions on contribution set forth in Section 113(f). See Koons Buick, 125 S. Ct. at 467 ("a provision that may seem ambiguous in isolation is often clarified by the remainder of the

-20-

statutory scheme").  Thus, even if pre-SARA courts correctly allowed contribution claims based

solely on a contribution right implied from Section 107, that implication and result is necessarily

altered by SARA's addition of the express contribution remedy.  Cf. U.S. v. Fausto, 484 U.S.

439, 451-55 (1988) (judicial task of reconciling laws enacted over time necessarily assumes that

implications of an earlier statute may be altered by implications of a later statute).   Stated

differently, after SARA, any right to contribution under CERCLA that can be implied from the

language of Section 107(a)(4)(B) is qualified by the express limitations on a contribution remedy

set forth Section 113(f).

Furthermore, if Section 107(a)(4)(B) were understood to provide an independent right to

contribution in the absence of a Section 106 or 107 civil action or settlement, that would render

Section 113(f)(1) and Section 113(f)(3)(B) unnecessary and superfluous.  See Hohn v. United

States, 524 U.S. 236, 249 (1998) ("We are reluctant to adopt a construction making another

statutory provision superfluous.").  That would also produce the absurd result that Congress

expressly designated two avenues by which a liable party may seek contribution for cleanup

costs under Section 113(f), while at the same time allowing a contribution claim to be brought

under Section 107 when the preconditions for those avenues are not satisfied.

The savings language in Section 113(f)(1) does not change this result.[20]  The savings

language does not create a right to contribution; it simply preserves whatever independent rights

to contribution, if any, exist outside of CERCLA such as under state law or other statutes.  There

is no evidence in the legislative history, statutory language, or structure of CERCLA indicating

---

[20] The savings language of Section 113(f)(1) reads:  "Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title."  42 U.S.C. § 9613(f)(1).

that Congress added the savings clause in Section 113(f)(1) to preserve a version of contribution

under Section 107(a)(4)(B) that would permit PRPs to circumvent the express preconditions for

seeking contribution under Sections 113(f)(1) and 113(f)(3).  It would have been pointless for

Congress to create explicitly limited rights to contribution under Section 113(f) if, at the same

time, the "savings" clause were intended to preserve an all-encompassing "contribution" remedy

under the same Act that would allow all persons potentially liable under Section 106 or 107 to

bring a contribution action at any time.  As the Supreme Court stated in Aviall:   "There is no

reason why Congress would bother to specify conditions under which a person may bring a

contribution claim, and at the same time allow contribution actions absent those conditions."

125 S. Ct. at 583.

Finally, this Court should draw no inference from the First Circuit's dicta that "[i]t is

possible that, although falling outside the statutory parameters established for an express action

for contribution, 42 U.S.C. § 9613(f)(1), a PRP who spontaneously initiates a cleanup without

governmental prodding might be able to pursue an implied right of action for contribution under

42 U.S.C. § 9607(a)."  United Techs. Corp., 33 F.3d at 99 n.8.  The First Circuit's remark was

itself premised on dicta taken from Key Tronic Corp. v. United States, 511 U.S. 809, 816 (1994),

a case where the question whether Section 107(a) alone gives PRPs a right to recover costs was

not presented.  As the Supreme Court later explained in Aviall:

> We held [in Key Tronic] that certain attorney's fees were not "necessary costs of
> response" within the meaning of § 107(a)(4)(B) . . . .  But we did not address the
> relevance, if any, of Key Tronic's status as a PRP or confront the relationship
> between §§ 107 and 113.  In discussing § 107, we did not even classify it
> precisely as a right of cost recovery or a right of contribution . . . .

125 S. Ct. at 585.  The Aviall Court also stated that the question of a stand-alone Section 107

-22-

contribution action should not be decided "on the basis of dictum in <u>Key Tronic</u>."  <u>Id.</u>

In sum, when the statutory text is considered as a whole and in light of governing principles, it does not support an interpretation that would allow Engelhard to bring a stand-alone, implied right of contribution under Section 107(a)(4)(B) whenever it fails to satisfy the prerequisites for contribution set forth in Section 113(f).

C.    The Supreme Court's *Aviall* Decision Does Not Call Into Question the Overwhelming Weight of Authority Among the Courts of Appeals Against Section 107(a) Claims To Recover Response Costs Brought By PRPs That Lack An Affirmative Defense.

Engelhard may contend that the Supreme Court's recent <u>Aviall</u> decision calls into question the weight of authority among the courts of appeals against freestanding Section 107(a) claims by PRPs.  That position is without merit.

In <u>Aviall</u>, the Supreme Court expressly declined to take up or decide whether a stand-alone contribution claim under Section 107 is viable because the issue had not been addressed by the district court or the Fifth Circuit in that case, was beyond the question presented, and had not been briefed.  125 S. Ct. at 585-86.  The Supreme Court also expressly declined to consider whether this Court's and the other nine courts of appeals' holdings that a PRP cannot sue another PRP for contribution under Section 107(a)(4)(B) are correct.  125 S. Ct. at 585-86.  Thus, those prior appellate decisions, including the First Circuit's decision in <u>United Technologies Corp.</u>, are neither overruled nor undermined.[21]

---

[21] There is nothing in the First Circuit's decision in <u>United Technologies Corp.</u>, for example, that suggests that turns on an assumption that a Section 113(f) contribution claim could be initiated where the preconditions of Section 113(f) had not been satisfied.  Thus, <u>Aviall</u> provides no basis for overruling or ignoring <u>United Technologies Corp.</u>  Furthermore, "[i]t is the prerogative of the Court of Appeals, and not the District Court to overrule precedent established by an appellate panel."  <u>Ruthhardt v. United States</u>, 164 F. Supp. 2d 232, 244-45 (D. Mass. 2001); <u>see Eulitt ex rel. Eulitt v. Maine, Dep't of Educ.</u>, 386 F.3d 344, 349 (1st Cir. 2004) ("Until a court of appeals

In the wake of Aviall, courts that have addressed the question whether Section 107(a) supports a freestanding contribution right have reached divergent opinions.[22] Those decisions that have found a freestanding 107(a) contribution right, however, are unpersuasive.

For example, in Consolidated Edison, a panel of the Second Circuit held that

[S]ection 107(a) permits a party that has not been sued or made to participate in an administrative proceeding, but that, if sued, would be held liable under [S]ection 107(a), to recover necessary costs incurred voluntarily, not under court or administrative order or judgment.

423 F.3d at 100. To reach this result, the Second Circuit relied on the language of Section 107(a)(4)(B) of CERCLA, which provides that an owner, operator, and "any person" [who arranges, accepts, or transports hazardous wastes] "shall be liable" for "any other necessary costs of response incurred by any other person consistent with the national contingency plan." See 423

_____

revokes a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it is unmistakably been cast into disrepute by supervening authority.") (emphasis added).

