# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____
)
ENGELHARD CORPORATION,                 )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )        **Civil Action No. 05-11241-JLT**
                                       )
UNITED STATES OF AMERICA, et al.,      )        (*Electronic filing*)
                                       )
            Defendants.                )
_____)

## MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION FOR JUDGMENT ON THE PLEADINGS ON PLAINTIFF'S FOURTH CAUSE OF ACTION

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment & Natural Resources Division

STEPHEN E. CROWLEY
U.S. Department of Justice
Environmental Defense Section
P.O. Box 23986
Washington, D.C.  20026-3986
Tel: (202) 514-0165
Fax: (202) 514-8865
Stephen.Crowley@usdoj.gov

MICHAEL J. SULLIVAN
United States Attorney
District of Massachusetts

ANTON P. GIEDT
Assistant U.S. Attorney
1 Courthouse Way
Boston, MA  02210
Tel:  (617) 748-3309
Fax: (617) 748-3967
anton.giedt@usdoj.gov

Dated: August 4, 2006                  *Attorneys for the United States*

## INTRODUCTION

In this case concerning hazardous waste contamination at a former industrial manufacturing facility in Plainville, Massachusetts, Plaintiff Engelhard Corporation's ("Engelhard") Fourth Cause of Action seeks contribution from the United States under CERCLA Section 113(f)(3)(B), 42 U.S.C. § 9613(f)(3)(B).[1/]  Section 113(f)(3)(B) enables a party to seek contribution if the party "has resolved its liability to the United States or a State for some or all of a response action or some or all of the costs of such action in an administrative or judicially approved settlement[.]"  42 U.S.C. § 9613(f)(3)(B).  In September 1993, Engelhard entered into an Administrative Order on Consent ("Order") with EPA that was issued pursuant to Section 3008(h) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6928(h).  The Order requires Engelhard to perform corrective action (i.e., investigation and cleanup) at its Plainville facility, and Engelhard asserts that the Order satisfies the requirements of CERCLA Section 113(f)(3)(B).

Engelhard's Fourth Cause of Action must be dismissed for failure to state a claim upon which relief may be granted.  Fed. R. Civ. P. 12(b)(6), 12(c).  First, Section 113(f)(3)(B) of CERCLA codified the common law right to contribution for parties who resolve a common or joint liability owed to a third party, and Engelhard cannot establish the existence of such a common liability, shared by the United States, for the performance of corrective action at Engelhard's facility.  No common liability exists because the Order does not require the United

_____

[1/] On October 18, 2005, the United States filed a motion (Dkt. No. 10) seeking dismissal of the First, Second, Third, Fifth, and Sixth Causes of Action in the Complaint.  On April 26, 2006, the Court held a hearing on that motion, and at the close of that hearing, directed the parties to file motions solely addressing the viability of Plaintiff's Fourth Cause of Action.  This memorandum and the accompanying motion thus address Plaintiff's Fourth Cause of Action.

States to perform corrective action, and because Section 3008(h) of RCRA authorizes EPA to issue and enforce corrective action orders against parties who receive them, but does not by itself make parties liable to EPA to perform corrective action. Second, Engelhard cannot state a claim under CERCLA Section 113(f)(3)(B) because the Order did not resolve any liability to EPA for response costs or response actions. Finally, even assuming that Engelhard resolved its liability for response costs or response actions in the Order, and also resolved a common liability for the performance of corrective action, Engelhard's contribution claim is barred by the three-year statute of limitations set forth in CERCLA Section 113(g)(3)(B), 42 U.S.C. § 9613(g)(3)(B).

## <u>LEGAL BACKGROUND</u>

### I.    CERCLA[7]

"CERCLA differentiates between [1] actions for recovery of costs and [2] actions for contribution." <u>United Technologies Corp. v. Browning-Ferris Indus., Inc.</u>, 33 F.3d 96, 99 (1st Cir. 1994) (citing 42 U.S.C. §§ 9613(g)(2) and (g)(3); internal quotations and other punctuation omitted). Actions for recovery of costs are "actions brought by innocent parties that have undertaken cleanups (say, the federal, state or local government)." <u>Id.</u> at 99. Such actions arise solely under CERCLA Section 107(a), 42 U.S.C. § 9607(a), and "are distinct and do not overlap" with actions for contribution that arise under Section 113(f) of CERCLA, 42 U.S.C. § 9613(f). <u>Id.</u> at 100; <u>see id.</u> at 103; <u>Cooper Indus., Inc. v. Aviall Servs., Inc.</u>, 543 U.S. 157, 163

---

[7] CERCLA is the Comprehensive Environmental Response, Compensation, and Liability Act, which is codified at 42 U.S.C. §§ 9601-75. We generally refer throughout this memorandum to sections of CERCLA and RCRA, rather than to sections of the U.S. Code. We also attach hereto a statutory addendum, as Exhibit 2, which identifies the sections of CERCLA and RCRA and the corresponding sections of the U.S. Code. For a general discussion of CERCLA and RCRA, we refer the Court to the United States' memorandum in support of its motion for partial dismissal, filed October 18, 2005 (Dkt. No. 11), at pp. 2-8.

n.3 (2004) ("Aviall") (stating that the two remedies are "clearly distinct"). Indeed, by contrast,

the right to contribution under Section 113(f) of CERCLA is "a right 'of one who has discharged

a common liability to recover of another also liable, the aliquot portion which he ought to pay or

bear.'" United Technologies, 33 F.3d at 99 (quoting Black's Law Dictionary 399 (6th ed.

1990)); see also id. ("contribution" under CERCLA Sections 113(f) and 113(g)(3) is "a claim

'by and between jointly and severally liable parties for an appropriate division of the payment

one of them has been compelled to make.'") (quoting Akzo Coatings, Inc. v. Aigner Corp., 30

F.3d 761, 764 (7th Cir. 1994)).[3]

Section 113(f) of CERCLA contains two separate provisions that provide an express

cause of action for contribution. Aviall, 543 U.S. at 166-67. One provision, Section 113(f)(1),

provides in pertinent part:

> Any person may seek contribution from any other person who is liable or
> potentially liable under [Section 107(a)], during or following any civil action
> under [Section 106] or under [Section 107(a).]

42 U.S.C. § 9613(f)(1). In Aviall, the Supreme Court held that a private responsible party who

has not been subject to a civil action under Sections 106 or 107(a) of CERCLA cannot assert an

action for contribution under Section 113(f)(1) from other jointly liable parties. 543 U.S. at 165-

67.[4] The second express right of contribution — the one specifically at issue here — is

---

[3] The general liability scheme for both types of actions is set forth under CERCLA Section
107(a), 42 U.S.C. § 9607(a). See Acushnet Co. v. Mohasco Corp., 191 F.3d 69, 75 (1st Cir.
1999).

[4] Section 113(f)(1) is not at issue in this motion. Engelhard's Complaint does not allege that
Engelhard has been subject to a civil action under Sections 106 or 107(a) of CERCLA. Further,
during the hearing held April 26, 2006, Engelhard's counsel conceded that "the consent order
does not satisfy a civil action. It's administrative only." Hr'g Tr. 21:14-15 (Dkt. No. 24).

-3-

contained in Section 113(f)(3)(B), and is available to

> [a] person who has resolved its liability to the United States or a State for some or all of a response action or some or all of the costs of such action in an administrative or judicially approved settlement * * * referred to in [CERCLA Section 113(f)(2)].

42 U.S.C. § 9613(f)(3)(B).[5/]

Section 113(g)(3) of CERCLA, 42 U.S.C. § 9613(g)(3), has two subsections, which

"provide[] two corresponding 3-year limitations periods for contribution actions[.]" Aviall, 543

U.S. at 167. The first subsection, Section 113(g)(3)(A), provides a three-year limitations period

that begins to run "after * * * the date of judgment in any action under [CERCLA] for recovery"

of response costs. 42 U.S.C. § 9613(g)(3)(A). This statute of limitations corresponds to

contribution actions brought under Section 113(f)(1) of CERCLA. The second subsection,

Section 113(g)(3)(B), provides a three-year limitations period that begins to run "after * * * the

date of an administrative order under section 9622(g) of this title (relating to de minimis

settlements) or 9622(h) of this title (relating to cost recovery settlements) or entry of a judicially

approved settlement with respect to such costs or damages." 42 U.S.C. § 9613(g)(3)(B). As

explained, infra, this statute of limitations corresponds to contribution actions brought under

Section 113(f)(3)(B) of CERCLA.

By contrast, initial actions for the recovery of cleanup costs are exclusively governed by

the distinct limitation periods contained in CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2).

See United Technologies, 33 F.3d at 99-100.

---

[5/] Section 113(f)(2) of CERCLA provides that "[a] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C. § 9613(f)(2).

## II.    RCRA

Prior to enacting CERCLA, Congress enacted the Resource Conservation and Recovery Act ("RCRA"), Pub. L. No. 94-580, 90 Stat. 2795 (1976), 42 U.S.C. §§ 6901-92k.  RCRA's primary purpose is to reduce the generation of hazardous wastes and to ensure proper storage, transportation, and disposal of hazardous wastes that is generated.  42 U.S.C. § 6902(b); see Meghrig v. KFC Western, Inc., 516 U.S. 479, 483 (1996).  Accordingly, under RCRA, facilities that treat, store, or dispose of hazardous wastes are required to have a RCRA permit issued by EPA or an authorized State.  42 U.S.C. §§ 6924-25.

When enacting RCRA's permit requirement, Congress recognized that "EPA could not issue [RCRA] permits to all affected facilities before * * * RCRA's effective date[.]"  Fla. Power & Light Co. v. EPA, 145 F.3d 1414, 1416 (D.C. Cir. 1998).  Therefore, Congress "provided that existing facilities meeting certain requirements could operate on an 'interim status' basis until final agency action could be taken on a facility's permit application.  42 U.S.C. § 6925(e)."  Id.; see EPA v. Envtl. Waste Control, Inc., 917 F.2d 327, 330 (7th Cir. 1990).  To obtain "interim status," a facility is required to file a notification of hazardous waste activity under RCRA Section 3010(a), 42 U.S.C. § 6930(a), as well as a "Part A application" for a RCRA operating permit.  See 40 C.F.R. § 270.70.  Facilities that apply for a RCRA permit, obtain "interim status," and maintain that status, are essentially grandfathered — i.e., treated for regulatory purposes as having been issued a RCRA permit until a final administrative determination is made on their permit application.  42 U.S.C. § 6925(e)(1)(C).[g]

---

[g] Interim status is not a permit, insofar as it is not "issued" by EPA.  It is rather a "statutorily conferred grandfathering," which allows facilities that treat, store, or dispose of hazardous

(continued...)

In part to address the concern that releases of hazardous wastes from RCRA-regulated facilities (both permitted and interim status facilities) posed a threat to human health and the environment, Congress in 1984 amended RCRA by passing the Hazardous and Solid Waste Amendments ("HSWA"), Pub. L. No. 98-616, 98 Stat. 3221 (1984). The HSWA expanded EPA's authority to require "corrective action" with regard to releases of hazardous waste from any "solid waste management unit" at a RCRA-regulated facility, regardless of when the waste was deposited. 42 U.S.C. §§ 6924(u), 6928; see Am. Iron & Steel Inst. v. EPA, 886 F.2d 390, 394-95 (D.C. Cir. 1989).[7] Specifically, a new Section 3004(u) provided that any RCRA permit issued to a facility after November 8, 1984

> shall require * * * corrective action for all releases of hazardous waste or
> constituents from any solid waste management unit at a treatment, storage, or

---

[6] (...continued)
wastes to undertake such operations until a valid RCRA permit is issued. Hempstead Cty. & Nevada Cty. Project v. EPA, 700 F.2d 459, 461 (8th Cir. 1983). Interim status does not exempt facilities from RCRA requirements. It is a status, the regulatory requirements of which must be met by the RCRA permit applicant. Id. Specifically, interim status facilities must comply with regulatory standards set forth under 40 C.F.R. pt. 265, and additional regulatory requirements as applicable, such as "corrective action" requirements set forth in an order issued by EPA under RCRA Section 3008(h), 42 U.S.C. § 6928(h). Those requirements are similar to the regulatory requirements that must be met by a regulated facility that is issued a final RCRA permit. See 40 C.F.R. pt. 264; 42 U.S.C. § 6924(u).

[7] "Corrective action" under RCRA involves the cleanup (including, when appropriate, investigations and monitoring) of hazardous wastes or hazardous constituents released into the environment from facilities that treat, store, or dispose of hazardous wastes. See "Advance notice of proposed rulemaking: Corrective Action for Releases From Solid Waste Management Units at Hazardous Waste Management Facilities," 61 Fed. Reg. 19,432, 19,443 (May 1, 1996) (acknowledged as "the primary corrective action implementation guidance" at 64 Fed. Reg. 54,605, 54,607 (Oct. 7, 1999)). The requirement to implement corrective action at a facility that treats, stores, or disposes of hazardous wastes does not end until an official completion determination is made by the appropriate governmental agency. See "Notice: Final Guidance on Completion of Corrective Action Activities at RCRA Facilities," 68 Fed. Reg. 8760 (Feb. 25, 2003).

disposal facility seeking a permit under this subchapter, regardless of the time at which waste was placed in such unit.

42 U.S.C. § 6924(u).

The HSWA also added a new Section 3008(h) to RCRA, 42 U.S.C. § 6928(h), which provided EPA with corresponding authority to require corrective action at interim status facilities.[9]  Section 3008(h) was thus a "supplement to EPA's power to impose corrective action through permits," intended to ensure that corrective actions would be undertaken by interim status facility owners and operators "without awaiting issuance of a final permit."  H.R. Conf. Rep. No. 98-1133, at 111 (1984), reprinted in 1984 U.S.C.C.A.N. 5576, 5682.  As EPA has explained:

> In many cases, the entire corrective action process for a facility will be implemented under a[n interim status corrective action] order [under RCRA Section 3008(h)].  However, in some cases a facility that has been issued a section 3008(h) order will be issued a permit prior to completion of the activities specified in the order.  In such cases, [EPA] may require the owner/operator to continue all or some of the activities under the order, or may incorporate the requirements of the order into the RCRA permit.  In any case, EPA intends that equivalent environmental results will be achieved whether corrective action requirements are imposed in an order under section 3008(h) or a permit.

55 Fed. Reg. 30,798, 30,855 (July 27, 1990).

---

[9] Section 3008(h) provides, in pertinent part:

> Whenever on the basis of any information [EPA] determines that there is or has been a release of hazardous waste into the environment from a[n interim status] facility * * * [EPA] may issue an order requiring corrective action or such other response measure as [EPA] deems necessary to protect human health or the environment or [EPA] may commence a civil action in the United States district court in the district in which the facility is located for appropriate relief, including a temporary or permanent injunction.