[22] Compare, e.g., Boarhead Farm Agreement Group v. Advanced Envtl. Tech. Corp., 381 F. Supp. 2d 427, 435 (E.D. Pa. 2005) ("It remains the law in this Circuit . . . that section 113 of CERCLA is the only avenue for the assertion of contribution claims by PRPs."); City of Waukesha v. Viacom Int'l Inc., 362 F. Supp. 2d 1025, 1027-28 (E.D. Wis. 2005) ("[Aviall] does not vacate the Seventh Circuit precedent that previously compelled the City to drop its § 107(a) claim."); Mercury Mall Assocs., Inc. v. Nick's Mkt., Inc., 368 F. Supp. 2d 513, 519 (E.D. Va. 2005) ("[T]he Fourth Circuit has made clear that § 9613 must be used by parties who are themselves potentially responsible parties.") (quotation marks omitted); and In re FV Steel & Wire Co., ___ B.R. ___, No. 04-22421-SVK, 2005 WL 2401636, at *4-5 (Bankr. E.D. Wis. Sept. 27, 2005) ("[T]he Seventh Circuit . . . has rejected an 'implied contribution' remedy under § 107."), with Consol. Edison Co. of N.Y., Inc. v. UGI Utils., Inc., 423 F.3d 90 (2d Cir. 2005) (discussed infra); Metro. Water Reclamation Dist. v. Lake River Corp., 365 F. Supp. 2d 913, 918 (N.D. Ill. 2005) ("Although PRP's are not explicitly named in § 107(a), there seems to be no reason why they would be excluded from the provision that allows recovery for any person, unless that right was provided for elsewhere in the statute."); and Vine Street LLC v. Keeling, 362 F. Supp. 2d 754, 764 (E.D. Tex. 2005) ("While Section 113(f) is specifically worded to create a specific cause of action, Section 107(a) is much more broadly worded and allows a variety of claims."). There are a number of unpublished district court decisions reaching divergent conclusions as well.

F.3d at 99-100.  However, as noted above, see pp. 15-16, supra, while Section 107(a)(4)(B) describes liable parties, and lists the elements of a claim for response costs, there is no express mention of a private PRP's right to recover costs from another PRP.  Moreover, to read Section 107(a)(4)(B) in isolation, as the Second Circuit does, ignores entirely Section 113(f) of CERCLA, thereby violating the cardinal rule that a statute should be read as a whole.  Section 107(a)(4)(B) must be read in conjunction with Section 113(f).  As the First Circuit has explained: "Since courts must strive to give effect to each subsection contained in a statute, indeed, to give effect to each word and phrase, we refuse to follow a course that ineluctably produces judicial nullification of an entire SARA subsection."  United Techs. Corp., 33 F.3d at 101; American Cyanamid Co. v. Capuano, 381 F.3d 6, 13 (1st Cir. 2004).[23]  Under that interpretive approach, Section 107(a)(4)(B) sets forth the elements of a claim and describes parties that are liable, and Section 113(f)(1) sets forth an express right to seek contribution from "any other person who is liable or potentially liable under [Section 107(a)] . . . ."  42 U.S.C. § 9613(f)(1).

The Second Circuit's construction also appears to be inconsistent with the contribution protection component of CERCLA's settlement framework.  Section 113(f)(2) of CERCLA provides that a party who settles with the government "shall not be liable for claims for contribution regarding matters addressed in the settlement."  42 U.S.C. § 9613(f)(2).  "Because only the amount of the settlement, not the pro rata share attributable to the settling party, is subtracted from the aggregate liability of the nonsettling parties, section [113(f)(2)] envisions that nonsettling parties may bear disproportionate liability."  United Techs. Corp., 33 F.3d at 103

---

[23] Unsurprisingly, the Second Circuit in Consolidated Edison recognized that its reasoning and interpretive approach to Sections 107 and 113 conflicted squarely with the First Circuit's decision in United Technologies.  See Consol. Edison, 423 F.3d at 99-100.

(citing United States v. Cannons Eng'g Corp., 899 F.2d 79, 90-91 (1st Cir. 1990)). "This

paradigm is not a scrivener's accident. It 'was designed to encourage settlements and provide

PRPs a measure of finality in return for their willingness to settle.'" Id. (quoting Cannons

Eng'g, 899 F.2d at 92)); see also In re Reading, 115 F.3d at 1119 ("This system gives the United

States obvious and important leverage to encourage quick and effective resolution of

environmental disputes."). If a PRP were allowed to avoid Section 113(f) and seek

reimbursement solely under Section 107(a)(4)(B) from a PRP that had settled earlier, however, it

is at best unclear whether Section 113(f)(2) would afford contribution protection to the settling

party. See In re Reading, 115 F.3d at 1119. "[T]hat would throw a proverbial monkey wrench

into the works," because "[c]onsent agreements would no longer provide protection, and settling

parties would have to endure additional rounds of litigation to apportion their losses." Id.

Accordingly, the Second Circuit's decision to recognize a freestanding claim under Section 107

appears inconsistent with CERCLA's settlement scheme, and should be rejected here.[24]

    The Second Circuit also erred by premising its decision on the belief that it "would be

impermissibly discouraging voluntary cleanup were [it] to read section 107(a) to preclude parties

that, if sued, would be held liable under section 107(a) from recovering necessary response

---

[24] The Second Circuit's holding also raises the prospect of another undesirable consequence
related to contribution protection. Contribution is an action among parties that are jointly liable
to a third party, which under CERCLA is typically the EPA or a State. A party that pays
"contribution" in the absence of a settlement or judgment resolving liability to EPA or a State
enforcement agency has no guarantee that its payment to the contribution plaintiff will discharge
or extinguish liability to the government; it remains potentially subject to a governmental action
seeking recovery of response costs under Section 107(a)(4)(A) if any relevant governmental
agency later investigates and determines that the voluntary conduct is inadequate or improper.
The traditional strictures on contribution that are reflected in the prerequisites to contribution in
Section 113(f) are designed to eliminate this prospect of double liability. See, e.g., Restatement
(Third) Torts § 23 (2000), Reporter's Note cmt. b.

costs." Consol. Edison, 423 F.3d at 100. Regardless of the appeal of this contention, congressional intent to create an implied contribution right distinct from the express contribution right provided by the statute cannot be assumed based on such a policy argument. See Texas Industries v. Radcliff Materials, Inc., 451 U.S. 630, 646 (1981) (contribution implicates complex policy issues which are matters for Congress, not the courts, to resolve); Key Tronic, 511 U.S. at 819 n.13 (expansion of the scope of CERCLA's existing remedies is a policy decision that must be made by Congress, not the courts).[25] In the future, Congress may decide to make a legislative judgment that a PRP who incurs response costs in the absence of the prerequisites in Section 113(f) should nonetheless be able to recover costs in contribution from other PRPs. But it would be improper for a Court to override the result dictated by statutory construction principles based on its own assessment of policy considerations. See United Techs. Corp., 33 F.3d at 102 ("Put bluntly, a court cannot rewrite a statute by the simple expedient of calling a camel a horse, overlooking obvious humps.").

Finally, even if the reasoning in Consolidated Edison were persuasive, the actual result of that decision, if applied here, would have no bearing on Engelhard's Section 107 claims. In Consolidated Edison, the Second Circuit took care to emphasize that its holding did not conflict with or undercut a prior Second Circuit decision, Bedford Affiliates v. Sills, 156 F.3d 416 (2d Cir. 1998), in which the Second Circuit held that Section 107(a) does not authorize a party that had incurred or is incurring cleanup costs pursuant to consent orders with a government agency

---

[25] Moreover, the choice here is not between an interpretation that encourages prompt, voluntary cleanups and one that does not. The legislative history reveals that Congress believed that Section 113(f), with its preconditions on initiation of a contribution action, would encourage private party settlements and cleanups. See H. Rep. No. 99-253(I), at 80, 1986 U.S.C.C.A.N. at 2862.

-27-

to recoup its costs.  See Consol. Edison, 423 F.3d at 100-02; Bedford Affiliates, 156 F.3d at 424.

Indeed, the Consolidated Edison decision found both Bedford Affiliates and United

Technologies Corp. "inapposite" precisely because those decisions "considered plaintiffs that

had either been held liable — or, because they had been sued, might imminently be held liable

— under an administrative or court order or judgment."  423 F.3d at 102.  Like the plaintiff in

Bedford Affiliates, Engelhard has incurred cleanup costs pursuant to an administrative consent

order, the 1993 AOC.[26]  Indeed, Engelhard's claims are premised upon the costs that were

allegedly necessitated by the terms of the AOC.  See Compl. ¶¶ 56-57, 80-82.  Accordingly, if

Consolidated Edison by its own terms does not disturb the holding and result in Bedford

Affiliates, then Consolidated Edison does nothing to advance Engelhard's case here.