42 U.S.C. § 6928(h)(1).

When expanding EPA's corrective action authorities through the enactment of the 1984 Hazardous and Solid Waste Amendments, the report of the House Energy and Commerce Committee explained that "[t]he responsibility to control * * * releases * * * lies with the facility owner and operator and should not be shifted to the Superfund program, particularly when a final permit has been requested by the facility." H.R. Rep. No. 98-198(I), at 61 (1983), reprinted in 1984 U.S.C.C.A.N. 5576, 5620 (discussing rationale for the enactment of Section 3004(u) of RCRA, 42 U.S.C. § 6924(u)).[9/] Indeed, despite the expansion of EPA's authority to require hazardous waste management facility owners and operators to perform corrective actions, there has never been an express right to contribution under RCRA that would allow facility owners or operators to recoup costs they incur as a result of performing corrective actions. Where solid or hazardous wastes "may present an imminent and substantial endangerment to health or the environment," Section 7002 of RCRA authorizes "any person" to seek a judicial order inter alia compelling a responsible party to take action necessary to address the endangerment. 42 U.S.C. § 6972. However, that provision, which is commonly known as the "citizen suit" endangerment provision, does not authorize claims for the reimbursement of "past cleanup costs," i.e., abatement costs incurred before the citizen claim is brought. Meghrig, 516 U.S. at 484, 488. Nor is there a waiver of federal sovereign immunity that would allow a party to recover its past or future abatement costs from the United States pursuant to the RCRA citizen suit

---

[9/] See also id. at 44; 1984 U.S.C.C.A.N. at 5604 ("For the very purpose of ensuring that these * * * facilities do not become the province of Superfund, which is insufficient to address the priortiy [sic] sites that have been identified to date, and for the principle that operators of facilities should address the contamination they caused, the Committee has included this provision.") (emphasis added) (explaining RCRA Section 3005(i), 42 U.S.C. § 6925(i), a provision requiring certain interim status facilities receiving hazardous waste after July 26, 1982 to comply with monitoring and corrective action standards issued pursuant to Section 3004 of RCRA).

endangerment provision.  See United States' Mem. In Supp. of Mot. for Partial Dismissal (Dkt.

No. 11, Oct. 18, 2005), at 31-35.

**FACTUAL BACKGROUND**

Between 1957 and 1993, the Plaintiff, Engelhard Corporation, including its corporate

predecessors-in-interest, built, owned, and operated a manufacturing facility (hereinafter

"Facility") on an 18.3 acre site located on State Route 152 in Plainville, Massachusetts.

Compl. ¶¶ 14-54.[10]  In 1980, Engelhard submitted to EPA both a "Notification of Hazardous

Waste Activity," pursuant to Section 3010(a) of RCRA, 42 U.S.C. § 6930(a), as well as a "Part

A Hazardous Waste Permit Application" pursuant to Section 3005 of RCRA, 42 U.S.C. § 6925.

See Ex. 1, at 7.  In these submissions, Engelhard identified itself as a hazardous waste generator

and transporter, and a hazardous waste treatment, storage, and disposal facility.  Id.  Through

these submissions, Engelhard was permitted to operate the Facility as an "interim status"

hazardous waste management facility pursuant to RCRA Section 3005(e), 42 U.S.C. § 6925(e).

Ex. 1, at 16.

On September 9, 1993, Engelhard and EPA entered into an Administrative Order on

Consent ("Order") regarding the Facility.  Compl. ¶ 56.  The Order is attached hereto as Exhibit

1.  The Order was issued pursuant to Section 3008(h) of RCRA, 42 U.S.C. § 6928(h), see Ex. 1

---

[10] The statement of factual background is derived from the well-pled factual allegations
contained in the Complaint (which we consider as true solely for the purposes of this motion),
and the September 9, 1993 Administrative Order on Consent ("Order") between EPA and
Engelhard regarding the Facility (attached hereto as Exhibit 1), the terms and existence of which
Engelhard relies upon extensively in support of its claims, including its Fourth Cause of Action.
See Compl. ¶¶ 56-57, 80-82.  Although a copy of the Order was not attached to Engelhard's
Complaint, this Court may properly consider the contents of the Order in deciding this motion.
See Watterson v. Page, 987 F.2d 1, 3-4 (1st Cir. 1993); Cadlerock Props. Joint Venture, L.P. v.
Schilberg, No. 3:01CV896, 2005 WL 1683494, at *2 (D. Conn. July 19, 2005).

("Preliminary Statement"), a provision that empowers EPA to issue corrective action orders at

interim status facilities.  When issuing the Order, EPA determined that

> 5.    The methods and practices of Hazardous Waste management employed by Engelhard at the Facility have resulted in Releases of Hazardous Constituents into the environment.
>
> 6.    Hazardous Wastes and/or Hazardous Constituents which have been released at the Facility have migrated and may still be migrating to the Ground Water, soils, surface waters and sediments at or in the vicinity of the Facility.  Therefore, EPA has determined that further investigation of these media should be conducted.
>
> 7.    The response measures to be conducted by Engelhard pursuant to this Consent Order are necessary for the purpose of protecting human health and the environment.

Ex. 1, at 16-17.

Engelhard's Fourth Cause of Action seeks contribution from the United States with

respect to the past and future costs of performing the corrective action at the Facility.

Compl. ¶¶ 79-82.  The Fourth Cause of Action is pled under Section 113(f)(3)(B) of CERCLA,

42 U.S.C. § 9613(f)(3)(B), and is predicated on Engelhard's legal assertions that the Order

"resolves some or all of Engelhard's liability to the EPA for response costs in the investigation

and remediation of the Facility," Compl. ¶ 81,[1/] and that the Order "is a 'settlement agreement'

pursuant to Section 113(f)(2) of  CERCLA," id. ¶ 82.

The Order contains no express covenant not to sue or release from liability for response

costs or response actions.  In fact, the Order includes an express reservation of rights, which

---

[1/] Notably, though Engelhard asserts that the Order resolves Engelhard's liability to "EPA for response costs," the Order requires Engelhard to perform certain corrective actions at the Facility; it does not require Engelhard to make any payment of costs to EPA or the Hazardous Substance Superfund.  See generally Ex. 1.  Nor is there any allegation that Engelhard has reimbursed EPA for any costs that EPA may have incurred at the Facility.  Moreover, as discussed infra, there has been no resolution of Engelhard's liability to EPA "for response costs" — whether pursuant to the Order or otherwise.

-10-

provides, in pertinent part:

1.      Nothing contained in this Consent Order shall be construed to prevent EPA from
        seeking legal or equitable relief to enforce the terms of this Consent Order or
        from taking other actions it deems necessary to protect human health and the
        environment. * * *

2.      EPA reserves the right to expend and recover funds under the
        Comprehensive Environmental Response, Compensation and Liability Act
        (CERCLA); to bring "imminent and substantial endangerment" actions
        under RCRA Section 7003 and/or CERCLA Section 106; to assess
        penalties for violations of and to require compliance with RCRA
        requirements under Section 3008(a); to address Releases other than those
        identified in this Consent Order; to require further study or action under
        Section 3008(h) of RCRA, as necessary, to respond to any Releases from
        the Facility, including those addressed in this Consent Order, to protect
        human health and the environment; and to bring actions as appropriate
        under any of the other authorities administered by EPA * * *.

3.      EPA reserves the right to perform any portion of the work agreed to herein
        or any additional Site characterization, or any response/corrective actions
        it deems necessary to protect human health or the environment.  EPA
        reserves the right to seek reimbursement from Engelhard for such
        additional costs incurred by the United States.  Notwithstanding
        compliance with the terms of this Consent Order, Engelhard is not
        released from any liability for the costs of any response actions taken by
        EPA.

Ex. 1, at 107-09.

## STANDARD OF REVIEW

        In reviewing a Rule 12(c) motion for judgment on the pleadings seeking dismissal for

failure to state a claim on which relief can be granted, the court applies the same standard of

review as it does to a motion to dismiss brought pursuant to Rule 12(b)(6).  Mass. Candy &

Tobacco Distribs., Inc. v. Golden Distribs., Ltd., 852 F. Supp. 63, 67 (D. Mass. 1994).  Under

that standard, a court must dismiss a claim when, accepting all well-pled factual allegations in

the complaint as true and drawing all reasonable inferences from them in favor of the plaintiff,

"it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

**ARGUMENT**

**I.  ENGELHARD HAS NO CONTRIBUTION CLAIM UNDER SECTION 113(f)(3)(B) OF CERCLA.**

    **A.  The United States Has No Liability For The Performance of Corrective Action At Engelhard's Facility, And Therefore Engelhard Has Not Resolved A Common Or Joint Liability.**

Engelhard has not resolved a common or joint liability to EPA which is shared by the United States, and therefore Engelhard cannot state a claim for contribution pursuant to Section 113(f)(3)(B) of CERCLA. Congress enacted Section 113(f)(3)(B) against a "venerable common-law backdrop," United States v. Bestfoods, 524 U.S. 51, 62 (1998), which Congress intended the courts use in CERCLA cases.[12] Statutes are not to be construed as making an innovation upon that common law backdrop unless Congress' intent to do so is fairly expressed. Robert C. Herd & Co. v. Krawill Mach. Corp., 359 U.S. 297, 304-05 (1959).[13] Here, the plain language of CERCLA Section 113(f)(3)(B) is consistent with the traditional common law

---

[12] See United Technologies, 33 F.3d at 99 n.7, 101; In re Bell Petroleum Servs., Inc., 3 F.3d 889, 895 (5th Cir. 1993); O'Neil v. Picillo, 883 F.2d 176, 178-79 (1st Cir. 1989); H.R. Rep. No. 99-253(I), at 74, 80 (1985), reprinted in 1986 U.S.C.C.A.N. 2835, 2856, 2862.

[13] See also United Technologies, 33 F.3d at 99 ("Under accepted canons of construction, legal terms used in framing a statute are ordinarily presumed to have been intended to convey their customary legal meaning. This precept has special force when, as now, there is no persuasive evidence that Congress aspired to use a particular legal term in some unusual or unorthodox sense.") (internal citations omitted); Field v. Mans, 516 U.S. 59, 69 (1995) ("[C]ommon-law terms * * * [used in a statute] imply elements that the common law has defined them to include. Congress could have enumerated their elements, but Congress's contrary drafting choice did not deprive them of a significance richer than the bare statement of their terms.") (internal citations omitted).

concept that the right to contribution depends on the resolution of an underlying common or joint liability to a third party.

In United Technologies, the First Circuit performed an exhaustive examination of CERCLA Section 113's text, structure, and legislative history, and concluded that in Section 113(f) Congress "used the word 'contribution' in the conventional sense, and fully intended courts to give the word its customary meaning."  33 F.3d at 101; accord E.I. DuPont De Nemours & Co. v. United States, 297 F. Supp. 2d 740, 749-50 (D.N.J. 2003) (a CERCLA "contribution action still must have all the indicia of a common law contribution action"). Accordingly, contribution under CERCLA Section 113(f) is "a right 'of one who has discharged a common liability to recover of another also liable, the aliquot portion which he ought to pay or bear.'"  United Technologies, 33 F.3d at 99 (quoting Black's Law Dictionary 399 (6th ed. 1990)) (emphasis added).[14]  Therefore, Engelhard's Section 113(f)(3)(B) contribution claim in this case must be based on resolution of a common or joint liability to EPA, shared by the United States.

Here, Engelhard's CERCLA Section 113(f)(3)(B) claim is based on its legal obligations to perform the corrective action requirements contained in the RCRA Section 3008(h) Order that

---

[14] See also United States v. Davis, 20 F. Supp. 2d 326, 337 (D.R.I. 1998) ("Contribution [under CERCLA] * * * requires a showing that the party seeking contribution already has paid more than its fair share of the common liability.") (emphasis added) (citing United Technologies, 33 F.3d at 100), aff'd in relevant part, 261 F.3d 1 (1st Cir. 2001); Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp., 153 F.3d 344, 350-51 (6th Cir. 1998) (a "primary requisite[] of the equitable right to contribution * * * and of the corresponding right and obligation at law, [is] * * * a situation wherein the parties are * * * under some common obligation or burden) (citing 18 Am. Jur. 2d Contribution § 9) (emphasis added).  Cf. Med. Prof'l Mut. Ins. Co. v. Breon Labs., Inc., 966 F. Supp. 120, 123 (D. Mass. 1997) ("[T]he plain language of Mass. Gen. L. ch. 231B, section 3(d) requires the Plaintiffs to discharge the common liability before they may seek contribution.  It is the failure to establish this critical element that renders the Plaintiffs' contribution claim insufficient.") (emphasis added), vacated on other grounds in unpubl. op. 181 F.3d 80 (1st Cir. 1999).

was issued by EPA.  Such legal obligations are not shared by the United States.  The Order requires Engelhard alone to perform corrective actions, and does not compel the United States to perform any corrective actions.  Hence, the Order does not create a liability or a legal obligation to EPA for the performance of corrective action that is shared by both Engelhard and the United States.

Moreover, while Section 3008(h)(1) of RCRA authorizes EPA to issue and enforce corrective action orders at interim status facilities against parties who receive them, that provision does not by itself make parties liable to EPA to perform corrective action.  Section 3008(h)(1) of RCRA provides, in pertinent part:

> Whenever on the basis of any information [EPA] determines that there is or has been a release of hazardous waste into the environment from a[n interim status] facility * * * [EPA] may issue an order requiring corrective action or such other response measure as [EPA] deems necessary to protect human health or the environment[.]

42 U.S.C. § 6928(h)(1).  The very statutory provision authorizing EPA to issue corrective action orders at interim status facilities is not predicated on, or triggered by, any past or ongoing violation of any law or regulation, much less any conduct at all.  See USG Corp. v. Brown, No. 89 C 2874, 1994 WL 654488, at *5 (N.D. Ill. Nov. 17, 1994) ("Nowhere does the statute say that a corrective action order is predicated on a previous violation of environmental law.").  As such, the legal obligation or liability to perform corrective action at interim status facilities flows not from RCRA Section 3008(h)(1) itself, but from EPA's issuance of an administrative order pursuant to that provision.  Apart from EPA's issuance of such an order, there is no liability or legal obligation to perform corrective action at interim status facilities.  Here, only Engelhard has been issued such an order.

-14-

Consequently, even assuming that all of the well-pled factual allegations in the Complaint are true, Engelhard has not resolved a common or joint liability, shared by the United States, to perform corrective action at the Facility. Accordingly, Engelhard's Section 113(f)(3)(B) contribution action must be dismissed.[15]

### B.  Engelhard Has Not Resolved Its Liability To EPA For Response Actions Or Response Costs At The Plainville Facility.