## II.    ENGELHARD HAS NO CONTRIBUTION CLAIM ARISING UNDER "FEDERAL COMMON LAW"

Engelhard's third cause of action alleges that the United States is "liable for contribution

under Federal common law."  Compl. ¶ 78.[27]  This claim is baseless; there is no "federal general

common law."  Texas Industries, 451 U.S. at 640 (quoting Erie R.R. Co. v. Tompkins, 304 U.S.

---

[26] In contrast to the AOC issued to Engelhard, which was issued by EPA under RCRA, the administrative consent orders at issue in Bedford Affiliates were issued pursuant to state law by the State of New York Department of Environmental Conservation.  See 156 F.3d at 421.  This distinction is without a difference to the rationale of Consolidated Edison court, however, which distinguished the plaintiffs in Bedford Affiliates on the basis that they, unlike the plaintiffs in Consolidated Edison, incurred or were incurring costs under a legal obligation of some sort.  See Consol. Edison, 423 F.3d at 101.  In short, the AOC in the instant case would sufficiently serve to take Engelhard out of the class of PRP plaintiffs that Consolidated Edison held were entitled to sue under Section 107.

[27] In addition to invoking "federal common law," Engelhard also suggests that its third cause of action is brought "[p]ursuant to Section 113(f)(1), 42 U.S.C. § 9613(f)(1)."  Compl. ¶ 77.  Engelhard cannot rely on that specific provision to state a claim, however, because Engelhard has not been sued pursuant to Section 106 or 107 of CERCLA.  See Aviall, 125 S. Ct. at 583-84.

64, 78 (1938)).  The instances in which courts may formulate federal common law are "few and restricted," and "fall into essentially two categories:  [1] those in which a federal rule of decision is necessary to protect uniquely federal interests, and [2] those in which Congress has given the courts the power to develop substantive law."  <u>Texas Industries</u>, 451 U.S. at 640 (citations and internal quotation marks omitted).  Neither instance is presented here.

First, although CERCLA implicates uniquely federal interests because CERCLA is concerned with the rights and obligations of the United States, that does not provide any reason to create a federal common law right of contribution against <u>private PRPs</u> and the United States alike.  Moreover, courts may not exercise common law powers premised on protection of federal interests to expand the waiver of federal sovereign immunity beyond that provided by Congress.  Indeed, a suit seeking recovery of money in contribution against the United States is against the federal sovereign and cannot be maintained without an express and unambiguous waiver of immunity from Congress.  <u>Lane v. Pena</u>, 518 U.S. 187, 192 (1996); <u>Marina Bay Realty Trust LLC v. United States</u>, 407 F.3d 418, 422 (1st Cir. 2005).  It is axiomatic that a waiver of the federal government's sovereign immunity must be strictly construed in terms of its scope, in favor of the sovereign.  <u>Lane</u>, 518 U.S. at 192.  By its terms, the waiver of sovereign immunity in CERCLA is limited to procedural and substantive requirements imposed by the statute.  42 U.S.C. § 9620(a) (federal agencies "shall be subject to, and comply with, <u>this chapter</u> in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity") (emphasis added).  A federal common law right — a non-statutory right — does not fall within the terms of that waiver.  As such, Engelhard's common law claim must fail.

Engelhard's third cause of action quotes a clause from Section 113(f)(1) of CERCLA,

-29-

which states that claims thereunder "shall be governed by Federal law." Compl. ¶ 77. That

clause is not a directive to courts to fashion a new substantive contribution remedy or right.

Rather, it is a Congressional directive to the courts, when apportioning cleanup costs among

responsible parties in instances where a valid Section 113(f)(1) contribution claim is brought, to

do so on a case-by-case basis according to principles adopted under federal common law.[28] It

does not follow that Congress thereby intended to give courts authority to create a supplementary

common law contribution right that could be utilized when the Congressionally-established,

statutory preconditions for contribution are absent. Judicial authority to construe and apply a

statute to particular cases "is fundamentally different from the authority to fashion a new rule or

---

[28] This conclusion is well-supported by the legislative history. As noted above, following
CERCLA's enactment in 1980, it was an open question whether PRPs could be held jointly and
severally liable under Section 107(a) cost recovery actions brought by a State or the United
States. Indeed, "[e]xplicit mention of joint and several liability was deleted from [Section 107
of] CERCLA in 1980 to allow courts to establish the scope of liability through a case-by-case
application of 'traditional and evolving principles of common law' and pre-existing statutory
law." H.R. Rep. No. 99-253(I), at 74 (1985), reprinted in 1986 U.S.C.C.A.N. 2835, 2856. In
1983, the "seminal case of United States v. Chem-Dyne Corporation, 572 F. Supp. 802 (S.D.
Ohio 1983), . . . established a uniform federal rule allowing for joint and several liability in
appropriate CERCLA cases." Id. In explaining why SARA would contain "no change . . . in the
standard of liability that applies under" Section 107(a) of CERCLA, the House Energy and
Commerce Committee stated that the "uniform federal rule on joint and several liability is
correct and should be followed. It is unnecessary and would be undesirable for Congress to
modify this uniform rule. Thus, nothing in this bill is intended to change the application of the . .
. rule . . . enunciated by the Chem-Dyne court." Id. When later explaining the purpose and
scope of the newly-written Section 113(f), the same House report stated: "As with joint and
several liability issues, contribution claims will be resolved pursuant to Federal common law."
Id. at 80, 1986 U.S.C.C.A.N. at 2862. This legislative discussion confirms that the reference to
Section 113(f) contribution claims being "governed by Federal law" was a directive to the courts
to use the same case-by-case, traditional common law approach to statutory Section 113(f)
contribution actions as was used by Chem-Dyne and other courts when adjudicating
governmental actions for the recovery of costs brought under Section 107(a)(4)(A). In referring
to "Federal law," therefore, Congress was not giving courts the power to fashion a new,
substantive contribution right that exists apart from the express conditions and requirements set
forth in Section 113(f).

to provide a new remedy which Congress has decided not to adopt.'"  See Texas Industries, 451

U.S. at 646, (quoting Northwest Airlines, 451 U.S. at 97).  The power to create federal common

law does not authorize a court to substitute its views for those expressed by Congress in a duly

enacted statute.  Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 625 (1978); see Mercury Mall

Assocs., Inc. v. Nick's Mkt., Inc., 368 F. Supp. 2d 513, 520 (E.D. Va. 2005).  "There is a basic

difference between filling a gap left by Congress' silence and rewriting rules that Congress has

affirmatively and specifically enacted."  Mobil Oil Corp., 436 U.S. at 625.  "[W]hen Congress

has legislated on a question that is claimed to be appropriate for the creation of federal common

law, courts must assume that Congress has articulated all the governing federal standards."

Ridenour v. Andrews Fed. Credit Union, 897 F.2d 715, 722 (4th Cir. 1990).

　　　　Applying these principles, it is improper to create a federal common law contribution

right to supplement and effectively subsume the express right provided by Congress in Section

113(f).  Indeed, it is precisely because CERCLA contains an express right of contribution that

this Court should decline to create a common law right.  Accordingly, this Court should decline

to create a common law contribution right and reject Engelhard's third cause of action for failure

to state a claim.

III.　　ENGELHARD MAY NOT RECOVER PAST OR FUTURE RESPONSE COSTS
　　　　FROM THE UNITED STATES PURSUANT TO RCRA.

　　　　Engelhard's fifth cause of action seeks to recover "all past and future environmental

response costs" pursuant to the citizen suit provision of RCRA, 42 U.S.C. § 6972.  Compl. ¶87.