Even if the United States shares a common or joint liability with Engelhard for corrective action at the Facility, Engelhard's claim under Section 113(f)(3)(B) of CERCLA must fail because Engelhard has not resolved its liability to EPA for any response actions or response costs. A private party that is potentially liable under CERCLA may bring a contribution claim under Section 113(f)(3)(B) only if it has resolved liability to the United States or a State for a response action or the costs of such action in an administrative or judicially approved settlement. 42 U.S.C. § 9613(f)(3)(B); Aviall, 543 U.S. at 167 ("to assert a contribution claim under § 113(f), a party must satisfy the conditions of either § 113(f)(1) or § 113(f)(3)(B)"); Restatement (Second) of Torts § 886A, cmt. f (1979) ("there can be no contribution so long as

---

[15] In fact, the lack of a common or joint liability requires dismissal of all of Engelhard's claims for contribution in this case, whether such claims arise under CERCLA Section 113(f)(3)(B), see Compl. ¶¶ 79-82 (Fourth Cause of Action), CERCLA Section 107(a)(4)(B), id. ¶¶ 72-74 (Second Cause of Action), "federal common law," see id. ¶ 78 (Third Cause of Action), or CERCLA Section 113(f)(1), see id. ¶ 77 (Third Cause of Action). As noted above, in CERCLA cases, the First Circuit and other courts have regularly looked to the common law concept of contribution, and authoritative sources defining that concept, such as the Restatement of Torts. See, e.g., United Technologies, 33 F.3d at 99 & n.7; O'Neil v. Picillo, 883 F.2d 176, 178-79 (1st Cir. 1989); Centerior Serv., 153 F.3d at 350-351; United States v. Colorado & Eastern R.R., 50 F.3d 1530, 1536 (10th Cir. 1995); United States v. Chem-Dyne Corp., 572 F. Supp. 802, 810 (S.D. Ohio 1983). Accordingly, the "common liability" element, which is a well-established element of contribution actions under the common law, must be met under any of Engelhard's theories of contribution.

-15-

the claim of the original plaintiff is still outstanding"). Whether a particular written instrument reflects an "administrative or judicially approved settlement" in which a person "has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action" requires case-specific analysis.[16]

Here, the Order plainly does not resolve any liability to EPA for response actions or response costs. First, the Order expressly reserves EPA's right to seek response costs and response actions, including requiring Engelhard to perform or reimburse EPA for the very actions required under the Order. The Order expressly provides that:

> EPA reserves the right to perform any portion of the work agreed to herein or any additional Site characterization, or any response/corrective actions it deems necessary to protect human health or the environment. EPA reserves the right to seek reimbursement from Engelhard for such additional costs incurred by the United States. Notwithstanding compliance with the terms of this Consent Order,

---

[16] Since Aviall was decided by the Supreme Court in December 2004, a number of courts have held that settlements must resolve a potentially responsible party's CERCLA liability in order to qualify under Section 113(f)(3)(B). See, e.g., Consol. Edison Co. of N.Y., Inc. v. UGI Utils., Inc., 423 F.3d 90, 95-96 (2d Cir. 2005); Niagara Mohawk Power Corp. v. Consol. Rail Corp., __ F. Supp. 2d __, No. 5:98-CV-1039, 2006 WL 1763554, at *2 (N.D.N.Y. June 28, 2006); Seneca Meadows, Inc. v. ECI Liquidating, Inc., 427 F. Supp. 2d 279, 286-87 (W.D.N.Y. 2006); ASARCO, Inc. v. Union Pac. R.R. Co., No. CV-4-2144, 2006 WL 173662, at **6-7 (D. Ariz. Jan. 24, 2006); City of Waukesha v. Viacom, Inc., 404 F. Supp. 2d 1112, 1117 (E.D. Wis. 2005); Ferguson v. Arcata Redwood Co., LLC, No. C03-056325I, 2005 WL 1869445, at *4 (N.D. Cal. Aug. 5, 2005); Cadlerock Props. Joint Venture, L.P. v. Schilberg, No. 3:01CV896, 2005 WL 1683494, at *4 n.3 (D. Conn. July 19, 2005); W.R. Grace & Co. – Conn. v. Zotos Int'l, Inc., No. 98-CV-838S(F), 2005 WL 1076117, at **4-5, 7 (W.D.N.Y. May 3, 2005); Elementis Chems., Inc. v. T.H. Agric. & Nutrition LLC, 373 F. Supp. 2d 257, 265 (S.D.N.Y. 2005). If the Court finds that the Order constitutes a settlement that resolves liability for response actions or response costs, then it would have to address whether a settlement must resolve CERCLA liability in order to trigger a right to contribution under CERCLA section 113(f)(3)(B). This issue is not presented in this motion, and the United States expressly reserves the right to litigate the issue at a later date if that should become necessary.

Engelhard is not released from any liability for the costs of any response actions taken by EPA.

Ex. 1, at 108-09.  The Order also provides that "EPA reserves the right to expend and recover funds under * * * CERCLA[.]"  Ex. 1, at 108.

The Order further provides that:

EPA reserves the right * * * to require further study or action under Section 3008(h) of RCRA, as necessary, to respond to any Releases from the Facility, including those addressed in this Consent Order, to protect human health and the environment * * *.

Ex. 1, at 108.  As such, EPA retains the right under the <u>very same</u> legal authority upon which the Order is founded — Section 3008(h) of RCRA — to require Engelhard to take corrective actions to address the <u>very same</u> releases of hazardous wastes that are the subject of the Order itself.  In addition, the Order expressly reserves EPA's right — through an administrative order or a request for judicial relief under "RCRA Section 7003 and/or CERCLA Section 106" — to compel Engelhard to undertake response actions at the Facility.  Ex. 1, at 108.  Thus, Engelhard's liability to EPA for the performance of response actions at the Facility was expressly reserved, not resolved.

Second, the Order contains no covenant not to sue, release, waiver, or substantially similar provision that purports to resolve, discharge, compromise, or waive Engelhard's liability to EPA for any response costs or response actions at the Facility.  Third, the Order contains no other indicia of an intent to resolve any liability for response actions or response costs by Engelhard's consent to do the work.[17]  Fourth, the Order concerns corrective action under RCRA

_____

[17] There is a single sentence in the Order which provides that "EPA and Engelhard have agreed to enter into this Consent Order in settlement of this matter without adjudication of any issue of

(continued...)

at an interim status facility.  While we do not argue here that one can never resolve liability for

response actions in a corrective action order, one would expect that if a resolution of response

action liability was intended, there would be an explicit expression of that intent.  The absence of

any such language in the Order, coupled with the absence of any other indicia of an intent to

resolve liability and the extensive, broad reservations discussed above, leads to the conclusion

that there was no resolution of liability for response actions here.

Accordingly, Engelhard's liability to EPA for response costs or response actions is not

extinguished or resolved by the Order, and Engelhard's Fourth Cause of Action must be

dismissed for failure to state a claim.

## II.  ENGELHARD'S FOURTH CAUSE OF ACTION IS BARRED BY THE THREE-YEAR STATUTE OF LIMITATIONS SET FORTH IN SECTION 113(g)(3)(B) OF CERCLA.

Even assuming the Order resolves Engelhard's liability for response costs or response

actions, and that the United States shares a common liability with Engelhard for the performance

of corrective actions, Engelhard's claim is barred by the three-year statute of limitations set forth

in CERCLA Section 113(g)(3)(B), 42 U.S.C. § 9613(g)(3)(B).  The Order was almost 12 years

old when Engelhard filed this suit, see Compl. ¶ 56 ("September 9, 1993"), well outside the

three-year period.  Engelhard's Fourth Cause of Action, therefore, must be dismissed.[18]

_____

[17]/(...continued)
law or fact."  Ex. 1, at 17.  "This matter" plainly refers to Engelhard's interim status corrective action obligations under the RCRA Section 3008(h) Order.  The lone sentence does not negate the specific and express provisions within the Order that reserve Engelhard's liability to EPA for response costs and response actions at the Plainville Facility.

[18] During 2002 and 2003, Engelhard and the United States entered into three tolling agreements, which taken together provide that the time period between April 26, 2002, and April 30, 2004,

(continued...)

-18-

First, under well-established principles governing the construction of federal statutes of limitation, as well as applicable case law and legislative history construing Section 113 as a whole, Engelhard's Section 113(f)(3)(B) claim is subject to Section 113(g)(3)(B)'s three-year limitation period.  Second, even if reading Section 113 as a whole and in light of congressional intent does not completely resolve the question, Engelhard's Section 113(f)(3)(B) claim is nevertheless subject to Section 113(g)(3)(B)'s limitation period under the rule that courts should borrow the most closely analogous statute of limitation.

**A.    Engelhard's Section 113(f)(3)(B) Claim Is Subject To Section 113(g)(3)(B)'s Three-Year Statute of Limitations.**

 Section 113(g)(3) of CERCLA reads, in full:

**(3)    Contribution**

No action for contribution for any response costs or damages may be commenced more than 3 years after—

**(A)** the date of judgment in any action under this chapter for recovery of such costs or damages, or

**(B)** the date of an administrative order under section 9622(g) of this title (relating to de minimis settlements) or 9622(h) of this title (relating to cost recovery settlements) or entry of a judicially approved settlement with respect to such costs or damages.

42 U.S.C. § 9613(g)(3).  As the First Circuit has recognized, this provision's express reference to "action[s] for contribution" indicates that it provides the applicable statute of limitations for

---

18/(...continued)
will not be included in calculating any statute of limitations that might be applicable to Engelhard's CERCLA claims.  Under these agreements, the United States expressly reserved the right to raise a statute of limitations defense based on Engelhard's failure to file a complaint prior to the beginning of the tolling periods.  Thus, the tolling agreements do not save Engelhard's claim.

contribution claims brought under Section 113(f) of CERCLA.  See United Technologies, 33

F.3d at 99-100.  Indeed, there are two other subsections within Section 113(g) of CERCLA that

contain statutes of limitation — Sections 113(g)(1) and 113(g)(2) — and neither of those

provisions refers to actions for contribution.  See 42 U.S.C. §§ 9613(g)(1), (g)(2).  Based on such

distinctions, as well as an exhaustive analysis of CERCLA legislative history and purpose, the

First Circuit has held that Section 113(g)(2) does not provide the statute of limitations for

contribution claims brought pursuant to Section 113(f).  See United Technologies, 33 F.3d at 99-

103.  In fact, the First Circuit held that Section 113(g)(2) exclusively provides the statute of

limitations for "action[s] for recovery of costs," and that those types of claims "are distinct and

do no overlap" with actions for contribution brought under Section 113(f).  Id. at 99-100.

Section 113(g)(3)(B), quoted in full above, does not expressly state that its limitations

period is triggered by the issuance of a RCRA Section 3008(h) administrative order, such as the

Order in this case.  Section 113(g)(3)(B) refers to three events that trigger the running of its

limitations period:  (1) the issuance of an administrative order under Section 122(g) of

CERCLA, 42 U.S.C. § 9622(g); (2) the issuance of an administrative order pursuant to Section

122(h) of CERCLA, 42 U.S.C. § 9622(h); and (3) the entry of a judicially approved settlement,

i.e., a consent decree.  See 42 U.S.C. § 9613(g)(3)(B).  Some district courts, prior to the Supreme

Court's decision in Cooper Industries, Inc. v. Aviall Services, Inc., 543 U.S. 157 (2004)

("Aviall"), held that CERCLA contribution claims based on administrative settlements not

expressly identified in Section 113(g)(3)(B) were subject to no statute of limitations at all.  See,

e.g., W.R. Grace & Co.– Conn. v. Zotos Int'l, Inc., No. 98-CV-838S(F), 2000 WL 1843282, at

*5 (W.D.N.Y. Nov. 2, 2000); Reichhold Chems., Inc. v. Textron, Inc., 888 F. Supp. 1116, 1125-

26 (N.D. Fla. 1995). Those district court decisions should no longer be followed because they are inconsistent with <u>Aviall</u> and contrary to congressional intent.

In <u>Aviall</u>, the Supreme Court analyzed the structure of CERCLA Sections 113(f) and 113(g)(3) together and concluded that the limitations period in Section 113(g)(3)(B) "correspond[s]" to actions for contribution brought under Section 113(f)(3)(B). 543 U.S. at 167. The question presented in <u>Aviall</u> was whether a private responsible party that had not been sued under Section 106 or 107 of CERCLA to undertake or pay for a cleanup of hazardous wastes could nevertheless seek contribution under Section 113(f)(1) of CERCLA from other liable parties. <u>Id.</u> at 160-61. In concluding that Section 113(f)(1) contribution claims could not be brought except "during or following" a Section 106 or 107 civil action, <u>see id.</u> at 166-68, the Court noted that its "conclusion follows not simply from § 113(f)(1) itself, but also from the whole of § 113." <u>Id.</u> at 167. The Court explained that CERCLA contains "two express avenues for contribution" — Section 113(f)(1) and Section 113(f)(3)(B) — and "two <u>corresponding</u> 3-year limitations periods for contribution actions, one beginning at the date of judgment, § 113(g)(3)(A), and one beginning at the date of settlement, § 113(g)(3)(B)." <u>Id.</u> (emphasis added). This parallel structure had significant implications, as the Court explained:

> Notably absent from § 113(g)(3) is any provision for starting the limitations period if a judgment or settlement never occurs, as is the case with a purely voluntary cleanup. The lack of such a provision supports the conclusion that, to assert a contribution claim under § 113(f), a party must satisfy the conditions of either § 113(f)(1) or § 113(f)(3)(B).

<u>Id.</u> Thus, Section 113(g)(3)'s structure as compared to that of Sections 113(f)(1) and 113(f)(3)(B) was relevant to the question presented in <u>Aviall</u>. Of additional significance is that the Court's analysis started with the premise that <u>all</u> contribution claims that arise under Section

113(f) are governed by <u>some</u> statute of limitation set forth in CERCLA — specifically, by either Section 113(g)(3)(A) or Section 113(g)(3)(B).  As such, the Court's analysis was fully consistent with the general body of law pertaining to federal statutes of limitations, which "do[es] not ordinarily assume that Congress intended that there be no time limit on actions at all" for express federal causes of action.  <u>Agency Holding Corp. v. Malley-Duff & Assocs., Inc.</u>, 483 U.S. 143, 146-47 (1987); <u>see</u> <u>DelCostello v. Int'l Bhd. of Teamsters</u>, 462 U.S. 151, 158-59 (1983); <u>Holmberg v. Armbrecht</u>, 327 U.S. 392, 395 (1946).

Accordingly, Section 113(g)(3)(B)'s three-year limitations period governs Engelhard's contribution claim under Section 113(f)(3)(B).  The contrary interpretation — that no limitations period should govern contribution claims brought under Section 113(f)(3)(B) if such claims are based on settlements other than the types specified in Section 113(g)(3)(B) — is plainly at odds with <u>Aviall</u>'s analysis of CERCLA Section 113's structure, and the general body of law pertaining to federal statutes of limitation.[19]

Furthermore, failing to subject Engelhard's claim to any statute of limitations period would fly in the face of congressional intent.  In a recent case involving the construction of Section 113(g)(3)(A)'s three-year limitation period, the First Circuit explained that Section 113 as a whole "implicates two competing principles."  <u>Am. Cyanamid Co. v. Capuano</u>, 381 F.3d 6, 15 (1st Cir. 2004).[20]  "On the one hand, CERCLA's essential purpose is making those

---

[19] We do not contend that actions for contribution under CERCLA Section 113(f)(3)(B) may be based only on the three types of settlements specified in CERCLA Section 113(g)(3)(B).

[20] In <u>Capuano</u>, the court held that Section 113(g)(3)(A)'s three-year limitations period did not begin to run against a contribution claim for groundwater-related response costs on the date that an earlier judgment was reached in a Section 107(a) governmental enforcement action relating to

(continued...)

responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created." Id. (internal punctuation and citations omitted).