Engelhard contends that the RCRA citizen suit provision alone "waives the United States'

sovereign immunity" from this citizen suit claim.  Compl. ¶ 13.  Engelhard's contention is

mistaken; its citizen suit claim must be dismissed because RCRA, viewed as a whole, does not

-31-

unambiguously waive the United States' sovereign immunity with respect to claims for past or future response costs.

Engelhard's claim for response costs is an effort to obtain a judgment or award of monetary relief from the United States.[29] The United States enjoys sovereign immunity from this claim

> absent a waiver that must be "unequivocally expressed in a statutory text." A waiver will not be implied, and a waiver . . . "will be strictly construed, in terms of its scope, in favor of the sovereign." Thus, "[t]o sustain a claim that the [United States] is liable for <u>awards of monetary damages</u>, the waiver of sovereign immunity must extend <u>unambiguously to such monetary claims</u>."

<u>Marina Bay Realty Trust LLC v. United States</u>, 407 F.3d 418, 422 (1st Cir. 2005) (quoting <u>Lane v. Pena</u>, 518 U.S. 187, 192 (1996)) (emphasis added).

In construing the scope of RCRA's waiver of sovereign immunity, the citizen suit provision may not be read in isolation, as Engelhard's pleading implies. Rather, to properly interpret the scope of the waiver of the United States' immunity from suit, the citizen suit provision must be read in conjunction with the remainder of the statute.[30]

---

[29] <u>See</u> <u>Marina Bay Realty Trust LLC v. United States</u>, 407 F.3d 418, 419-22 (1st Cir. 2005) (claim under Massachusetts law against the United States, seeking recovery of "cleanup costs" associated with "past oil contamination" is a claim for monetary damages against the United States); <u>McClellan Highway Corp. v. United States</u>, 95 F. Supp. 2d 1, 16 (D. Mass. 2000) (same); 28 U.S.C. § 2414 (Judgment Fund payment for adverse judgments and compromise settlements).

[30] <u>See</u> <u>United States Dep't of Energy v. Ohio</u>, 503 U.S. 607, 618 (1992) (when construing sovereign immunity waivers under RCRA and Clean Water Act "we look beyond the citizen-suit sections to the full texts of the respective statutes") (hereinafter "<u>DOE v. Ohio</u>"); <u>City of Jacksonville v. Dep't of the Navy</u>, 348 F.3d 1307, 1319 (11th Cir. 2003) (considering the scope of sovereign immunity waiver in citizen suit provision of the Clean Air Act ("CAA"), 42 U.S.C. § 7604(e)) ("[I]nstead of presuming a broad interpretation of the citizen suit provision by reading it in isolation, we will interpret this section 'in light of the remainder of the statute of which it is a part.'") (quoting <u>United States v. Tenn. Air Pollution Control Bd.</u>, 185 F.3d 529, 534 (6th Cir. 1999)); <u>cf.</u> <u>Meghrig</u>, 516 U.S. at 486 (construing the scope of relief authorized under RCRA

RCRA Section 6001(a), 42 U.S.C. § 6961(a), is commonly known as the "federal facilities" provision of RCRA.  Cf. City of Jacksonville, 348 F.3d at 1319 ("we turn to the federal facilities provision" to construe the scope of waiver with respect to CAA citizen suit claim); McClellan Highway Corp. v. United States, 95 F. Supp. 2d 1, 16-17 (D. Mass. 2000) (construing the scope of the immunity waiver provided by the RCRA federal facilities provision in light of the Supreme Court's analysis in Meghrig, a case concerning citizen suit claims for response costs).  The federal facilities provision limits the waiver of sovereign immunity to require federal agency compliance with federal, state, and local requirements "respecting control and abatement of solid waste or hazardous waste disposal and management."  42 U.S.C. § 6961(a).  According to a recent decision by the First Circuit, this provision

> "does not plainly encompass response costs and thus does not evidence an unambiguous waiver of sovereign immunity to private suits for reimbursement of response costs . . . .  At most, there is an ambiguity . . . regarding a waiver, and such an ambiguity must be construed in favor of immunity."

Marina Bay, 407 F.3d at 422 (quoting McClellan Highway Corp., 95 F. Supp. 2d at 16, 17) (emphasis added).[31/]

Thus, to conclude that the citizen suit provision constitutes a waiver of federal sovereign

---

citizen suit provision in light of "[o]ther aspects of RCRA's enforcement scheme")

[31/] In so holding, the First Circuit echoed an earlier Supreme Court decision, DOE v. Ohio, which found that the RCRA federal facilities provision did not waive sovereign immunity with respect to civil penalties for past violations of RCRA and the Clean Water Act.  See 503 U.S. at 627-28. Notably, in the wake of DOE v. Ohio, Congress amended the RCRA federal facilities provision by enacting the Federal Facility Compliance Act of 1992, Pub. L. No. 102-386, § 102, 106 Stat. 1505 (1992).  This Act allowed claims against the United States for certain civil penalties, but, as confirmed by Marina Bay, failed to expressly allow for response cost claims against the United States.  See 407 F.3d at 423 n.8.  Thus, although legislative history may not serve to supply a waiver of sovereign immunity that does not appear clearly in statutory text, see Lane, 518 U.S. at 192, the legislative history of the RCRA federal facilities provision does not support the conclusion that the waiver under that provision extends to response cost claims.

immunity with respect to response cost claims asserted under RCRA, this Court would need to conclude that the citizen suit provision abrogates sovereign immunity <u>beyond that</u> expressly provided for in the federal facilities provision. That conclusion has been disfavored in similar statutory contexts,[32] and should be rejected here.

Moreover, even when read in isolation, there is nothing in the RCRA citizen suit provision itself that unambiguously expands the limited waiver set forth in the federal facilities provision. The citizen suit provision broadly allows for private suits "against any person, including the United States . . . ." 42 U.S.C. § 6972(a)(1)(B). However, the provision also specifically addresses the relief available in such citizen suits:

> The district court shall have jurisdiction . . . to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste [which may present an imminent and substantial endangerment to health or the environment, or] to order such person to take such other action as may be necessary, . . . .

42 U.S.C. § 6972(a) (emphasis added). Nothing in this language unambiguously authorizes response cost claims against the United States. Just as the First Circuit in <u>Marina Bay</u> was unable to find an unambiguous waiver of immunity for response cost claims in RCRA's federal facilities provision, the citizen suit provision's express terms do not unambiguously provide for actions to recover response costs against the United States. Consequently, the Court should

---

[32] <u>See</u>, <u>e.g.</u>, <u>City of Jacksonville</u>, 348 F.3d at 1319 ("Given [the limited waiver of immunity provided by federal facilities section of Clean Air Act], without express intent from Congress to indicate otherwise, we will not interpret the broad language of the citizen suit provision to provide a larger scope of waiver of immunity."); <u>cf. also</u> <u>Miami-Dade County v. United States</u>, 345 F. Supp. 2d 1319, 1354-55 (S.D. Fla. 2004) (focusing on the federal facilities provision in construing scope of RCRA's sovereign immunity waiver with respect to state law contribution claims for response costs, despite waiver having been asserted by plaintiff under both citizen suit provision and federal facilities provision).

dismiss Engelhard's fifth cause of action for lack of subject matter jurisdiction, Fed. R. Civ. P. 12(b)(1).

Finally, even if this Court were to find a valid waiver in RCRA for Engelhard's response cost claims, the Supreme Court has squarely held that the citizen suit provision does not authorize claims for the reimbursement of "past costs," i.e., abatement costs incurred before the citizen claim is brought. See Meghrig, 516 U.S. at 484, 488. As such, Engelhard cannot state a claim under the citizen suit provision for any cleanup or abatement costs it may have incurred at the Facility prior to filing this lawsuit, i.e., June 13, 2005. See Fed. R. Civ. P. 12(b)(6).