> On the other hand, the Supreme Court has recognized that statutes of limitations are not disfavored, but rather "'are found and approved in all systems of enlightened jurisprudence' [and] represent a pervasive legislative judgment that . . . 'the right to be free of stale claims in a time comes to prevail over the right to prosecute them.  United States v. Kubrick, 444 U.S. 111, 117 (1979) (citations omitted).  Indeed, by passing SARA, Congress recognized that "CERCLA currently includes no explicit statute of limitations for the filing of cost recovery actions [and SARA] provides for the timely filing of cost recovery actions, to assure that evidence concerning liability and response costs is fresh and to provide a measure of finality to affected responsible parties."

Id. (quoting H.R. Rep. No. 99-253(I), at 15 (1985)).  Thus, failing to subject Engelhard's Section 113(f)(3)(B) claim to a limitations period would ignore the balance Congress intended to strike between the two "competing" statutory principles, and undermine Congress's intent to assure finality to affected parties and the availability of fresh evidence concerning liability and costs.[21]

---

[20]/(...continued)
the recovery of soil-related response costs at the same site.  381 F.3d at 12-15.  The court emphasized the fact that the groundwater-related response costs had not even been contemplated, much less incurred, at the time of the original judgment in the governmental enforcement action.

[21]/ In the instant case, the concerns regarding finality and stale evidence are especially relevant. Engelhard's substantial delay in bringing its claim (nearly 12 years after issuance of the Order) has forced the United States to engage in an archeology of the records of several federal agencies and the National Archives in an attempt to locate those limited number of remaining records that pertain to the Engelhard's Facility and which were not previously destroyed under standard procedures related to the maintenance of agency records.  Moreover, former Engelhard and governmental employees who may have had better knowledge of the Facility's waste generating and disposal operations during the 1960s, '70s, and '80s, or governmental contacts with the Facility, have retired, moved on, or passed away.  This deprives the United States of fresh evidence concerning the Engelhard's day-to-day waste generation and handling operations, and evidence of the United States' role, if any, in such operations.  Such factors are crucial to the resolution of liability and cost allocation issues.

Moreover, there is no basis to conclude that the two competing interests that motivated

Congress's enactment of Section 113 are any less present in cases where, as here, a Section

113(f)(3)(B) contribution action is not based on one of the types of settlements expressly

identified in Section 113(g)(3)(B).  In fact, the final conference report that accompanied the

passage of SARA indicates that Congress intended the three-year statute of limitations period in

Section 113(g)(3)(B) to apply to <u>all</u> Section 113(f)(3)(B) claims, regardless of the statutory

subsection underlying administrative settlement:

> The conference substitute also adopts section 113(g)(3) of the House amendment,
> which prohibits the commencement of <u>any action for contribution</u> more than three
> years after the date of judgment in any civil action under this Act for recovery of
> costs or damages or more than three years after the date of entry of <u>administrative</u>
> <u>or judicially approved settlements</u>.

H.R. Conf. Rep. No. 99-962, at 223 (1986), <u>reprinted in</u> 1986 U.S.C.C.A.N. 3276, 3316

(emphasis added).  Accordingly, Engelhard's Section 113(f)(3)(B) claim is subject to Section

113(g)(3)(B)'s three-year limitations period.

### B.    Alternatively, the Court Should Borrow the Statute of Limitation In CERCLA Section 113(g)(3)(B), the Most Closely Analogous Statute of Limitation For Section 113(f)(3)(B) Contribution Claims.

Should the Court find that statutory structure and congressional intent do not completely

resolve the question, Engelhard's Section 113(f)(3)(B) claim nevertheless is subject to Section

113(g)(3)(B)'s three-year limitations period under the rule that courts should borrow the most

closely analogous statute of limitation.

### 1.    Borrowing Section 113(g)(3)(B) Advances Federal Policies and Is More Practical Than Borrowing Varying State Law Statutes of Limitation.

Congress's failure to provide express statutes of limitation for express federal causes of

action is "a void which is commonplace in federal statutory law." <u>Board of Regents v. Tomanio</u>,

446 U.S. 478, 483 (1980); <u>see</u> <u>North Star Steel Co. v. Thomas</u>, 515 U.S. 29, 33 (1995).  The

Supreme Court has explained that courts should borrow and apply a federal statute of limitations

> "'when a rule from elsewhere in federal law clearly provides a closer analogy
> than available state statutes, and when the federal policies at stake and the
> practicalities of litigation make that rule a significantly more appropriate vehicle
> for interstitial lawmaking.'"

<u>North Star Steel</u>, 515 U.S. at 35 (quoting <u>Reed v. United Transp. Union</u>, 488 U.S. 319, 324

(1989), in turn quoting <u>DelCostello</u>, 462 U.S. at 172).

Here, Section 113(g)(3)(B) provides the most closely analogous statute of limitation,

advances the federal policies at stake, and serves the practicalities of litigation.  First, a uniform

rule should apply to CERCLA contribution claims, but statutes of limitation for contribution

actions under state law vary from State to State.[22]  It would make little sense to have limitation

periods vary depending upon the state law applicable to the federal judicial district in which the

actions are filed, particularly since federal agencies may be sued under Section 113(f)(3)(B) in

---

[22] <u>See</u> Restatement (Second) of Torts § 886A cmt. g (1979) ("The contribution suit should * * *
be made subject to its own statute of limitations, sufficiently short to afford protection against
undue extension of the tortfeasor's liability.  <u>These questions are for the legislature</u> * * * .")
(emphasis added); Maurice T. Brunner, Annotation, "What Statute of Limitation Applies to
Action For Contribution Against Joint Tortfeasor," 57 A.L.R.3d 927, § 1[a] ("The question of
what statute of limitations applies is, of course, a peculiarly statutory one.").  Section 3(d) of the
Uniform Contribution Among Tortfeasors Act ("UCATA"), contains a one-year limitations
period that begins to run when the would-be contribution plaintiff has "discharge[d] by payment
the common liability."  However, the UCATA has been adopted by only eleven States, while
forty-five States recognize rights to contribution, either legislatively or judicially, and there is no
generally accepted statute of limitations period among those States.  <u>See</u> Michael K. Sugrue,
"Note: The Rights of Settling Tortfeasors Under The Massachusetts Contribution Among
Tortfeasors Act," 35 <u>Suffolk Univ. L. Rev.</u> 571, 579 nn.53-54 (2001) (citing Jean Macchiaroli
Eggen, "Understanding State Contribution Laws and Their Effect on the Settlement of Mass Tort
Actions," 73 <u>Tex. L. Rev.</u> 1701, 1750-77 (1995)).

-25-

every federal judicial district.  This would result in different statutes of limitations for the same type of contribution action, depending on the venue.  Moreover, some CERCLA contribution cases against the United States "package" multiple claims arising from separate hazardous waste sites located in different states.[23]  There is no sound practical or policy reason to apply different limitations periods to different sites for the exact same type of federal claim in the same case.

Second, Section 113(g)(3)(B) clearly provides the most closely analogous statute of limitation for Section 113(f)(3)(B) contribution claims.  Section 113(g)(3)(B) specifically addresses contribution claims under Section 113(f)(3)(B) of CERCLA, including those based on administrative orders issued by EPA to potentially responsible parties.  Section 113(g)(3)(B) is actually designed to balance interests identical to those at issue in <u>any</u> action for contribution arising under Section 113(f)(3)(B) of CERCLA, whether or not the action is based on a settlement expressly identified in Section 113(g)(3)(B).

> **2.      Section 113(g)(3)(B) Provides A More Closely Analogous Statute of Limitation For Section 113(f)(3)(B) Contribution Claims Than Does Section 113(g)(2).**

The only other possible statute of limitation, set forth in CERCLA Section 113(g)(2), is not applicable to CERCLA Section 113(f) contribution claims, <u>see</u> <u>United Technologies</u>, 33 F.3d at 99-103, much less <u>more analogous</u> to such claims than the limitations provision in Section

---

[23] <u>E.g.</u>, <u>Alcoa, Inc. v. United States</u>, Civ. A. No. 03-1180 (W.D. Pa.) (seeking contribution under CERCLA for expenditures at six industrial sites in six different states); <u>DuPont v. United States</u>, No. CIV 97-497 (D.N.J.) (seeking contribution at fifteen separate industrial sites located in eight different states); <u>General Motors Corp. v. United States</u>, No. 01-CV-2201 (D.N.J.) (more than a dozen industrial sites in three states).

113(g)(3)(B).  Section 113(g)(2) provides, in relevant part:

**(2)  Actions for recovery of costs**

An initial action for recovery of the costs referred to in section 9607 of this title [42 U.S.C. § 9607] must be commenced—

**(A)** for a removal action, within 3 years after completion of the removal action, * * *; and

**(B)** for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

42 U.S.C. § 113(g)(2) (emphasis added).  The First Circuit, in United Technologies, held that Section 113(g)(2) governs actions for the recovery of costs brought under Section 107, and that such actions "are distinct and do not overlap" with actions for contribution filed under Section 113(f).  See 33 F.3d at 99-101; see also id. at 103 ("CERCLA's text indicates that contribution and cost recovery actions are distinct, non-overlapping anodynes"); Aviall, 543 U.S. at 163 n.3 (explaining that the two remedies are "clearly distinct").  The First Circuit also held that Section 113(g)(3) provides the exclusive statute of limitation for actions brought by potentially responsible parties under Section 113(f)(1).  United Technologies, 33 F.3d at 101-03.  In addition, the Supreme Court in Aviall characterized Section 113(g)(3)(B) as the limitation provision which "correspond[s]" to Section 113(f)(3)(B) actions.  543 U.S. at 167.  Together, the analyses by the First Circuit and the Supreme Court indicate that Section 113(g)(3)(B), not Section 113(g)(2), fits more closely with Section 113(f)(3)(B) contribution claims.

A direct comparison of the language of Sections 113(g)(2) and 113(g)(3)(B) also shows that Section 113(g)(3)(B) is the most closely analogous provision for any contribution claim

filed under Section 113(f)(3)(B).  Section 113(g)(3) is specifically entitled "Contribution" and its

text states that "[n]o action for contribution" may be commenced more than three years after the

events listed in that Section.  42 U.S.C. § 9613(g)(3) (emphasis added).  Section 113(g)(2), by

contrast, is entitled "Actions for recovery of costs" and makes no reference at all to contribution

actions.  Id. § 9613(g)(2); see United Technologies, 33 F.3d at 100 (Section 113(g)(2)'s

reference to actions for "'recovery of the costs'" is "reiterative of the subsection heading

'Actions for recovery of costs'"); H.R. Conf. Rep. No. 99-962, at 223 (1986), reprinted in 1986

U.S.C.C.A.N. 3276, 3316 (stating that "section 113(g)(2) of CERCLA" is "the statute of

limitations for civil actions for the recovery of response costs").  As such, Section 113(g)(2), by

its terms, does not even apply to contribution claims arising under CERCLA, much less offer the

most closely analogous provision for contribution claims arising under Section 113(f)(3)(B).

In addition, a well-established rule is that statutes of limitation for contribution actions

begin to run when the would-be contribution plaintiff's cause of action accrues.[24]  Actions for

contribution under Section 113(f)(3)(B) accrue when the would-be contribution plaintiff has

entered into an administrative or judicially approved settlement that resolves that party's liability

for response costs or response actions.  This rule is significant, because while Section

113(g)(3)(B) references events that mark the accrual of a right to contribution under Section

---

[24] See D'Onofrio Constr. Co. v. Recon Co., 255 F.2d 904, 907-08 (1st Cir. 1958) (discussing established rule and an "unusual" exception to established rule under Rhode Island law); Asdar Group v. Pillsbury, Madison & Sutro, 99 F.3d 289, 295 (9th Cir. 1996) ("Given the timing of the accrual of the right to contribution, the general rule for limitation of contribution claims is that 'the statute of limitations governing claims for contribution runs from the discharge of the obligation * * * .'") (quoting 18 Am. Jur. 2d, Contribution § 102); Maurice T. Brunner, Annotation, "When Statute of Limitation Commences to Run Against Claim For Contribution or Indemnity Based On Tort," 57 A.L.R. 3d 867, § 3[a] (same); Unif. Contribution Among Tortfeasors Act (1955 revised ed.) § 3(d).

113(f)(3)(B) — namely, entry of administrative or judicially approved settlements — Section 113(g)(2) references events that do <u>not</u> mark the accrual of the right to contribution under Section 113(f)(3)(B). <u>See</u> 42 U.S.C. § 9613(g)(2) (indicating that the limitation periods begin to run upon completion of removal action or initiation of on-site physical construction of a remedial action). This indicates that Section 113(g)(3)(B) is a more closely analogous limitations provision for Section 113(f)(3)(B) contribution claims. Moreover, since Section 113(g)(3)(B) expressly governs Section 113(f)(3)(B) claims based on administrative orders issued by EPA under Sections 122(g) and 122(h) of CERCLA, then by close analogy, Section 113(g)(3)(B) should govern Section 113(f)(3)(B) claims based on <u>other</u> administrative orders issued by EPA, such as RCRA Section 3008(h) orders. By contrast, Section 113(g)(2) bears no such parallel textual structure.

> **3.    Section 113(f)(3)(B) Contribution Actions — Which Are "Distinct" Causes of Action From Actions For The Recovery Of Costs Brought Under Section 107(a) — Are Governed By the Statute of Limitation In Section 113(g)(3)(B).**

Prior to <u>Aviall</u>, some courts concluded that CERCLA Section 113(g)(2) provided the limitations period for contribution claims that were brought in the absence of any of the triggering events expressly identified in either Section 113(g)(3)(A) or Section 113(g)(3)(B). <u>See</u>, <u>e.g.</u>, <u>Sun Co., Inc. (R & M) v. Browning-Ferris, Inc.</u>, 124 F.3d 1187, 1192-94 (10th Cir. 1997); <u>Gen. Elec. Co. v. Am. Annuity Group, Inc.</u>, 137 F. Supp. 2d 1, 4-7 (D.N.H. 2001). Although Section 113(g)(2) does not expressly govern contribution actions, and instead governs "initial action[s] for recovery of the costs referred to in section [107]" of CERCLA, the Tenth Circuit, in <u>Sun Company</u>, reasoned that Section 113(f) contribution actions can be viewed as "actions for recovery of the costs referred to in section [107]." 124 F.3d at 1191-92. The Tenth

-29-

Circuit viewed all Section 113(f) claims as arising under Section 107, while being "governed by the equitable principles of § 113(f)." Id. at 1192; see also id. at 1191 ("§ 113(f) did not create a new cause of action"). Accordingly, in instances where no Section 106 or 107 action has been filed at the relevant site, and thus no "triggering event" under Section 113(g)(3) could possibly occur, the court concluded that Section 113(f) actions also qualify as "initial actions for the recovery of the costs referred to in section [107]" within the meaning of Section 113(g)(2). Id. at 1192-94. The Tenth Circuit's analysis drew support from Key Tronic Corp. v. United States, 511 U.S. 809, 818 (1994), see Sun Co., 124 F.3d at 1193, where the Supreme Court provided dictum that Section 107 "impliedly authorizes private parties to recover cleanup costs from other [responsible parties]" and that the remedies in Sections 107 and 113 are "somewhat overlapping." 511 U.S. at 816.[25]

Whatever its merit before Aviall, the Sun Company rule cannot stand after Aviall. Specifically addressing Key Tronic's dictum, the Court in Aviall clarified that "[t]he cost recovery remedy of § 107(a)(4)(B) and the contribution remedy of § 113(f)(1) are similar at a general level in that they both allow private parties to recoup costs from other private parties. But the two remedies are clearly distinct." 543 U.S. at 163 n.3. The Court went on to note that Key Tronic did not even classify the "overlapping" right in Sections 107 and 113 "as a right of cost recovery or a right of contribution," and that it was improper to resolve the scope of potential claims under Section 107 "on the basis of dictum in Key Tronic." Id. at 170. Accordingly, after Aviall, Section 113(f) contribution actions are no longer properly classified as

_____

[25] Indeed, prior to Aviall, the United States had taken the view that where a contribution action under Section 113(f) was brought in the absence of a civil action under Section 106 or 107, the statute of limitations was contained in Section 113(g)(2).