IV.    THE DECLARATORY JUDGMENT ACT CREATES NO CAUSE OF ACTION

Engelhard's sixth cause of action is a claim pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02. Compl. ¶¶ 88-91. This claim must be dismissed. The Declaratory Judgment Act does not establish a separate cause of action, and it is not a grant of jurisdiction to a district court, but merely provides an additional remedy in cases where the court otherwise has subject matter jurisdiction. Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671-72 (1950).

CONCLUSION

For the foregoing reasons, this Court should issue an order dismissing the first, second, third, fifth, and sixth causes of action in the Complaint. A proposed order is attached hereto.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney
District of Massachusetts

ANTON P. GIEDT
Assistant U.S. Attorney
1 Courthouse Way
Boston, MA  02210
Tel:  (617) 748-3309

Fax: (617) 748-3967
anton.giedt@usdoj.gov

KELLY A. JOHNSON
Acting Assistant Attorney General
Environment & Natural Resources Division


Dated: October 18, 2005                          /s/ Stephen E. Crowley
                                                 STEPHEN E. CROWLEY
                                                 U.S. Department of Justice
                                                 Environment & Natural Resources Division
                                                 Environmental Defense Section
                                                 P.O. Box 23986
                                                 Washington, D.C.  20026-3986
                                                 Tel: (202) 514-0165
                                                 Fax: (202) 514-8865
                                                 Stephen.Crowley@usodj.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

_____
                                            )
ENGELHARD CORPORATION,                      )
                                            )
          Plaintiff,                        )
                                            )
     v.                                     )     **Civil Action No. 05-11241-JLT**
                                            )
UNITED STATES OF AMERICA, <u>et al.</u>,    )     (*Electronic filing*)
                                            )
          Defendants.                       )
                                            )
_____)

### [PROPOSED] ORDER

Upon consideration of the United States' Motion for Partial Dismissal, and any

opposition thereto, the Court being fully advised in the grounds for said Motion, it is, this ___

day of _____, 2005, hereby ORDERED that United States' Motion be GRANTED, and it

is further ORDERED that the first, second, third, and fifth causes of action in the Complaint are

hereby DISMISSED pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).


Dated: _____          _____
                                      The Honorable Joseph L. Tauro
                                      United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this 18th day of October 2005, served a true and correct copy of the foregoing,

1)    MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION FOR PARTIAL DISMISSAL, and

2)    PROPOSED ORDER

on Plaintiff's counsel of record by electronic filing, as follows:

Ronald L. Kuis, Esq.
12 Scenery Road
Pittsburgh, PA 15221
rlkuis@aol.com

David P. Rosenblatt
Paul R. Mastrocola
Burns & Levinson, LLP
125 Summer Street
Boston, MA  02110
Drosenblatt@burnslev.com

/s/ Stephen E. Crowley
STEPHEN E. CROWLEY
Attorney for the Defendants

UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY
REGION I

IN THE MATTER OF:   )
           )  RCRA DOCKET NO: I-92-1051
           )
Engelhard Corporation   )
Route 152        )
Plainville, MA  02762   )  CONSENT ORDER
           )
EPA I.D. #MAD001190644  )

## PRELIMINARY STATEMENT

This Administrative Order on Consent ("Consent Order") is issued to Engelhard Corporation ("Engelhard" or "Respondent"), Route 152, Plainville, Massachusetts pursuant to Section 3008(h) of the Solid Waste Disposal Act, commonly referred to as the Resource Conservation and Recovery Act ("RCRA"), as amended, 42 U.S.C. § 6928(h).

The authority to issue this Consent Order is vested in the Administrator of the United States Environmental Protection Agency ("EPA") under RCRA and has been delegated to the Regional Administrators by EPA Delegation No. 8-31, dated March 6, 1986. This authority has been further delegated by the Regional Administrator for Region I to the Director of the Waste Management Division ("Director") on September 29, 1988.  For purposes of this Consent Order only, Engelhard consents to the jurisdiction of EPA to issue this Consent Order.

RCRA Docket No. I-92-1051

<u>Certificate of Service</u>

I hereby certify that the original Consent Order was served upon the Regional Hearing Clerk and copies thereof were served upon the Presiding Officer and Counsel for the Respondent, this day, in the following manner and at the addresses listed below:

Original by hand delivery to: Linda D'Amore
                                   Acting Regional Hearing Clerk
                                   U.S. Environmental Protection
                                    Agency
                                   Region I
                                   J.F.K. Federal Building, RCG
                                   Boston, Massachusetts 02203

Copy by hand delivery to:     Robert A. DiBiccaro
                                   Presiding Officer
                                   U.S. Environmental Protection
                                   Agency
                                   Region I
                                   J.F.K. Federal Building, RRC
                                   Boston, Massachusetts 02203

Copy by certified mail to:    Lois R. Murphy
                                     Cahill Gordon & Reindel
                                   Eighty Pine Street
                                   New York, New York  10005

Copy by first class mail to:  Donald L. Anglehart
                                   Testa Hurwitz & Thibault
                                   53 State Street
                                   Boston, Massachusetts 02109

Date: 8/9/93

_Andrea Simpson_
Andrea Simpson
Assistant Regional Counsel

## TABLE OF CONTENTS

Provision                                                          Page

Definitions ................................................1

Applicability ..............................................5

Statement of Purpose .......................................5

Findings ...................................................6

Determinations.............................................16

Consent Agreement .........................................17

I.      Stabilization Plan .................................18

        A. Required Stabilization Measures..................21

        B. Stabilization Measures Work Plan................27

        C. Stabilization Management Plan ..................29

II.     Conceptual Designs, Confirmatory Sampling Plans and
        Operation & Maintenance Plans for Stabilization
        Measures ...........................................34

        A. Conceptual Designs .............................35

        B. Confirmatory Sampling Plan.....................36

        C. Operation and Maintenance Plans ...............39

III.    Final Designs and Implementation of Stabilization
        Measures ...........................................41

IV.     Stabilization Reports ..............................41

V.      RCRA Facility Investigation ("RFI") Proposal........43

        A. Current Assessment Summary Report ..............44

        B. Identification of Additional Media of Concern and
           Areas of Concern...............................48

        C. Preliminary Investigation of Potential Corrective
           Measures ......................................50

        D. Facility Investigation .........................52

           1. Environmental Setting .......................52

              a. Soil/Bedrock Characterization ..........52

          b. Procedures for Determining Ground-
             Water Hydraulics ......................53

          c. Procedures for Evaluating Surface Waters
             and Sediments ........................54

          d. Procedures for Evaluating Climatic
             Conditions ..........................54