"actions for recovery of the costs referred to" in Section 107.  Section 113(g)(2) — which by its terms governs only "actions for recovery of the costs referred to" in Section 107, and does not even refer to actions for contribution — cannot supply the most closely analogous statute of limitation for contribution actions filed under Section 113(f).

Nor can <u>Sun Company</u> be squared with <u>United Technologies</u>, where the First Circuit held that actions for the recovery of costs "are distinct and do not overlap with" Section 113(f) contribution actions.  33 F.3d at 100, 103.  The court also held that "initial actions for recovery of the costs" arise under Section 107 exclusively, and are exclusively governed by Section 113(g)(2)'s limitations period.  <u>Id.</u> at 99-100.  As such, Section 113(g)(2) cannot provide the most closely analogous statute of limitation for Section 113(f)(3)(B) contribution claims.

## CONCLUSION

For the foregoing reasons, the Court should grant the United States' Motion For Partial Judgment On The Pleadings On Plaintiff's Fourth Cause of Action.

Respectfully submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment & Natural Resources Division

Dated: August 4, 2006

/s/ Stephen E. Crowley
STEPHEN E. CROWLEY
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 23986
Washington, D.C.  20026-3986
Tel: (202) 514-0165
Fax: (202) 514-8865
Stephen.Crowley@usdoj.gov

MICHAEL J. SULLIVAN
United States Attorney
District of Massachusetts

ANTON P. GIEDT
Assistant U.S. Attorney
1 Courthouse Way
Boston, MA  02210
Tel:  (617) 748-3309
Fax: (617) 748-3967
anton.giedt@usdoj.gov

*Attorneys for the United States*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ENGELHARD CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **Civil Action No. 05-11241-JLT** |
| | ) |
| UNITED STATES OF AMERICA, et al., | ) (*Electronic filing*) |
| | ) |
| Defendants. | ) |
| | ) |

## [PROPOSED] **ORDER**

Upon consideration of the United States' Motion for Judgment on the Pleadings on Plaintiff's Fourth Cause of Action, and any opposition thereto, the Court being fully advised in the grounds for said Motion, it is hereby ORDERED that United States' Motion be GRANTED, and it is further ORDERED that the Fourth Cause of Action in the Complaint is hereby DISMISSED WITH PREJUDICE pursuant to Fed. R. Civ. P. 12(c) and 12(b)(6).


Dated: _____          _____
                                        The Honorable Joseph L. Tauro
                                        United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this 4th day of August 2006, served a true and correct copy of the foregoing

1)      MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION FOR JUDGMENT ON THE PLEADINGS ON PLAINTIFF'S FOURTH CAUSE OF ACTION, and

2)      PROPOSED ORDER

on Plaintiff's counsel of record by electronic filing, as follows:

Ronald L. Kuis, Esq.
12 Scenery Road
Pittsburgh, PA 15221
rlkuis@aol.com

David P. Rosenblatt
Paul R. Mastrocola
Burns & Levinson, LLP
125 Summer Street
Boston, MA  02110
Pmastrocola@burnslev.com
Drosenblatt@burnslev.com

/s/ Stephen E. Crowley
STEPHEN E. CROWLEY
Attorney for the United States

# Exhibit 1

## RCRA Section 3008(h) Administrative Order



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

REGION I

J.F. KENNEDY FEDERAL BUILDING, BOSTON, MASSACHUSETTS 02203-2211

September 9, 1993

Linda D'Amore
Regional Hearing Clerk
U.S. Environmental Protection Agency
Region I
J.F. Kennedy Federal Building, RCG
Boston, Massachusetts  02203

Re:  <u>Engelhard Corporation; Docket No. I-92-1051</u>

Dear Ms. D'Amore:

Enclosed for filing in the above-referenced matter, please find a
signed Consent Order and a Certificate of Service.

Thank you for your assistance.

Very truly yours,

Andrea Simpson
Assistant Regional Counsel

Enclosure

cc:  Robert A. DiBiccaro, Presiding Officer
     Lois R. Murphy, Esq.
     Donald Anglehart, Esq.



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

REGION I

J.F. KENNEDY FEDERAL BUILDING, BOSTON, MASSACHUSETTS 02203-2211

**CERTIFIED MAIL**

September 9, 1993

Lois R. Murphy
Cahill Gordon and Reindel
Eighty Pine Street
New York, New York  10005

Re: <u>Engelhard Corporation; RCRA Docket No. I-92-1051</u>

Dear Lois:

Enclosed please find a copy of the Consent Order which was signed
by the Acting Regional Administrator today and filed with the
Regional Hearing Clerk.  Pursuant to Section XIII. of the Consent
Order, Engelhard must notify EPA of its designated Project
Coordinator within seven days of today's date.  Pursuant to
Section I. of the Consent Order, the Stabilization Plan is due
within 90 days of today's date.

Please call me if you have any questions concerning the Consent
Order.

Very truly yours,

Andrea Simpson
Andrea Simpson
Assistant Regional Counsel

cc:  Bob Brackett

RECEIVED BY
THOMAS S. BROWN

SEP 1 6 1993

COPIES TO:
CIRC. TO:
RETURN
FILE: 01-Plainville - Soil/GW

14-101

UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY
REGION I

IN THE MATTER OF:              )
                               )        RCRA DOCKET NO: I-92-1051
                               )
Engelhard Corporation          )
Route 152                      )
Plainville, MA  02762          )        CONSENT ORDER
                               )
EPA I.D. #MAD001190644         )

PRELIMINARY STATEMENT

This Administrative Order on Consent ("Consent Order") is issued to Engelhard Corporation ("Engelhard" or "Respondent"), Route 152, Plainville, Massachusetts pursuant to Section 3008(h) of the Solid Waste Disposal Act, commonly referred to as the Resource Conservation and Recovery Act ("RCRA"), as amended, 42 U.S.C. § 6928(h).

The authority to issue this Consent Order is vested in the Administrator of the United States Environmental Protection Agency ("EPA") under RCRA and has been delegated to the Regional Administrators by EPA Delegation No. 8-31, dated March 6, 1986. This authority has been further delegated by the Regional Administrator for Region I to the Director of the Waste Management Division ("Director") on September 29, 1988.  For purposes of this Consent Order only, Engelhard consents to the jurisdiction of EPA to issue this Consent Order.

RCRA Docket No. I-92-1051

<u>Certificate of Service</u>

I hereby certify that the original Consent Order was served upon
the Regional Hearing Clerk and copies thereof were served upon
the Presiding Officer and Counsel for the Respondent, this day,
in the following manner and at the addresses listed below:

Original by hand delivery to: Linda D'Amore
                                   Acting Regional Hearing Clerk
                                   U.S. Environmental Protection
                                   Agency
                                   Region I
                                   J.F.K. Federal Building, RCG
                                   Boston, Massachusetts 02203

Copy by hand delivery to:     Robert A. DiBiccaro
                                   Presiding Officer
                                   U.S. Environmental Protection
                                   Agency
                                   Region I
                                   J.F.K. Federal Building, RRC
                                   Boston, Massachusetts 02203

Copy by certified mail to:     Lois R. Murphy
                                   Cahill Gordon & Reindel
                                   Eighty Pine Street
                                   New York, New York   10005

Copy by first class mail to:   Donald L. Anglehart
                                   Testa Hurwitz & Thibault
                                   53 State Street
                                   Boston, Massachusetts 02109

Date: 8/9/93

                                   Andrea Simpson
                                   Assistant Regional Counsel

# TABLE OF CONTENTS

**Provision**                                                          **Page**

Definitions ................................................1

Applicability ...............................................5

Statement of Purpose ........................................5

Findings ....................................................6

Determinations...............................................16

Consent Agreement ...........................................17

I.     Stabilization Plan ...................................18

       A. Required Stabilization Measures...................21

       B. Stabilization Measures Work Plan.................27

       C. Stabilization Management Plan ...................29

II.    Conceptual Designs, Confirmatory Sampling Plans and
       Operation & Maintenance Plans for Stabilization
       Measures .............................................34

       A. Conceptual Designs ..............................35

       B. Confirmatory Sampling Plan.......................36

       C. Operation and Maintenance Plans .................39

III.   Final Designs and Implementation of Stabilization
       Measures .............................................41

IV.    Stabilization Reports ...............................41

V.     RCRA Facility Investigation ("RFI") Proposal.........43

       A. Current Assessment Summary Report ...............44

       B. Identification of Additional Media of Concern and
          Areas of Concern..................................48

       C. Preliminary Investigation of Potential Corrective
          Measures .........................................50

       D. Facility Investigation ..........................52

          1. Environmental Setting ........................52

             a. Soil/Bedrock Characterization ...........52

       b. Procedures for Determining Ground-
          Water Hydraulics ....................53

       c. Procedures for Evaluating Surface Waters
          and Sediments ....................54

       d. Procedures for Evaluating Climatic
          Conditions ....................54

   2. Source and Waste Characterization ...........55

   3. Contamination Characterization ...............55

      a. Ground Water ............................56

      b. Soil ....................................57

      c. Surface Water and Sediments ............57

   4. Health and Environmental Risk Assessment......58

   5. Data Collection Quality Assurance Plan .......59

      a. Data Collection Strategy ................59

      b. Sampling ................................60

   6. Data Management Plan ........................61

      a. Data Record ............................61

      b. Tabular Displays .......................62

      c. Graphical Displays .....................63

   7. Health and Safety Plan .......................63

  E. Project Management Plan ..........................65

VI.   Review of the RFI Proposal ........................69

VII.  Phase I Interim Report and Phase II Proposal ........70

VIII. Review of the Phase I Report & Phase II Proposal ....75

IX.   RFI Report ........................................75

  A. Environmental Setting ............................75

   1. Hydrogeology ................................75

   2. Soils ......................................78

   3. Surface Water and Sediments ................ 79

B. Source and Waste Characterization ................80

    1. AOC and sub-AOC Characteristics .............81

    2. Waste Characteristics ........................81

C. Contamination Characterization ...................83

    1. Ground-Water Contamination ...................83

    2.  Soil Contamination ..........................84

    3. Surface Water and Sediment Contamination .....85

D. Health and Environmental Risk Assessment ........87

E. Stabilization and Interim Measures Report .. .....87

F. Identification of Additional Tasks ..............87

X.    Review of the RFI Report ..........................91

XI.   Media Protection Standards ("MPS") Proposal ........91

    A. Ground Water Protection Standards ................92

    B. Soil Protection Standards ......................97

    C. Surface Water and Sediment Protection
       Standards ......................................99

XII.  Interim Measures .................................101

XIII. Designation of Project Coordinator and EPA
     Project Manager .................................102

XIV.  Sampling ........................................ 103

XV.   Site Access .....................................104

XVI.  Retention and Availability of Information ........ 106

XVII. Reservation of Rights and Non-Release of
     of Other Claims .................................107

XVIII.No Preauthorization of Funding ...................109

XIX.  Other Applicable Laws ...........................110

XX.   Indemnification of the United States Government.....110

XXI.  Financial Assurance .............................111

XXII. Subsequent Modification ........................ 111

XXIII. Incorporation and Enforceability of Documents ..... 112

XXIV. Termination and Satisfaction ...................... 113

XXV. Severability ...................................... 113

XXVI. Survivability/Permit Integration ................. 113

XXVII. EPA Review and Approval Process ................... 114

XXVIII. Stipulated Penalties............................. 115

XXIX. Force Majeure..................................... 122

XXX. Dispute Resolution................................ 124

XXXI. Effective Date................................... 126

Figure 1: Facility Boundary and Building Plan

Figure 2: Locations of Areas and sub-Areas of Concern

Figure 3: Area of Ground-Water Stabilization Measure

Figure 4: Area of Fence Relocation Stabilization Measure

Attachment I: AOCs and Media to be Investigated

Attachment II: Technical Agreement

Attachment III: Legal Description of Facility Boundary

Appendix I - Information Requirements of the RFI Proposal for the Environmental Setting, Source and Contamination Characterization

Appendix II - Information Requirements of the RFI Proposal for the Sampling and Analysis Program

Appendix III - Health and Environmental Risk Assessment

## DEFINITIONS

All terms used in this Consent Order are as defined in 40 C.F.R.
Sections 260.10 and 264.141, unless defined below:

1. "Act" or "RCRA" means the Resource Conservation and Recovery
   Act, as amended by the Hazardous and Solid Waste Amendments
   of 1984, 42 U.S.C. §§ 6901 et seq.

2. "Appendix IX" means Appendix IX to 40 C.F.R. Part 264, as
   amended. See 52 Fed. Reg. 25942 (July 9, 1987) (Final Rule).

3. "Aquifer" means a geological formation, group of geological
   formations, or part of a geological formation that is
   capable of yielding water to water supply wells or springs.

4. "Area of Concern" or "sub-Area of Concern" means an area at
   the Facility where solid or Hazardous Waste or Hazardous
   Constituents may have been managed or may have come to be
   located and from which releases of Hazardous Waste or
   Hazardous Constituents have or may have occurred. Examples
   include, without limitation: landfills, surface
   impoundments, waste piles, storage tanks, incinerators,
   tanks (including 90-day accumulation tanks), container
   storage areas, waste water treatment units, and waste
   recycling operations.

5. "Background" for any particular media (Ground Water, soil,
   surface water and sediments, and/or air) shall mean a
   representative nearby sample of that media that is
   upgradient of any Zone(s) of Contamination and/or is not

1

affected by the Facility.

6. "Constituents of Concern" means those constituents listed in Appendix VIII to 40 C.F.R. Part 261 or in Appendix IX to 40 C.F.R. Part 264 which have been or may have been released from AOCs or sub-AOCs at the Facility.

7. "Day" means a calendar day unless otherwise stated.

8. "Director" means the Director of the Waste Management Division, EPA Region I or his designee. For purposes of Section XXX, Director means the Director or Acting Director of the Waste Management Division, EPA, Region I.