       2. Source and Waste Characterization ...........55

       3. Contamination Characterization ..............55

          a. Ground Water .........................56

          b. Soil ................................57

          c. Surface Water and Sediments ............57

       4. Health and Environmental Risk Assessment......58

       5. Data Collection Quality Assurance Plan .......59

          a. Data Collection Strategy ...............59

          b. Sampling ............................60

       6. Data Management Plan .....................61

          a. Data Record .........................61

          b. Tabular Displays .....................62

          c. Graphical Displays ...................63

       7. Health and Safety Plan ...................63

       E. Project Management Plan ...................65

VI.    Review of the RFI Proposal ...................69

VII.   Phase I Interim Report and Phase II Proposal ........70

VIII.  Review of the Phase I Report & Phase II Proposal ....75

IX.    RFI Report ..............................75

       A. Environmental Setting ...................75

       1. Hydrogeology ..........................75

       2. Soils ...............................78

       3. Surface Water and Sediments ............... 79

B. Source and Waste Characterization ................80

    1. AOC and sub-AOC Characteristics .............81

    2. Waste Characteristics .......................81

C. Contamination Characterization ...................83

    1. Ground-Water Contamination ..................83

    2.  Soil Contamination .........................84

    3. Surface Water and Sediment Contamination .....85

D. Health and Environmental Risk Assessment ........87

E. Stabilization and Interim Measures Report .. .....87

F. Identification of Additional Tasks ..............87

X.     Review of the RFI Report ..........................91

XI.    Media Protection Standards ("MPS") Proposal ........91

A. Ground Water Protection Standards ...............92

B. Soil Protection Standards ......................97

C. Surface Water and Sediment Protection Standards ......................................99

XII.   Interim Measures .................................101

XIII. Designation of Project Coordinator and EPA Project Manager ..................................102

XIV.  Sampling ........................................ 103

XV.   Site Access .....................................104

XVI.  Retention and Availability of Information ........ 106

XVII. Reservation of Rights and Non-Release of of Other Claims ..................................107

XVIII.No Preauthorization of Funding ...................109

XIX.  Other Applicable Laws ...........................110

XX.   Indemnification of the United States Government.....110

XXI.  Financial Assurance .............................111

XXII. Subsequent Modification ......................... 111

XXIII. Incorporation and Enforceability of Documents ..... 112

XXIV. Termination and Satisfaction ...................... 113

XXV. Severability ...................................... 113

XXVI. Survivability/Permit Integration .................. 113

XXVII. EPA Review and Approval Process ................... 114

XXVIII. Stipulated Penalties..............................115

XXIX. Force Majeure.....................................122

XXX. Dispute Resolution................................124

XXXI. Effective Date...................................126

Figure 1: Facility Boundary and Building Plan

Figure 2: Locations of Areas and sub-Areas of Concern

Figure 3: Area of Ground-Water Stabilization Measure

Figure 4: Area of Fence Relocation Stabilization Measure

Attachment I: AOCs and Media to be Investigated

Attachment II: Technical Agreement

Attachment III: Legal Description of Facility Boundary

Appendix I  -  Information Requirements of the RFI Proposal for the Environmental Setting, Source and Contamination Characterization

Appendix II -  Information Requirements of the RFI Proposal for the Sampling and Analysis Program

Appendix III - Health and Environmental Risk Assessment

## DEFINITIONS

All terms used in this Consent Order are as defined in 40 C.F.R. Sections 260.10 and 264.141, unless defined below:

1. "Act" or "RCRA" means the Resource Conservation and Recovery Act, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.

2. "Appendix IX" means Appendix IX to 40 C.F.R. Part 264, as amended. See 52 Fed. Reg. 25942 (July 9, 1987) (Final Rule).

3. "Aquifer" means a geological formation, group of geological formations, or part of a geological formation that is capable of yielding water to water supply wells or springs.

4. "Area of Concern" or "sub-Area of Concern" means an area at the Facility where solid or Hazardous Waste or Hazardous Constituents may have been managed or may have come to be located and from which releases of Hazardous Waste or Hazardous Constituents have or may have occurred. Examples include, without limitation:  landfills, surface impoundments, waste piles, storage tanks, incinerators, tanks (including 90-day accumulation tanks), container storage areas, waste water treatment units, and waste recycling operations.

5. "Background" for any particular media (Ground Water, soil, surface water and sediments, and/or air) shall mean a representative nearby sample of that media that is upgradient of any Zone(s) of Contamination and/or is not

1

affected by the Facility.

6. "Constituents of Concern" means those constituents listed in Appendix VIII to 40 C.F.R. Part 261 or in Appendix IX to 40 C.F.R. Part 264 which have been or may have been released from AOCs or sub-AOCs at the Facility.

7. "Day" means a calendar day unless otherwise stated.

8. "Director" means the Director of the Waste Management Division, EPA Region I or his designee. For purposes of Section XXX, Director means the Director or Acting Director of the Waste Management Division, EPA, Region I.

9. "Facility" (see "Site") includes all contiguous land owned by Engelhard Corporation west of Route 152 in Plainville, Massachusetts, and structures, other appurtenances and improvements on the land, not limited to solid or Hazardous Waste management areas used for treating, storing, or disposing of Hazardous Waste, as shown on Figure 1 and described in Attachment III.

10. "Ground Water" (or "ground-water") means water below the land surface in the subsurface zone below which all pore space is filled with water.

11. "Hazardous Constituents" are those constituents listed in Appendix VIII to 40 C.F.R. Part 261 or in Appendix IX to 40 C.F.R. Part 264.

12. "Hazardous Waste" is as defined in Section 1004(5) of RCRA, 42 U.S.C. § 6903(5).

13. "Health-Based Criteria" shall refer to those health-based standards that, in order of preference, have been either promulgated by EPA in regulation form, adopted by EPA in guidance form, or deemed acceptable by the Director.

14. "Monitoring Well" means a well capable of producing ground-water samples that, upon laboratory analysis, can provide a reliable indication of ground-water quality.

15. "Observation Well" means a well used to measure ground-water table elevations.

16. "Point of Exposure" means the point at which a potential receptor can come into contact, either now or in the future, with Hazardous Waste and/or Hazardous Constituents.

17. "Release" includes any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment.

18. "Site" (see "Facility") includes all contiguous land owned by Engelhard Corporation west of Route 152 in Plainville, Massachusetts, and structures, other appurtenances and improvements on the land, not limited to solid or Hazardous Waste management areas used for treating, storing, or disposing of Hazardous Waste, as shown on Figure 1 and described in Attachment III.

19. "Stabilization" means a national management strategy which stresses the control or abatement of threats to human health and the environment from Releases of Hazardous Wastes or Hazardous Constituents at RCRA facilities, or prevents or

3

minimizes the further spread of contamination while long term remedies are pursued.

20.   "Water Quality Standards" are provisions of State or Federal law which consist of a designated use or uses for the waters of the United States and water quality criteria for such waters based upon such uses.  Water quality standards are established to protect the public health or welfare, enhance the quality of water and serve the purposes of the Clean Water Act ("CWA").

21.   "Zone of Contamination" means the three dimensional extent of contamination that was produced or is being produced from a Release of Hazardous Wastes or Hazardous Constituents from an Area of Concern or sub-Area of Concern.

4

## APPLICABILITY

1. This Consent Order applies to and is binding upon Engelhard Corporation, its successors and assigns.

2. No change in ownership or corporate status will in any way alter Engelhard's responsibility under this Consent Order.

3. Engelhard agrees to provide a copy of this Consent Order to all contractors and consultants retained to conduct or monitor any portion of the work performed pursuant to this Consent Order prior to the date that work, pursuant to this Consent Order, is to begin.  Engelhard or its contractors or consultants shall provide written notice of this Consent Order to all subcontractors hired to perform any portion of the work required by this Consent Order prior to the commencement of work by such subcontractors.  Engelhard shall be responsible for ensuring that its contractors and subcontractors perform the work contemplated herein in accordance with this Consent Order.

4. Engelhard agrees to give notice of this Consent Order to any successor in interest prior to transfer of ownership or operation of the Facility, and agrees to notify EPA in writing of such transfer of ownership or operation at least thirty (30) days prior to such action.

## STATEMENT OF PURPOSE

In entering into this Consent Order, the mutual objectives of the parties are:  to further evaluate the nature and extent of Releases of Hazardous Waste and/or Hazardous Constituents from

5

AOCs at the Facility; to complete a RCRA Facility Investigation; to implement specified measures identified in this Consent Order to stabilize Releases of Hazardous Wastes and/or Hazardous Constituents to the environment; to conduct Interim Measures, if necessary; and to gather data to support a future Corrective Measures Study in anticipation that such a study is deemed necessary.