9. "Facility" (see "Site") includes all contiguous land owned by Engelhard Corporation west of Route 152 in Plainville, Massachusetts, and structures, other appurtenances and improvements on the land, not limited to solid or Hazardous Waste management areas used for treating, storing, or disposing of Hazardous Waste, as shown on Figure 1 and described in Attachment III.

10. "Ground Water" (or "ground-water") means water below the land surface in the subsurface zone below which all pore space is filled with water.

11. "Hazardous Constituents" are those constituents listed in Appendix VIII to 40 C.F.R. Part 261 or in Appendix IX to 40 C.F.R. Part 264.

12. "Hazardous Waste" is as defined in Section 1004(5) of RCRA, 42 U.S.C. § 6903(5).

13. "Health-Based Criteria" shall refer to those health-based standards that, in order of preference, have been either promulgated by EPA in regulation form, adopted by EPA in guidance form, or deemed acceptable by the Director.

14. "Monitoring Well" means a well capable of producing ground-water samples that, upon laboratory analysis, can provide a reliable indication of ground-water quality.

15. "Observation Well" means a well used to measure ground-water table elevations.

16. "Point of Exposure" means the point at which a potential receptor can come into contact, either now or in the future, with Hazardous Waste and/or Hazardous Constituents.

17. "Release" includes any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment.

18. "Site" (see "Facility") includes all contiguous land owned by Engelhard Corporation west of Route 152 in Plainville, Massachusetts, and structures, other appurtenances and improvements on the land, not limited to solid or Hazardous Waste management areas used for treating, storing, or disposing of Hazardous Waste, as shown on Figure 1 and described in Attachment III.

19. "Stabilization" means a national management strategy which stresses the control or abatement of threats to human health and the environment from Releases of Hazardous Wastes or Hazardous Constituents at RCRA facilities, or prevents or

3

minimizes the further spread of contamination while long term remedies are pursued.

20. "Water Quality Standards" are provisions of State or Federal law which consist of a designated use or uses for the waters of the United States and water quality criteria for such waters based upon such uses. Water quality standards are established to protect the public health or welfare, enhance the quality of water and serve the purposes of the Clean Water Act ("CWA").

21. "Zone of Contamination" means the three dimensional extent of contamination that was produced or is being produced from a Release of Hazardous Wastes or Hazardous Constituents from an Area of Concern or sub-Area of Concern.

## APPLICABILITY

1. This Consent Order applies to and is binding upon Engelhard Corporation, its successors and assigns.

2. No change in ownership or corporate status will in any way alter Engelhard's responsibility under this Consent Order.

3. Engelhard agrees to provide a copy of this Consent Order to all contractors and consultants retained to conduct or monitor any portion of the work performed pursuant to this Consent Order prior to the date that work, pursuant to this Consent Order, is to begin. Engelhard or its contractors or consultants shall provide written notice of this Consent Order to all subcontractors hired to perform any portion of the work required by this Consent Order prior to the commencement of work by such subcontractors. Engelhard shall be responsible for ensuring that its contractors and subcontractors perform the work contemplated herein in accordance with this Consent Order.

4. Engelhard agrees to give notice of this Consent Order to any successor in interest prior to transfer of ownership or operation of the Facility, and agrees to notify EPA in writing of such transfer of ownership or operation at least thirty (30) days prior to such action.

## STATEMENT OF PURPOSE

In entering into this Consent Order, the mutual objectives of the parties are: to further evaluate the nature and extent of Releases of Hazardous Waste and/or Hazardous Constituents from

5

AOCs at the Facility; to complete a RCRA Facility Investigation; to implement specified measures identified in this Consent Order to stabilize Releases of Hazardous Wastes and/or Hazardous Constituents to the environment; to conduct Interim Measures, if necessary; and to gather data to support a future Corrective Measures Study in anticipation that such a study is deemed necessary.

## FINDINGS

1. Engelhard Corporation is incorporated under the laws of the State of Delaware.

2. Engelhard owns and operates a Facility located in Plainville, Massachusetts.

3. Engelhard's Facility commenced operations in 1957. Between 1957 and 1962, the plant had two primary functions: rolling and fabricating steel and titanium, and fabricating uranium fuel elements under Atomic Energy Commission licenses. The Facility has, at various times until recently, manufactured precious metals into wire and flatstock, primarily for the jewelry and electrical industries. The manufacturing processes have included melting the raw metals, mixing with other metals to make alloys, shaping the metal, heat treating, and finishing. Wastes generated at various times as a result of these processes included: waste water containing cyanide, chromium, and/or acid/alkaline waste streams; solvents; pollution control dust; and metal hydroxide sludge.

4.  Engelhard owned and operated the Facility on and after November 19, 1980, the applicable date which renders facilities subject to interim status requirements or the requirement to have a permit under Sections 3004 and 3005 of RCRA, 42 U.S.C. § 6924 and § 6925, and 40 C.F.R. Parts 265, 268 and 270.

5.  Pursuant to Section 3010(a) of RCRA, 42 U.S.C. § 6930(a), Engelhard submitted to EPA a Notification of Hazardous Waste Activity dated August 13, 1980.  In this notification, Engelhard identified itself as a Hazardous Waste generator and transporter, and a Hazardous Waste treatment, storage, and disposal ("TSD") facility.

6.  On November 18, 1980, Engelhard submitted to EPA a Part A Hazardous Waste Permit Application pursuant to Section 3005 of RCRA, 42 U.S.C. § 6925, and the regulations promulgated thereunder, 40 C.F.R. § 270.10(e)(1).  In this submission, Engelhard identified itself as managing listed and characteristic Hazardous Wastes at the Facility.

7.  Engelhard requested and was granted a change of status by the Massachusetts Department of Environmental Protection ("DEP") from a TSD facility to a Large Quantity Generator on April 19, 1989.

8.  On March 31, 1986, EPA sent Engelhard a Request for Information pursuant to Section 3007(a) of RCRA, 42 U.S.C. § 6927(a), and Section 104(e) of CERCLA, 42 U.S.C. § 9604(e) ("Information Request").

7

9.  Engelhard responded to the Information Request on September 8, 1986. The Company provided supplemental responses to the Information Request on March 6, 1987 and July 20, 1989.

10. Engelhard has voluntarily completed three phases of Site investigation. From 1987 to 1990, these activities have included the installation of Monitoring Wells and sampling of Ground Water, soil, soil gas, surface water, sediments and fish.

11. Two reports concerning Engelhard's voluntary investigations were prepared by Environ Corporation, Engelhard's consultant. These reports, <u>Results of Phase I and Phase II Field Investigation, Engelhard Corporation, Plainville, Massachusetts</u>, dated March 13, 1989, and <u>Phase III Summary Report, Engelhard Corporation, Plainville, Massachusetts</u>, dated March 30, 1990, ("the Environ Reports") were submitted to EPA, the DEP and the local Board of Health by Engelhard.

12. Based on the information submitted in responses to the Section 3007(a) Information Request, the Environ Reports and information gathered by EPA, forty-six (46) Areas of Concern ("AOCs") were identified by EPA at the Facility and are listed in the September 1991 RCRA Facility Assessment ("RFA") prepared by EPA.

13. EPA and Engelhard agree, for the purpose of this Consent Order, that Engelhard shall conduct further investigation of twenty (20) of the original forty-six (46) AOCs.

8

14.  EPA and Engelhard agree to reclassify certain AOCs as sub-AOCs.  These AOCs are proximate to each other, share the same potential remedial issues and are areas at which similar wastes were managed.  Accordingly, two new AOCs, AOC A and AOC B, are composed of sub-AOCs as follows:

> AOCS #1 and #12 are reclassified as sub-AOCs A-1 and A-12.  Sub-AOCs A-1 and A-12 are combined to form a new AOC:  AOC-A.

> AOCS #2, #3, #4, #18, and #35 are reclassified as sub-AOCS B-2, B-3, B-4, B-18, and B-35.  These sub-AOCs are combined to form a new AOC:  AOC-B.

Based on this reclassification of AOCs, EPA and Engelhard agree that Engelhard shall conduct further investigations for the following fifteen (15) AOCs:

> AOC-A (composed of sub-AOCs A-1 and A-12), AOC-B (composed of sub-AOCs B-2, B-3, B-4, B-18, and B-35), AOC #5, AOC #6, AOC #7, AOC #13, AOC #14, AOC #16, AOC #19, AOC #22, AOC #23, AOC #26, AOC #29, AOC #30, and AOC #44.

15.  A brief description and dates of operation of the AOCs and sub-AOCs to be investigated are set forth below in numerical sequence by AOC number.  The locations of these AOCS and sub-AOCs are set out on a map of the Site attached to this Consent Order as Figure 2.

9

### 15.1  Sub-AOC A-1

Sub-AOC A-1 is an area located west of Building #8 where untreated process wastewaters, wastewater processed through the water treatment plant, regenerate waste, and cyanide wastewaters were released to pits and to the ground surface.  Portions of Sub-AOC A-1 are located beneath the 100,000 gallon equalization tank and lined lagoon, and Building #10.  This Sub-AOC was in use sometime after startup of the wastewater treatment operation in 1973 until replacement of the initial treatment facility in 1981.

### 15.2  Sub-AOC B-2

Sub-AOC B-2 is an area located south of Building #6.  This Sub-AOC was used from 1973 to 1984, and received Releases containing metal sludge and wastewater associated with a wet scrubber system and Releases from Sub-AOC B-18.  The wet scrubber system was replaced in 1984 by a baghouse system.

### 15.3  Sub-AOC B-3

Sub-AOC B-3 is an area or leach field which is located south of Building #6.  This sub-AOC was first used for operations in Building #6, constructed in 1966.  Discharges to this sub-AOC ceased in 1976.  Waste streams containing wastewaters from trenches in a melt room and blowdown from boilers were discharged onto the ground surface and/or the leach field.

### 15.4  Sub-AOC B-4

Sub-AOC B-4 is an area located south of Building #3 which was used from 1973 to 1984. Metal sludge and wastewater were released onto the ground surface from two (2) wet scrubbers. The wet scrubbers were replaced by baghouses in 1984.

### 15.5  AOC #5

AOC #5 is an area, pit or pond located beneath the northwest corner of what is now Building #8. This area was first used by operations in Buildings #5 and #6 constructed in 1966. Discharges to this area ceased in 1972. Cooling, annealing and acid cleaning wastewaters contaminated with metals were discharged onto the ground. AOC #5 also includes an area where an above floor degreaser was operated in Building #8, directly overlapping the area described above. Building #8 was constructed in 1972.

### 15.6  AOC #6

AOC #6 is an area located under the southwest corner of what is now Building #8. This area was first used by operations in Buildings #5 and #6, constructed in 1966. Discharges to AOC #6 ceased in 1972. Wastewaters from metal cleaning operations were released onto the ground.

### 15.7  AOC #7

AOC #7 was used as an outdoor waste storage area from sometime after the Facility began operations in 1957 until 1983. This AOC is located in the vicinity of Buildings #9 and #12. Waste oils, chlorinated solvents, corrosive wastes,

and scrubber and wastewater treatment sludges were stored in various types of containers, including drums.  In 1960, cooling water from the Nuclear Division was disposed of in the courtyard.  To alleviate a problem of ponding and rusting of barrels containing metal scrap, a trench was dug in 1960 to carry the water across the yard to Turnpike Lake.  Prior to 1972, the area was graded to allow drainage to the Lake. Prior to 1972, oils from drums were observed by Facility personnel draining toward the Lake.

### 15.8  Sub-AOC A-12

Sub-AOC A-12 is a former waste storage area that was used from sometime after the wastewater treatment facility began operations in 1972 until 1980.  This sub-AOC is located beneath what is now the north end of Building #10.  The area was used for the above-ground storage of wastes in containers including spent carbon, spent resins and spent filter sand from the wastewater treatment plant, waste acids and alkalis, and waste oils.  One 1,000 gallon above-ground tank was used to store waste oil, and one 4,000 gallon underground concrete tank was used for storing regenerate wastes.  The 4,000 gallon underground storage tank was removed prior to construction of the north end addition to Building #10.

### 15.9  AOC #13

AOC #13 consists of the surface waters of Turnpike Lake and the near shore sediments and shoreline of Turnpike Lake which abut the Facility.  Releases of Hazardous Wastes and/or

12

Hazardous Constituents to the Lake or Lake shoreline have occurred from AOCs at the Facility. Roof drains from Buildings #1, #2, #5, #6, #7, and #9 discharged to the south embayment of Turnpike Lake and stormwater discharges from the roof drains contained heavy metals.

### 15.10  AOC #14

AOC #14 is an area located under what is now Building #8. This area was used from sometime after Building #5 was constructed in 1966 until 1972. Wastewater from various metal cleaning operations was discharged into a leachfield.

### 15.11  AOC #16

AOC #16 consists of a wastewater disposal system which is comprised of two cesspits and an associated leachfield, which were used from 1957 to 1976. At various times, this AOC received wastewaters from the wire melt room, personnel cleanup wastes from a locker room, wastes from an assay laboratory, and treated wastewaters generated during the fabrication of uranium fuel elements.

### 15.12  Sub-AOC B-18

Sub-AOC B-18 is an underground storage tank located south of Buildings #6 and #7 which was constructed in 1976 and is still in use. The 1,000 gallon tank is used to collect cooling tower bleed-off, scrubber bleed-off, boiler blowdown and contact cooling wastewaters for direct pumping to the wastewater treatment plant. The tank has overflowed in the past in the area identified as Sub-AOC B-2 and entered

13

Turnpike Lake.  Pumps and pipes were replaced in 1981 to prevent any such Releases.

15.13  AOC #19

AOC #19 is a small building adjoining Building #7 set approximately four feet below ground level.  The building contains a grease trap which treats contact cooling water generated by the rolling mill.  A sump pump located in the building discharged water contaminated with oil (and potentially with metals) to the ground surface outside the building wall.

15.14  AOC #22

AOC #22 is a dry well located under the northeast corner of Building #9 which was used from sometime after the Facility began operations in 1957 until 1977.  The dry well received unknown quantities of steam condensate from a sump containing two (2) steam-heated vapor degreasers.  Halogenated solvent residues may have been present in this condensate.  AOC #22 is a potential source of volatile organic compounds found in Ground Water.

15.15  AOC #23

AOC #23 consists of an operational storm drain and leachfield which is located north of Building #1.  Engelhard's records do not indicate when the storm drain and leachfield were constructed.  Currently, the AOC receives runoff from a paved area.  At one time it received floor spillage from the lower boiler room in Building #1 which included spillage from a

14

process wastewater tank located in the area.

### 15.16   AOC #26

AOC #26 consists of a 22-foot long by 2-foot wide concrete trench which served as a housing for process piping in Building #1.  In 1989, Engelhard employees reported that wastewater had leaked from this piping and trench.  The piping connected aqueous acid/alkali cleaning tanks with a drain that leads to the wastewater treatment system.

### 15.17   AOC #29

AOC #29 consists of a former above-floor degreaser located in Building #8 in the north central portion of the Facility. Building #8 was constructed in 1972.

### 15.18   AOC #30

AOC #30 consists of a former deg aaser pit located in the floor of Building #6.  Building #6 was constructed in 1966. The degreaser is a potential source of volatile organic compounds found in soil gas in this area.