## FINDINGS

1. Engelhard Corporation is incorporated under the laws of the State of Delaware.

2. Engelhard owns and operates a Facility located in Plainville, Massachusetts.

3. Engelhard's Facility commenced operations in 1957. Between 1957 and 1962, the plant had two primary functions: rolling and fabricating steel and titanium, and fabricating uranium fuel elements under Atomic Energy Commission licenses. The Facility has, at various times until recently, manufactured precious metals into wire and flatstock, primarily for the jewelry and electrical industries. The manufacturing processes have included melting the raw metals, mixing with other metals to make alloys, shaping the metal, heat treating, and finishing. Wastes generated at various times as a result of these processes included: waste water containing cyanide, chromium, and/or acid/alkaline waste streams; solvents; pollution control dust; and metal hydroxide sludge.

6

4. Engelhard owned and operated the Facility on and after November 19, 1980, the applicable date which renders facilities subject to interim status requirements or the requirement to have a permit under Sections 3004 and 3005 of RCRA, 42 U.S.C. § 6924 and § 6925, and 40 C.F.R. Parts 265, 268 and 270.

5. Pursuant to Section 3010(a) of RCRA, 42 U.S.C. § 6930(a), Engelhard submitted to EPA a Notification of Hazardous Waste Activity dated August 13, 1980. In this notification, Engelhard identified itself as a Hazardous Waste generator and transporter, and a Hazardous Waste treatment, storage, and disposal ("TSD") facility.

6. On November 18, 1980, Engelhard submitted to EPA a Part A Hazardous Waste Permit Application pursuant to Section 3005 of RCRA, 42 U.S.C. § 6925, and the regulations promulgated thereunder, 40 C.F.R. § 270.10(e)(1). In this submission, Engelhard identified itself as managing listed and characteristic Hazardous Wastes at the Facility.

7. Engelhard requested and was granted a change of status by the Massachusetts Department of Environmental Protection ("DEP") from a TSD facility to a Large Quantity Generator on April 19, 1989.

8. On March 31, 1986, EPA sent Engelhard a Request for Information pursuant to Section 3007(a) of RCRA, 42 U.S.C. § 6927(a), and Section 104(e) of CERCLA, 42 U.S.C. § 9604(e) ("Information Request").

7

9. Engelhard responded to the Information Request on September 8, 1986. The Company provided supplemental responses to the Information Request on March 6, 1987 and July 20, 1989.

10. Engelhard has voluntarily completed three phases of Site investigation. From 1987 to 1990, these activities have included the installation of Monitoring Wells and sampling of Ground Water, soil, soil gas, surface water, sediments and fish.

11. Two reports concerning Engelhard's voluntary investigations were prepared by Environ Corporation, Engelhard's consultant. These reports, <u>Results of Phase I and Phase II Field Investigation, Engelhard Corporation, Plainville, Massachusetts</u>, dated March 13, 1989, and <u>Phase III Summary Report, Engelhard Corporation, Plainville, Massachusetts</u>, dated March 30, 1990, ("the Environ Reports") were submitted to EPA, the DEP and the local Board of Health by Engelhard.

12. Based on the information submitted in responses to the Section 3007(a) Information Request, the Environ Reports and information gathered by EPA, forty-six (46) Areas of Concern ("AOCs") were identified by EPA at the Facility and are listed in the September 1991 RCRA Facility Assessment ("RFA") prepared by EPA.

13. EPA and Engelhard agree, for the purpose of this Consent Order, that Engelhard shall conduct further investigation of twenty (20) of the original forty-six (46) AOCs.

14.   EPA and Engelhard agree to reclassify certain AOCs as sub-AOCs.  These AOCs are proximate to each other, share the same potential remedial issues and are areas at which similar wastes were managed.  Accordingly, two new AOCs, AOC A and AOC B, are composed of sub-AOCs as follows:

> AOCS #1 and #12 are reclassified as sub-AOCs A-1 and A-12.  Sub-AOCs A-1 and A-12 are combined to form a new AOC:  AOC-A.

> AOCS #2, #3, #4, #18, and #35 are reclassified as sub-AOCS B-2, B-3, B-4, B-18, and B-35. These sub-AOCs are combined to form a new AOC:  AOC-B.

Based on this reclassification of AOCs, EPA and Engelhard agree that Engelhard shall conduct further investigations for the following fifteen (15) AOCs:

> AOC-A (composed of sub-AOCs A-1 and A-12), AOC-B (composed of sub-AOCs B-2, B-3, B-4, B-18, and B-35), AOC #5, AOC #6, AOC #7, AOC #13, AOC #14, AOC #16, AOC #19, AOC #22, AOC #23, AOC #26, AOC #29, AOC #30, and AOC #44.

15.   A brief description and dates of operation of the AOCs and sub-AOCs to be investigated are set forth below in numerical sequence by AOC number.  The locations of these AOCS and sub-AOCs are set out on a map of the Site attached to this Consent Order as Figure 2.

### 15.1  Sub-AOC A-1

Sub-AOC A-1 is an area located west of Building #8 where untreated process wastewaters, wastewater processed through the water treatment plant, regenerate waste, and cyanide wastewaters were released to pits and to the ground surface.  Portions of Sub-AOC A-1 are located beneath the 100,000 gallon equalization tank and lined lagoon, and Building #10.  This Sub-AOC was in use sometime after startup of the wastewater treatment operation in 1973 until replacement of the initial treatment facility in 1981.

### 15.2  Sub-AOC B-2

Sub-AOC B-2 is an area located south of Building #6.  This Sub-AOC was used from 1973 to 1984, and received Releases containing metal sludge and wastewater associated with a wet scrubber system and Releases from Sub-AOC B-18.  The wet scrubber system was replaced in 1984 by a baghouse system.

### 15.3  Sub-AOC B-3

Sub-AOC B-3 is an area or leach field which is located south of Building #6.  This sub-AOC was first used for operations in Building #6, constructed in 1966.  Discharges to this sub-AOC ceased in 1976.  Waste streams containing wastewaters from trenches in a melt room and blowdown from boilers were discharged onto the ground surface and/or the leach field.

### 15.4  Sub-AOC B-4

Sub-AOC B-4 is an area located south of Building #3 which was used from 1973 to 1984.  Metal sludge and wastewater were released onto the ground surface from two (2) wet scrubbers. The wet scrubbers were replaced by baghouses in 1984.

### 15.5  AOC #5

AOC #5 is an area, pit or pond located beneath the northwest corner of what is now Building #8.  This area was first used by operations in Buildings #5 and #6 constructed in 1966. Discharges to this area ceased in 1972.  Cooling, annealing and acid cleaning wastewaters contaminated with metals were discharged onto the ground.  AOC #5 also includes an area where an above floor degreaser was operated in Building #8, directly overlapping the area described above.  Building #8 was constructed in 1972.

### 15.6  AOC #6

AOC #6 is an area located under the southwest corner of what is now Building #8.  This area was first used by operations in Buildings #5 and #6, constructed in 1966.  Discharges to AOC #6 ceased in 1972.  Wastewaters from metal cleaning operations were released onto the ground.

### 15.7  AOC #7

AOC #7 was used as an outdoor waste storage area from sometime after the Facility began operations in 1957 until 1983.  This AOC is located in the vicinity of Buildings #9 and #12.  Waste oils, chlorinated solvents, corrosive wastes,

and scrubber and wastewater treatment sludges were stored in various types of containers, including drums. In 1960, cooling water from the Nuclear Division was disposed of in the courtyard. To alleviate a problem of ponding and rusting of barrels containing metal scrap, a trench was dug in 1960 to carry the water across the yard to Turnpike Lake. Prior to 1972, the area was graded to allow drainage to the Lake. Prior to 1972, oils from drums were observed by Facility personnel draining toward the Lake.