### 15.19 Sub-AOC B-35

Sub-AOC B-35 is a non-operational dust collector located on a concrete pad at the southwest corner outside of Building #7.  This dust collector may have been a source of Release of metals to soils.

### 15.20   AOC #44

AOC #44 is an unlined storm water basin located northwest of Building #10.  The basin receives storm water from the roof of Building #8, constructed in 1972.

15

16.  Therefore, EPA believes there is a need to obtain further
     information to identify and evaluate the nature and extent
     of Releases of Hazardous Wastes and/or Hazardous
     Constituents from the AOCs and sub-AOCs identified above, to
     identify and assess any adverse environmental and/or public
     health effects at the Facility and off-site, to implement
     specific Stabilization measures as described herein and to
     implement other interim measures, if necessary.

## DETERMINATIONS

The Determinations set forth below are those of EPA only.
Based upon the contents of the Administrative Record and the
aforementioned information contained in the Findings above, EPA
has determined, pursuant to Section 3008(h) of RCRA, that:

1.  Engelhard is a "person" within the meaning of Section
    1004(15) of RCRA, 42 U.S.C. § 6903(15).

2.  Engelhard owns and operates the Facility.

3.  The Facility was authorized, at all times relevant to this
    Consent Order, to operate under Section 3005(e) of Subtitle
    C of RCRA, 42 U.S.C. § 6925(e), and Massachusetts General
    Laws ch. 21C.

4.  Some of the waste streams generated from manufacturing
    processes at the Facility were hazardous as defined in
    Section 1004(5) of RCRA, 42 U.S.C. § 6903(5).

5.  The methods and practices of Hazardous Waste management
    employed by Engelhard at the Facility have resulted in
    Releases of Hazardous Waste and Hazardous Constituents into

the environment.

6.  Hazardous Wastes and/or Hazardous Constituents which have been released at the Facility have migrated and may still be migrating to the Ground Water, soils, surface waters and sediments at or in the vicinity of the Facility.  Therefore, EPA has determined that further investigation of these media should be conducted.

7.  The response measures to be conducted by Engelhard pursuant to this Consent Order are necessary for the purpose of protecting human health and the environment.

### CONSENT AGREEMENT

1.  EPA and Engelhard have agreed to enter into this Consent Order in settlement of this matter without adjudication of any issue of fact or law.

2.  For purposes of this Consent Order and any action to enforce the terms of this Consent Order, Engelhard admits to the jurisdiction of EPA to require the actions agreed to herein under the authority of RCRA, 42 U.S.C. § 6901 <u>et</u> <u>seq</u>.

3.  EPA and Engelhard agree that the Findings and requirements of this Consent Order, and any actions taken pursuant hereto, do not constitute any admission of fact or law or liability by Engelhard as to any issue raised, except that Engelhard agrees that this Consent Order shall be admissible as evidence in any proceeding brought by EPA to enforce the terms and requirements of this Consent Order.

17

4.  Engelhard agrees to comply with the terms of this
    Consent Order.

5.  Engelhard waives its right to a hearing on any issue of fact
    or law or requirements set forth in this Consent Order.
    Engelhard also waives its right to challenge any decisions
    made by the Director pursuant to this Consent Order, except
    as provided in the Dispute Resolution Section below, or as
    provided by applicable law.

6.  Based upon the information known by EPA at the time of the
    signing of this Consent Order, EPA and Engelhard agree that
    further investigation of the AOCs listed in the RFA, but not
    specifically identified herein, is not necessary.  However,
    if, at any time, EPA, Engelhard or its contractors obtains
    or becomes aware of any new or additional information
    concerning Releases or threatened Releases of Hazardous
    Waste and/or Hazardous Constituents at or from any of the
    AOCs which are not currently being investigated pursuant to
    this Consent Order, EPA may require further investigation of
    those AOCs.  In addition, Engelhard agrees to investigate
    any previously unidentified AOCs which are identified
    pursuant to this Consent Order and which require
    investigation, as determined by EPA.

I.  **STABILIZATION PLAN**

    Introduction

    Within ninety (90) days after the effective date of this
    Consent Order, Engelhard shall submit a Stabilization Plan

Pages 19 through 106 of the Order and have been intentionally left out of this Exhibit 1.  Those pages set forth, *inter alia*, the corrective action requirements that Engelhard Corporation is obligated to perform under the Order. Those pages will be provided to the Court upon its request.

Order.  Information claimed to be confidential shall be afforded the protection specified at 40 C.F.R. Part 2, Subpart B.  If no such claim accompanies any information submitted to EPA, such information may be made available to the public without further notice to Engelhard.  Engelhard shall not assert a confidentiality claim regarding any hydrogeological or analytical data generated pursuant to this Consent Order.

4.  Engelhard shall submit, when due, to the EPA Project Manager, a total of seven (7) bound copies and one (1) unbound copy of each submittal required under this Consent Order.  Such submittals shall be mailed to:

> U.S. Environmental Protection Agency
> Region I
> J.F. Kennedy Federal Building
> Boston, Massachusetts 02203
> Attention: Project Manager

5.  The tabulated validated data for any submittals shall be made available to EPA upon request in a mutually agreed upon format including, if requested, computer readable files in a mutually agreed upon format.

XVII. RESERVATION OF RIGHTS AND NON-RELEASE OF OTHER CLAIMS

1.  Nothing contained in this Consent Order shall be construed to prevent EPA from seeking legal or equitable relief to enforce the terms of this Consent Order or from taking other actions it deems necessary to protect human health and the environment.  These

107

actions include, but are not limited to, seeking
further enforcement in Federal District Court pursuant
to Section 3008(h)(2) of RCRA, if Engelhard fails to
comply with the requirements of this Consent Order
within the time frames specified.  Pursuant to that
Section, EPA may seek penalties of up to $25,000 for
each day of non-compliance.

2.    EPA reserves the right to expend and recover funds
under the Comprehensive Environmental Response,
Compensation and Liability Act (CERCLA); to bring
"imminent and substantial endangerment" actions under
RCRA Section 7003 and/or CERCLA Section 106; to assess
penalties for violations of and to require compliance
with RCRA requirements under Section 3008(a); to
address Releases other than those identified in this
Consent Order; to require further study or action under
Section 3008(h) of RCRA, as necessary, to respond to
any Releases from the Facility, including those
addressed in this Consent Order, to protect human
health and the environment; and to bring actions as
appropriate under any of the other authorities
administered by EPA.  EPA also reserves the right to
bring actions against non-parties, if appropriate.

3.    EPA reserves the right to perform any portion of the
work agreed to herein or any additional Site
characterization, any response/corrective actions it

108

deems necessary to protect human health or the environment. EPA reserves the right to seek reimbursement from Engelhard for such additional costs incurred by the United States. Notwithstanding compliance with the terms of this Consent Order, Engelhard is not released from any liability for the costs of any response actions taken by EPA.

4. Compliance by Engelhard with the terms of this Consent Order shall not relieve Engelhard of its obligations to comply with RCRA or any other applicable local, state, or federal law.

5. Nothing in this Consent Order shall constitute or be construed as a release from any claim, cause of action or demand in law or equity against any person, firm, partnership, or corporation not a signatory to this Consent Order for any liability it may have arising out of or relating in any way to the generation, storage, treatment, handling, transportation, Release, or disposal of any Hazardous Constituents, hazardous substances, Hazardous Wastes, pollutants, or contaminants found at, taken to, or taken from the Facility.

## XVIII. NO PREAUTHORIZATION OF FUNDING

Nothing in this Consent Order shall be deemed to constitute any approval or denial of preauthorization of funds under Section 111(a)(2) of CERCLA, 42 U.S.C. § 9611(a)(2).

109

XIX. <u>OTHER APPLICABLE LAWS</u>

All actions required to be taken pursuant to this Consent Order shall be undertaken in accordance with the requirements of all applicable local, state and federal laws and regulations.

XX. <u>INDEMNIFICATION OF THE UNITED STATES GOVERNMENT</u>

1.  To the extent permitted by law, Engelhard agrees to indemnify and save and hold harmless the United States Government and its agencies, departments, agents and employees, from any and all claims or causes of action arising from or on account of acts or omissions of Engelhard or its agents, independent contractors, receivers, trustees, and assigns in carrying out activities required by this Consent Order.

2.  This indemnification shall not be construed in any way as affecting or limiting the rights or obligations of Engelhard or the United States under their various contracts.  Nor shall this indemnification be construed as requiring Engelhard to indemnify and save and hold harmless the United States Government, its agencies, departments, contractors, agents, or employees from any and all claims or causes of action arising from willful acts or omissions of the United States Government, its agencies, departments, contractors, agents, or employees.

110

## XXI. FINANCIAL ASSURANCE

1. Within thirty (30) days after Engelhard receives written notice of EPA approval of the RFI Proposal in accordance with Section VI above, Engelhard shall provide financial assurance for the performance of the work required under this Consent Order using one or more of the mechanisms allowable under 40 C.F.R. § 265.143(c),(d),(e) or (f). If Engelhard fails to perform any of the terms or conditions of this Consent Order, the financial assurance shall be available to EPA to perform such terms or conditions of this Consent Order provided that, prior to drawing upon any financial assurance instrument, EPA shall notify Engelhard, in writing, of the alleged failure to perform and provide Engelhard with a reasonable period of not less than fifteen (15) days in which to remedy the alleged non-performance.

2. Each year, on the anniversary of the provision of financial assurance, Engelhard shall adjust the amount of financial assurance to reflect the approved completion of construction items and/or any other factors that may bear on the cost of the yet-to-be-completed work that is required under this Consent Order.

## XXII. SUBSEQUENT MODIFICATION

1. This Consent Order may be amended. Any amendment shall

111

be in writing and shall be effective on the date on which it is signed by EPA and Engelhard.

2. EPA may, within its discretion, extend approved schedules or deadlines under this Consent Order whenever it deems such extensions appropriate.

3. Any reports, plans, specifications, schedules and attachments or modifications thereto required by this Consent Order are, upon approval by EPA, incorporated into this Consent Order. Any noncompliance with such EPA approved reports, plans, specifications, schedules and attachments shall be considered a failure to achieve the requirements of this Consent Order and may subject Engelhard to the assessment of penalties of up to 25,000 dollars per day, pursuant to Section 3008(h)(2) of RCRA, 42 U.S.C. § 6928(h)(2).

4. No informal advice, guidance, suggestions, or comments by EPA regarding reports, plans, specifications, schedules or any other writing submitted to Engelhard will be construed as relieving Engelhard of its obligation to obtain written approval, if and when required by this Consent Order.

XXIII. INCORPORATION AND ENFORCEABILITY OF DOCUMENTS

All attachments and appendices to this Consent Order shall be deemed incorporated into, and made an enforceable part of, this Consent Order.

**XXIV.** **TERMINATION AND SATISFACTION**

The provisions of this Consent Order shall be deemed satisfied upon Engelhard's receipt of written notice from EPA that Engelhard has demonstrated, to the satisfaction of EPA, that the terms of this Consent Order, including any amendments, have been satisfactorily completed.  EPA shall issue such notice after receipt of notice from Engelhard that it has completed the requirements of this Consent Order.

**XXV.** **SEVERABILITY**

If any provision of this Consent Order, or the application of this Consent Order to any party or circumstances is held to be invalid by any judicial or administrative authority, the application of such provisions to other parties or circumstances and the remainder of the Consent Order shall remain in force and shall not be affected thereby.

**XXVI.** **SURVIVABILITY/PERMIT INTEGRATION**

Subsequent to the issuance of this Consent Order, a RCRA permit may be issued to the Facility incorporating the requirements of this Consent Order by reference into the permit.

Any requirements of this Consent Order shall not terminate upon the issuance of a RCRA permit unless the requirements are expressly replaced by the requirements in the permit.

113

## XXVII. <u>EPA REVIEW AND APPROVAL PROCESS</u>

1. After review of any proposal, plan (except for certain Stabilization plans detailed in Sections I, II and III and the Health and Safety Plan detailed in Section V), report or other item (submission) required by this Consent Order, the Director shall either:

   a. Approve, in whole or in part, the submission;

   b. Approve, in whole or in part, the submission with conditions and/or modifications;

   c. Disapprove, in whole or in part, the submission, notifying Engelhard of deficiencies;

   d. Direct that Engelhard modify the submission to cure the deficiencies; or,

   e. Any combination of the above.

   If the Director approves, conditionally approves, or modifies the submission, Engelhard shall proceed to take the action(s) required by the submission, as approved or as consistent with the terms of the conditional approval or modification.

2. If the Director disapproves the submission, the Director shall specify the deficiencies, in writing, and establish a time frame within which Engelhard shall resubmit the proposal, plan, report or other item required by the Consent Order to the Director.

3. If, after resubmission, the Director disapproves the proposal, plan, report or other item required by the

114

Consent Order, the Director may, within his/her discretion, either require Engelhard to make further modification(s) or make such modification(s) as he/she deems necessary to satisfy the requirements of the Consent Order.  In the event that the Director makes such modification(s), the modified submission becomes the approved submission.

4.   Initiation of any phase of this Consent Order may be commenced by receipt of notice to such effect from EPA and is not necessarily dependant upon approval of any prior phase.  All deliverables, except as otherwise provided herein, are subject to the review and approval provisions set forth in this Section XXVII and all deliverables are subject to the Dispute Resolution provisions set forth in Section XXX of this Consent Order.

XXVIII.  **STIPULATED PENALTIES**

1.   Engelhard agrees to take all measures necessary to perform its obligations under this Consent Order.  If Engelhard fails to take or complete any of the actions specified in subsections a. through m. below, within the time periods contained in or approved pursuant to this Consent Order, Engelhard shall pay stipulated penalties in the amounts listed in Paragraph 2 below, unless Engelhard has been prevented or delayed from so acting by a "Force Majeure" event as determined by EPA,

and as specified in Section XXIX below:

a.  Submittal of the Stabilization Plan, Conceptual Designs, Confirmatory Sampling Plans, or Operation and Maintenance Plans for Stabilization Measures, Final Designs for Stabilization Measures or Stabilization Reports in accordance with Sections I-IV of this Consent Order.

b.  Submittal of the RFI Proposal in accordance with Section V of this Consent Order;

c.  Submittal of the Phase I Interim Report and Phase II Proposal in accordance with Section VII of this Consent Order;

d.  Submittal of the RFI Report in accordance with Section IX of this Consent Order;

e.  Submittal of the Media Protection Standards Proposal in accordance with Section XI of this Consent Order;

f.  Submittal of any supplemental RFI reports required under Section IX of this Consent Order;

g.  Submittal of an Interim Measures Plan or Report, if required under Section XII of this Consent Order;

h.  Submittal of any modified reports or proposals required under this Consent Order;

i.  Failure to comply with the Site access provisions of Section XV of this Consent Order;

116

j.    Failure to comply with the financial assurance provisions of Section XXI of this Consent Order;

k.    Failure to begin construction for Stabilization Measures;

l.    Failure to begin operation of Stabilization Measures; or

m.    Failure to achieve the following Stabilization performance standards:

For soils at AOC B:  the specific performance standards approved by EPA, only after an additional Stabilization measures workplan has been implemented;

For roof drain runoff at AOC #13:  the specific performance standards approved by EPA, only after an additional Stabilization measures workplan has been implemented;

For contaminated Ground Water migrating from the Facility:  the general performance standard in paragraph I.A.3.a. and the specific performance standards approved by EPA, only after an additional Stabilization measures workplan has been implemented; or

For public access at AOC #13:  the general performance standards.