## 15.8  Sub-AOC A-12

Sub-AOC A-12 is a former waste storage area that was used from sometime after the wastewater treatment facility began operations in 1972 until 1980. This sub-AOC is located beneath what is now the north end of Building #10. The area was used for the above-ground storage of wastes in containers including spent carbon, spent resins and spent filter sand from the wastewater treatment plant, waste acids and alkalis, and waste oils. One 1,000 gallon above-ground tank was used to store waste oil, and one 4,000 gallon underground concrete tank was used for storing regenerate wastes. The 4,000 gallon underground storage tank was removed prior to construction of the north end addition to Building #10.

## 15.9  AOC #13

AOC #13 consists of the surface waters of Turnpike Lake and the near shore sediments and shoreline of Turnpike Lake which abut the Facility. Releases of Hazardous Wastes and/or

12

Hazardous Constituents to the Lake or Lake shoreline have occurred from AOCs at the Facility. Roof drains from Buildings #1, #2, #5, #6, #7, and #9 discharged to the south embayment of Turnpike Lake and stormwater discharges from the roof drains contained heavy metals.

15.10  AOC #14

AOC #14 is an area located under what is now Building #8. This area was used from sometime after Building #5 was constructed in 1966 until 1972. Wastewater from various metal cleaning operations was discharged into a leachfield.

15.11  AOC #16

AOC #16 consists of a wastewater disposal system which is comprised of two cesspits and an associated leachfield, which were used from 1957 to 1976. At various times, this AOC received wastewaters from the wire melt room, personnel cleanup wastes from a locker room, wastes from an assay laboratory, and treated wastewaters generated during the fabrication of uranium fuel elements.

15.12  Sub-AOC B-18

Sub-AOC B-18 is an underground storage tank located south of Buildings #6 and #7 which was constructed in 1976 and is still in use. The 1,000 gallon tank is used to collect cooling tower bleed-off, scrubber bleed-off, boiler blowdown and contact cooling wastewaters for direct pumping to the wastewater treatment plant. The tank has overflowed in the past in the area identified as Sub-AOC B-2 and entered

13

Turnpike Lake.  Pumps and pipes were replaced in 1981 to prevent any such Releases.

15.13  AOC #19

AOC #19 is a small building adjoining Building #7 set approximately four feet below ground level.  The building contains a grease trap which treats contact cooling water generated by the rolling mill.  A sump pump located in the building discharged water contaminated with oil (and potentially with metals) to the ground surface outside the building wall.

15.14  AOC #22

AOC #22 is a dry well located under the northeast corner of Building #9 which was used from sometime after the Facility began operations in 1957 until 1977.  The dry well received unknown quantities of steam condensate from a sump containing two (2) steam-heated vapor degreasers.  Halogenated solvent residues may have been present in this condensate.  AOC #22 is a potential source of volatile organic compounds found in Ground Water.

15.15   AOC #23

AOC #23 consists of an operational storm drain and leachfield which is located north of Building #1.  Engelhard's records do not indicate when the storm drain and leachfield were constructed.  Currently, the AOC receives runoff from a paved area.  At one time it received floor spillage from the lower boiler room in Building #1 which included spillage from a

14

process wastewater tank located in the area.

### 15.16  AOC #26

AOC #26 consists of a 22-foot long by 2-foot wide concrete trench which served as a housing for process piping in Building #1.  In 1989, Engelhard employees reported that wastewater had leaked from this piping and trench.  The piping connected aqueous acid/alkali cleaning tanks with a drain that leads to the wastewater treatment system.

### 15.17  AOC #29

AOC #29 consists of a former above-floor degreaser located in Building #8 in the north central portion of the Facility. Building #8 was constructed in 1972.

### 15.18  AOC #30

AOC #30 consists of a former deg aaser pit located in the floor of Building #6.  Building #6 was constructed in 1966. The degreaser is a potential source of volatile organic compounds found in soil gas in this area.

### 15.19 Sub-AOC B-35

Sub-AOC B-35 is a non-operational dust collector located on a concrete pad at the southwest corner outside of Building #7.  This dust collector may have been a source of Release of metals to soils.

### 15.20  AOC #44

AOC #44 is an unlined storm water basin located northwest of Building #10.  The basin receives storm water from the roof of Building #8, constructed in 1972.

15

16. Therefore, EPA believes there is a need to obtain further information to identify and evaluate the nature and extent of Releases of Hazardous Wastes and/or Hazardous Constituents from the AOCs and sub-AOCs identified above, to identify and assess any adverse environmental and/or public health effects at the Facility and off-site, to implement specific Stabilization measures as described herein and to implement other interim measures, if necessary.

<u>DETERMINATIONS</u>

The Determinations set forth below are those of EPA only. Based upon the contents of the Administrative Record and the aforementioned information contained in the Findings above, EPA has determined, pursuant to Section 3008(h) of RCRA, that:

1. Engelhard is a "person" within the meaning of Section 1004(15) of RCRA, 42 U.S.C. § 6903(15).

2. Engelhard owns and operates the Facility.

3. The Facility was authorized, at all times relevant to this Consent Order, to operate under Section 3005(e) of Subtitle C of RCRA, 42 U.S.C. § 6925(e), and Massachusetts General Laws ch. 21C.

4. Some of the waste streams generated from manufacturing processes at the Facility were hazardous as defined in Section 1004(5) of RCRA, 42 U.S.C. § 6903(5).

5. The methods and practices of Hazardous Waste management employed by Engelhard at the Facility have resulted in Releases of Hazardous Waste and Hazardous Constituents into

16

the environment.

6. Hazardous Wastes and/or Hazardous Constituents which have been released at the Facility have migrated and may still be migrating to the Ground Water, soils, surface waters and sediments at or in the vicinity of the Facility. Therefore, EPA has determined that further investigation of these media should be conducted.

7. The response measures to be conducted by Engelhard pursuant to this Consent Order are necessary for the purpose of protecting human health and the environment.

## CONSENT AGREEMENT

1. EPA and Engelhard have agreed to enter into this Consent Order in settlement of this matter without adjudication of any issue of fact or law.

2. For purposes of this Consent Order and any action to enforce the terms of this Consent Order, Engelhard admits to the jurisdiction of EPA to require the actions agreed to herein under the authority of RCRA, 42 U.S.C. § 6901 et seq.

3. EPA and Engelhard agree that the Findings and requirements of this Consent Order, and any actions taken pursuant hereto, do not constitute any admission of fact or law or liability by Engelhard as to any issue raised, except that Engelhard agrees that this Consent Order shall be admissible as evidence in any proceeding brought by EPA to enforce the terms and requirements of this Consent Order.

17

4. Engelhard agrees to comply with the terms of this Consent Order.

5. Engelhard waives its right to a hearing on any issue of fact or law or requirements set forth in this Consent Order. Engelhard also waives its right to challenge any decisions made by the Director pursuant to this Consent Order, except as provided in the Dispute Resolution Section below, or as provided by applicable law.

6. Based upon the information known by EPA at the time of the signing of this Consent Order, EPA and Engelhard agree that further investigation of the AOCs listed in the RFA, but not specifically identified herein, is not necessary. However, if, at any time, EPA, Engelhard or its contractors obtains or becomes aware of any new or additional information concerning Releases or threatened Releases of Hazardous Waste and/or Hazardous Constituents at or from any of the AOCs which are not currently being investigated pursuant to this Consent Order, EPA may require further investigation of those AOCs. In addition, Engelhard agrees to investigate any previously unidentified AOCs which are identified pursuant to this Consent Order and which require investigation, as determined by EPA.

I. <u>STABILIZATION PLAN</u>

<u>Introduction</u>

Within ninety (90) days after the effective date of this Consent Order, Engelhard shall submit a Stabilization Plan

18