2.    For any violation of the requirements listed in Paragraph 1 above, Engelhard shall pay stipulated

117

penalties in the following amounts, according to the provisions in Paragraph 5 below:

| Amount/Day | Period of Noncompliance |
|---|---|
| $2,500 | 1st through 7th calendar day |
| $3,750 | 8th through 14th calendar day |
| $5,000 | 15th calendar day and beyond |

3. If Engelhard fails to complete any Phase I and/or Phase II tasks in accordance with the schedules approved pursuant to Sections V. and VII. above, Engelhard shall pay, upon written demand by the Director, $1,000 for each and every day of such noncompliance into an escrow account. The escrow account shall be administered by a neutral third party and shall be payable, with interest, upon demand by Engelhard. Engelhard shall demand payment of any funds in the escrow account only after having submitted the RFI Report in accordance with Section IX above. Engelhard shall then distribute such funds in accordance with the following provisions:

a. If Engelhard meets the deadline(s) for the Phase I Report and Phase II Proposal and/or the RFI Report established in Sections VII and IX, respectively, any amounts in the escrow account associated with the met deadline(s) shall be retained by Engelhard.

b. If Engelhard misses the deadline(s) for the Phase I Report and Phase II Proposal and/or the RFI

118

Report, any amounts in the escrow account
associated with the missed deadline(s) shall be
paid to the United States as provided in paragraph
5 below.

4.   If Engelhard fails to comply with the requirements
specified below, within the applicable time periods,
Engelhard shall pay stipulated penalties in the amount
of $1,000 for each and every day of such non-
compliance:

    a.   Failure to submit progress reports on
        schedule;

    b.   Failure to comply with the requirements of
        Section XIV (Sampling); or

    c.   Failure to comply with Section XVI (Retention
        and Availability of Information).

5.   Stipulated penalties under this Section shall be paid
to the United States within thirty (30) days after
written demand by EPA.  Payments owed to EPA under this
Section shall be paid by cashier's or certified check,
payable to the Treasurer, United States of America.
Engelhard shall note on this check the docket number of
this Consent Order.  The check shall be sent to:

        EPA - Region I
        P.O. Box 36019M
        Pittsburgh, PA  15251

At the time of payment, Engelhard shall send a notice
of such payment to the Regional Hearing Clerk at:

119

U.S. Environmental Protection Agency
JFK Federal Building, RCG
Boston, MA  02203
ATTN:  Regional Hearing Clerk

6.    The stipulated penalties set forth in this Section do
      not preclude EPA from pursuing any other remedies or
      sanctions which may be available to EPA by reason of
      Engelhard's failure to comply with any of the
      requirements of this Consent Order, nor shall payment
      of said penalties relieve Engelhard of the
      responsibility to comply with the requirements of this
      Consent Order.

7.    For purposes of Paragraph 1 above, Engelhard's failure
      in the initial submittal of any proposal and/or report
      required herein to address in good faith any
      specifically required component of that proposal and/or
      report shall constitute a violation of this Consent
      Order.

8.    For purposes of Paragraph 1 above, if after the
      Director has approved any proposal and/or report with
      conditions or disapproved any proposal and/or report
      and specified the deficiencies therein, Engelhard
      thereinafter fails to submit a modified proposal and/or
      report within the specified timeframe which
      satisfactorily addresses the specified conditions or
      deficiencies, such failure shall constitute a violation
      of this Consent Order.

9.    Issuance and receipt of a notice of noncompliance is

120

## XXIX. FORCE MAJEURE

1.  Engelhard shall perform all requirements under this
    Consent Order within the time limits specified,
    approved, or established herein.  However, if any
    circumstance arises which has caused or will cause a
    delay in meeting the time limits or schedules for
    performance of any of the requirements, Engelhard shall
    submit written notification to EPA no later than ten
    (10) days after the date Engelhard first concludes that
    such circumstance has caused or will cause a delay or
    prevents Engelhard from meeting the time limits or
    approved schedules.  Engelhard shall describe in detail
    the length or anticipated length of the delay or
    circumstance which prevents performance, the measures
    taken or to be taken to prevent or minimize the delay
    or circumstance which prevents performance, and the
    schedule for implementation of the measures to be
    taken.  Engelhard shall take all efforts to prevent or
    minimize any delay and to eliminate any circumstance
    which prevents or might prevent the requirements under
    this Consent Order from being performed.  Failure to
    notify EPA in writing within ten (10) days of first
    conclusion by Engelhard that performance of any
    requirement is prevented or of any such actual or
    anticipated delay, shall constitute a waiver of any
    "Force Majeure" claim.

2.   If the delay in meeting the time limit or approved
     schedule for performance of the requirements specified
     herein will be or has been caused by an act of God,
     fire, flood or vandalism, or other circumstance beyond
     the control of Engelhard or its contractors,
     subcontractors, or laboratories, then the deadline for
     that measure shall be extended for a period required to
     compensate for the delay, but in no event shall that
     extension be longer than the delay actually caused by
     such circumstance.  By way of illustration, and without
     limiting the generality of the foregoing, examples of
     potential "Force Majeure" events under this section
     include extreme weather, unforeseeable geologic
     conditions, or equipment failure not reasonably
     foreseeable or preventable.  In the event that the
     parties agree that a delay is or was warranted, the
     parties shall stipulate to an extension of the
     particular deadline affected and, if necessary, any
     succeeding deadline affected by such delay.  In the
     event that the parties cannot agree as to whether a
     delay is or was warranted, such disagreement shall be
     subject to the Dispute Resolution provisions of this
     Consent Order, and Engelhard shall demonstrate that the
     event was a "Force Majeure" event, that the delay was
     caused by the "Force Majeure" event, and that the
     duration of the delay is or was warranted under the

123

circumstances.

3. Financial or economic conditions, or changes in the same, or increased costs or expenses associated with the implementation of actions called for by this Consent Order shall not constitute a "Force Majeure" event.

## XXX. DISPUTE RESOLUTION

1. In the event that Engelhard disagrees, in whole or in part, with EPA's disapproval or modification of any submission or any other decision or directive made by EPA pursuant to this Consent Order, Engelhard shall notify EPA of its objections by providing EPA with a written statement of position within fourteen (14) days of receipt of EPA's disapproval or modification or any other decision or directive. Engelhard's statement of position shall set forth the specific matters in dispute, the position that Engelhard asserts should be adopted as consistent with the requirements of this Consent Order, the basis for Engelhard's position, and shall include any supporting documentation.

2. EPA and Engelhard shall have an additional fourteen (14) days from EPA receipt of Engelhard's statement of position to meet or confer to attempt to resolve the dispute. If agreement is reached, the resolution shall be reduced to writing, signed by representatives of each party and incorporated into this Consent Order.

124

Engelhard shall implement the same in accordance with such agreement.

3. If EPA and Engelhard are not able to reach agreement within the fourteen (14) day period, the Director of the Waste Management Division will thereafter notify Engelhard, in writing, of his decision on the dispute and Engelhard shall comply with the terms and conditions of EPA's decision on the dispute.  The decision shall be incorporated into this Consent Order and any requirements thereof shall be considered to be requirements of this Consent Order.

4. Notwithstanding the invocation of this dispute resolution procedure, Engelhard shall proceed, at the direction of EPA, to take any action required by those portions of the submission and of the Consent Order that EPA determines are not substantially affected by the dispute.

5. The time periods established within paragraphs 1 and 2 above, may be extended by EPA upon notice to Engelhard or, at EPA's discretion, upon the request of Engelhard where good cause is shown.

125

**XXXI. EFFECTIVE DATE**

This Consent Order shall become effective on the date it is
signed by the Regional Administrator.


Date: 9/9/93

Merrill S. Hohman
Director
Waste Management Division
U.S. Environmental Protection
Agency


Date: 9/7/93

Andrea Simpson
Assistant Regional Counsel
U.S. Environmental Protection
Agency


Date: 27 August '93

Durland Evans
Vice President and General Manager
EMG North America
Engelhard Corporation


IT IS SO ORDERED.

Paul G. Keough
Acting Regional Administrator, Region I
U.S. Environmental Protection Agency

Sept 9, 1993
Date


126

# EXHIBIT 2

# STATUTORY ADDENDUM

# INDEX TO STATUTORY ADDENDUM

**RCRA Section 3008(h),**
42 U.S.C. § 6928(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**CERCLA Section 107(a),**
42 U.S.C. § 9607(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**CERCLA Section 113(f)(1),**
42 U.S.C. § 9613(f)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**CERCLA Section 113(f)(2),**
42 U.S.C. § 9613(f)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**CERCLA Section 113(f)(3),**
42 U.S.C. § 9613(f)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**CERCLA Section 113(g)(1),**
42 U.S.C. § 9613(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**CERCLA Section 113(g)(2),**
42 U.S.C. § 9613(g)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**CERCLA Section 113(g)(3),**
42 U.S.C. § 9613(g)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

# RCRA Section 3008(h)
## (42 U.S.C. § 6928(h))

**§6928.        Federal enforcement**

\* \* \*

**(h) Interim status corrective action orders**

 **(1)** Whenever on the basis of any information the Administrator determines that there is or has been a release of hazardous waste into the environment from a facility authorized to operate under section 6925(e) of this title, the Administrator may issue an order requiring corrective action or such other response measure as he deems necessary to protect human health or the environment or the Administrator may commence a civil action in the United States district court in the district in which the facility is located for appropriate relief, including a temporary or permanent injunction.

 **(2)** Any order issued under this subsection may include a suspension or revocation of authorization to operate under section 6925(e) of this title, shall state with reasonable specificity the nature of the required corrective action or other response measure, and shall specify a time for compliance.  If any person named in an order fails to comply with the order, the Administrator may assess, and such person shall be liable to the United States for, a civil penalty in an amount not to exceed $25,000 for each day of noncompliance with the order.

# CERCLA Section 107(a)
## (42 U.S.C. § 9607(a))

**§ 9607.    Liability**

**(a) Covered persons; scope; recoverable costs and damages; interest rate; "comparable maturity" date**

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

**(1)** the owner and operator of a vessel or a facility,

**(2)** any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

**(3)** any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

**(4)** any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

**(A)** all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

**(B)** any other necessary costs of response incurred by any other person consistent with the national contingency plan;

**(C)** damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

[Continued ..... ]

- 2 -

# CERCLA Section 107(a)

## (42 U.S.C. § 9607(a))

[. . . Continued]

      **(D)** the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

The amounts recoverable in an action under this section shall include interest on the amounts recoverable under subparagraphs (A) through (D). Such interest shall accrue from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned. The rate of interest on the outstanding unpaid balance of the amounts recoverable under this section shall be the same rate as is specified for interest on investments of the Hazardous Substance Superfund established under subchapter A of chapter 98 of Title 26. For purposes of applying such amendments to interest under this subsection, the term "comparable maturity" shall be determined with reference to the date on which interest accruing under this subsection commences.

# CERCLA Section 113(f)(1)
## (42 U.S.C. § 9613(f)(1))

**§ 9613.    Civil proceedings**

* * *

**(f) Contribution**

**(1) Contribution**

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title.

# CERCLA Section 113(f)(2)
## (42 U.S.C. § 9613(f)(2))

**§ 9613.    Civil proceedings**

\* \* \*

**(f) Contribution**

\* \* \*

### (2) Settlement

A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

# CERCLA Section 113(f)(3)
## (42 U.S.C. § 9613(f)(3))

**§ 9613.    Civil proceedings**

* * *

**(f) Contribution**

* * *

### (3) Persons not party to settlement

**(A)** If the United States or a State has obtained less than complete relief from a person who has resolved its liability to the United States or the State in an administrative or judicially approved settlement, the United States or the State may bring an action against any person who has not so resolved its liability.

**(B)** A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to in paragraph (2).

**(C)** In any action under this paragraph, the rights of any person who has resolved its liability to the United States or a State shall be subordinate to the rights of the United States or the State. Any contribution action brought under this paragraph shall be governed by Federal law.

# CERCLA Section 113(g)(1)
## (42 U.S.C. § 9613(g)(1))

**§ 9613.    Civil proceedings**

\* \* \*

**(g) Period in which action may be brought**

### (1) Actions for natural resource damages

Except as provided in paragraphs (3) and (4), no action may be commenced for damages (as defined in section 9601(6) of this title) under this chapter, unless that action is commenced within 3 years after the later of the following:

**(A)** The date of the discovery of the loss and its connection with the release in question.

**(B)** The date on which regulations are promulgated under section 9651(c) of this title.

With respect to any facility listed on the National Priorities List (NPL), any Federal facility identified under section 9620 of this title (relating to Federal facilities), or any vessel or facility at which a remedial action under this chapter is otherwise scheduled, an action for damages under this chapter must be commenced within 3 years after the completion of the remedial action (excluding operation and maintenance activities) in lieu of the dates referred to in subparagraph (A) or (B). In no event may an action for damages under this chapter with respect to such a vessel or facility be commenced (i) prior to 60 days after the Federal or State natural resource trustee provides to the President and the potentially responsible party a notice of intent to file suit, or (ii) before selection of the remedial action if the President is diligently proceeding with a remedial investigation and feasibility study under section 9604(b) of this title or section 9620 of this title (relating to Federal facilities). The limitation in the preceding sentence on commencing an action before giving notice or before selection of the remedial action does not apply to actions filed on or before October 17, 1986.

# CERCLA Section 113(g)(2)
## (42 U.S.C. § 9613(g)(2))

### § 9613.    Civil proceedings

* * *

### (g) Period in which action may be brought

* * *

### (2) Actions for recovery of costs

An initial action for recovery of the costs referred to in section 9607 of this title must be commenced—

> **(A)** for a removal action, within 3 years after completion of the removal action, except that such cost recovery action must be brought within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) of this title for continued response action; and

> **(B)** for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

In any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages. A subsequent action or actions under section 9607 of this title for further response costs at the vessel or facility may be maintained at any time during the response action, but must be commenced no later than 3 years after the date of completion of all response action. Except as otherwise provided in this paragraph, an action may be commenced under section 9607 of this title for recovery of costs at any time after such costs have been incurred.

# CERCLA Section 113(g)(3)
## (42 U.S.C. § 9613(g)(3))

**§ 9613.     Civil proceedings**

\* \* \*

**(g) Period in which action may be brought**

\* \* \*

### (3) Contribution

No action for contribution for any response costs or damages may be commenced more than 3 years after—

    **(A)** the date of judgment in any action under this chapter for recovery of such costs or damages, or

    **(B)** the date of an administrative order under section 9622(g) of this title (relating to de minimis settlements) or 9622(h) of this title (relating to cost recovery settlements) or entry of a judicially approved settlement with respect to such costs or damages.